# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT L. WIGGINS, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:12-cv-02705-SGC |
| | ) | |
| FDIC, as Receiver of Superior | ) | |
| Bank, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER REGARDING
## THE FDIC'S MOTION TO STRIKE AND MOTION FOR SUMMARY
## JUDGMENT[1]

This case is before the court on defendant Federal Deposit Insurance Corporation's ("FDIC") (1) motion to strike the declaration of Robert L. Wiggins, Jr. (Doc. 271) and (2) motion for summary judgment on Plaintiffs' Second Amended Complaint (Doc. 224). The FDIC moves this court to enter an order dismissing all claims against it pursuant to Rule 56 of the *Federal Rules of Civil Procedure*. (*Id.*). The motions are fully briefed and ripe for review. (Docs. 224, 225, 265, 270, 271, 300, 304). After careful consideration of the parties' briefing and for the reasons discussed below, the court finds the FDIC's motion to strike, construed as objections

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States magistrate judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 193).

to evidence disputing summary judgment,[2] is due to be sustained in part and overruled in part, and the FDIC's motion for summary judgment is due to be granted.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This action arises from a long series of loans and real estate transactions between the parties. Plaintiffs, Robert L. Wiggins, Jr. ("Wiggins"), and Wolf Pup, LLC ("Wolf Pup"), (collectively, "Plaintiffs"), financed the purchase and construction of a real estate development in Baldwin County, Alabama through a loan with Superior Bank ("Superior"). Plaintiffs then sold the property to defendant Character Counts, LLC ("CCLLC"), a single asset entity owned by defendant Frank P. Ellis, IV ("Ellis"), and Joseph Scott Raley ("Raley"). CCLLC purchased the property from Plaintiffs by assuming their loan with Superior. Superior later sold the loan to Ellis, who financed his purchase of the loan with a personal loan from Superior. In connection with selling the original loan to Ellis, Superior paid down the outstanding balance on the loan by seizing money from accounts funded by Wiggins and Wolf Pup. Superior Bank failed, and the FDIC was named as its receiver.[3]

---

[2] *See infra* at 9-10.

[3] After Superior failed, defendant Cadence Bank ("Cadence") acquired Ellis's personal loan from Superior, and Cadence eventually reached a settlement agreement with Ellis regarding payment of his personal loan. Finally, Ellis foreclosed on the original loan and sold the property to defendant Trinity Retreat, LLC ("Trinity Retreat"), a single asset entity owned by Ellis's wife, defendant Mihyon Ellis ("Mihyon"). Trinity Retreat financed its purchase of the property with a loan from defendant Bryant Bank ("Bryant").

### A.    Superior Bank's Loan to Wolf Pup

Wolf Pup owned a 62-unit real estate development named Wolf Bay Landings in Baldwin County, Alabama (the "Property"), which was financed through a loan with Superior. (Doc. 94 at ¶ 1). Wolf Pup's loan with Superior involved several transactions in September and December 2005, and Wolf Pup's entire indebtedness to Superior was approximately $17.5 million (the "Loan"). (Doc. 94 at ¶ 1; Doc. 90-5 at 1). The Loan was secured by a mortgage on the Property and also by continuing guaranties from Wiggins and other people associated with Wolf Pup. (Doc. 90-5 at 1; Doc. 94 at ¶ 1).

### B.    CCLLC's Purchase of the Property and Assumption of the Loan

In 2007, Wolf Pup sold the Property to CCLLC, allowing Ellis and CCLLC to purchase the Property by assuming the Loan. (Doc. 94 at ¶ 2; Doc. 90-5). In connection with the sale of the Property, Wolf Pup, CCLLC, and Superior Bank executed a Loan Assumption and Modification Agreement (the "Modification Agreement"), which was dated October 5, 2007. (Doc. 94 at ¶ 3; Doc. 48-3).[4] The Modification Agreement states in part:

---

[4] Also in connection with the sale of the Property, Ellis, Raley, and Wolf Pup entered into a membership interest pledge agreement dated October 5, 2007 (the "Pledge Agreement"). (Doc. 48-2). In the Pledge Agreement, Ellis and Raley pledged their 100% membership interest in CCLLC to Wolf Pup, as security for their obligations under the loan documents. (*Id.* at ¶ 1). Additionally, the Pledge Agreement provided that Wolf Pup is entitled to attorneys' fees if it "initiate[s] litigation for the purposes of enforcing any of its rights [under the Pledge Agreement] or for the purposes of seeking damages [under the Pledge Agreement] . . . ." (*Id.* at ¶ 10).

3

> It is the intent of this instrument, and [Wolf Pup], [Superior], and CCLLC agree, that [Wolf Pup] shall remain liable under the Note and the other Loan Documents, and upon the occurrence of an Event of Default by CCLLC under the Note or the other Loan Documents, and in addition to [Superior]'s right to enforce the Loan Documents and pursue its remedies against CCLLC, [Superior] may enforce the terms of the Note against and collect the indebtedness evidenced by the Note from [Wolf Pup], all to the same extent as if this instrument had never been executed.

(Doc. 48-3 at 5). The Modification Agreement required Ellis to be added as a guarantor of the Loan, and Wiggins also agreed to remain a guarantor of the Loan. (*Id.* at 5-6, 9-10, 18-19).

The Modification Agreement also required Wolf Pup to establish an interest reserve account at Superior Bank in an amount not less than $560,000 (the "Interest Reserve Account") and gave Superior the right to debit the Account to make monthly interest payments and payment of Loan expenses under the Loan. (Doc. 48-3 at 7). Under the terms of the Modification Agreement, if Superior debited the Interest Reserve Account for payment of Loan interest and expenses, CCLLC had an obligation to deposit funds into the Interest Reserve Account within ten days to restore the balance of the Account to $560,000. (*Id.*).

Additionally, the Modification Agreement required that a $1.5 million certificate of deposit funded by Wiggins and assigned to Superior (the "Wiggins CD") would continue to secure the Loan. (Doc. 48-3 at 7). Under the Modification Agreement, Superior had the right to apply funds from the Wiggins CD toward

payment of the Loan in the event of a default that had not been cured within thirty days after notice of the default to CCLLC and Wolf Pup.  (*Id.*).

## C.     Ellis's Purchase of the Loan

After CCLLC assumed the Loan, Superior and CCLLC unilaterally extended the Loan's maturity date by entering into a Fourth Amendment to the loan documents.  (Doc. 94 at ¶ 17).  Plaintiffs did not know about or consent to the amendment to the Loan.  (*Id.*).

Then, on December 23, 2010, Superior sold the Loan to Ellis and assigned the loan documents to Ellis without notifying Plaintiffs of the sale.  (*Id.* at ¶ 18; Doc. 106 at 127-141).  Ellis financed his purchase of the Loan with a personal loan from Superior (the "Ellis Loan").  (Doc. 94 at ¶ 21).  In connection with Ellis's purchase of the Loan, and without informing Plaintiffs, Superior seized funds from the Interest Reserve Account and the Wiggins CD and applied the funds to pay down the indebtedness on the Loan.  (*Id.* at ¶¶ 24 & 26).

## D.     Superior Taken Over by the FDIC

After Superior sold the Loan to Ellis, Superior failed, and the FDIC was appointed as receiver.  (Doc. 94 at ¶ 34).  The FDIC assigned all of Superior's rights and interests in the Ellis Loan to a new entity, Superior Bank, N.A., and that entity was purchased by and merged with defendant Cadence Bank on November 11, 2011. (*Id.*).

### E.     Plaintiffs' Claim to the FDIC

Wiggins submitted a claim to the FDIC as receiver for Superior Bank.  (Doc.

28-2).  The Proof of Claim Wiggins submitted states in full as follows:[5]

> The undersigned, Robert Wiggins, individually and as majority member of Wolf Pup and on its behalf, [] says that Superior Bank, Birmingham, now in liquidation is justly indebted to Wolf Pup[,] LLC and Robert Wiggins upon the following Claim:

> This claim includes a claim that Superior Bank suppressed and actively concealed material information that it had a duty to disclose for the purpose of depriving Wiggins and his interests of critical information concerning defaults in agreements between Wiggins and his interests, on the one hand, and Ellis and his interests, on the other hand.  These agreements are set out in the attached package of documents from October 2007.  This suppression and concealment occurred at times unknown in the course of attempts to perform and workout a loan to Wolf Pup, LLC.  By withholding information, either on its own initiative, but more likely in conspiracy with Frank Ellis, Wiggins, as guarantor of the loan, together with his interests was not provided timely information concerning the application of collateral for purposes of servicing the loan, which application of the collateral had, in fact, triggered obligations of Ellis and his interests to Wiggins and his interests.

> In 2005, [] Superior Bank closed loans in the total amount of approximately $17,500,000.00 to Wolf Pup, LLC for purchase of land and the construction of a development containing sixty-two (62) units to be constructed in Orange Beach, Alabama, known as Wolf Bay Landing.  The last of these loans closed on December 22, 2005.  Wolf Pup, LLC was formed for the purpose of developing Wolf Bay Landing. Beowulf, LLC has an 80% ownership interest in Wolf Pup.  The members of Beowulf, LLC are Robert Wiggins and Ann Wiggins. These loans were guaranteed by Robert Wiggins, and three other persons who had interests, either direct or indirect, in Wolf Pup, namely

---

[5] Due to the importance of the Proof of Claim to the issue before the court, the undersigned quotes the Proof of Claim in its entirety.

Linda Peacock, Kelly Schuck, and Scott Raley. Wiggins individually pledged some $1.5 million in deposits to secure the Wolf Pup loan. Additionally, an interest reserve account of some $560,000 was created at Superior Bank. In the fall of 2007, "purchased" [sic] Wolf Bay Landings Condominiums, less Units A301 and A110, by assuming the loans previously made by Superior Bank to Wolf Pup, LLC. At that time, it has been said that Character Counts had as its members Frank P. Ellis, IV (80% ownership) and Scott Raley (20% ownership). Frank P. Ellis, IV guaranteed the loans jointly and severally.

In connection with the Character Counts transaction, a series of documents were executed, attached hereto, that provided a number of remedies to Wiggins and his interests should Frank P. Ellis, IV and Character Counts, LLC fail to perform. As an example, and not by complete recital, they provided that Ellis and Character Counts shall "take all steps necessary to ensure such interest reserve and pledged collateral are not seized or drawn upon by Superior Bank or otherwise applied to the indebtedness" (para. 1); and that Ellis and Character Counts agreed "to immediately repay to Wolf Pup any portion of the $560,000.00 interest reserve posted by Wolf Pup to Superior Bank to secure the indebtedness . . . to the extent same is seized or drawn upon by Superior Bank or otherwise applied to such indebtedness." (para. 2)

Superior Bank, upon information and belief, knew of the existence of the obligations of Ellis and Character Counts under these agreements, and the remedies that could flow from their breach. When Superior did seize or draw on the interest reserve, at times unknown, it either negligently, recklessly, wantonly or intentionally suppressed and concealed its actions from Wiggins and his interests, including the original borrower Wolf Pup, LLC, thereby preventing the exercise of remedies by Wiggins and his interests, including Wolf Pup, LLC, against Ellis and his interests. The value of the remedies declined as time passed.

Since Wiggins does not know when these interest reserves were applied, Wiggins is currently unable to state precisely the extent of his damages as relates to the remedies. Superior has refused, despite repeated requests, to account for the various applications of the interest reserve or other collateral, simply providing untimely balances remaining in the accounts.

> This being a fraud claim, it will require discovery of the internal documents of Superior Bank relating to the application(s) of the interest reserve and other breaches of the agreements of October 5, 2007 to precisely define the damages suffered.

(Doc. 28-2 at 1-2) (last paragraph omitted).  The FDIC received the Proof of Claim on July 19, 2011.  (*Id*. at 1).

The FDIC disallowed Plaintiffs' claim based on the following findings:

> Claimants have failed to present any basis other than allegations contained in their Proof [of] Claim to show that Superior owed them a legally cognizable duty to notify Claimants of CCLLC's defaults or Superior's draw on the Interest Reserve Account.  Claimants waived all notice under the original loan documents and the documents of assumption and Claimants have not shown that Superior had any independent duty to advise them of CCLLC's default.

(Doc. 48-7 at 2).  The FDIC notified Plaintiffs of its decision disallowing their claim on June 15, 2012.  (*See* Doc. 48-7 at 2).  This action timely followed.

## F.    Procedural Posture of this Action

Plaintiffs filed this action on August 14, 2012, against the FDIC as receiver of Superior Bank.  (Doc. 1).  In their original six-count complaint, Plaintiffs sought a declaratory judgment releasing them as sureties for the Loan and asserted claims against the FDIC based on Superior's alleged wrongful seizure of funds from the Interest Reserve Account and the Wiggins CD.  (*Id.*).  After the FDIC moved to dismiss the complaint, this court ordered Plaintiffs to join Ellis and CCLLC as defendants, dismissed Plaintiffs' breach of the implied duty of good faith and fair dealing claim, and ordered Plaintiffs to state a claim for breach of contract to the

extent possible. (Doc. 21). Since then, Plaintiffs have amended their complaint twice. (Docs. 22, 94).

On February 22, 2016, Plaintiffs filed their Second Amended Complaint, which contained thirteen counts against the FDIC and other defendants. (Doc. 94). The majority of the claims asserted against the FDIC in the Second Amended Complaint were based on allegations Superior wrongfully seized funds from the Interest Reserve Account and the Wiggins CD. (*See id.*). After the FDIC moved to dismiss the Second Amended Complaint, the court dismissed all of the claims against the FDIC except Plaintiff's conspiracy claim. (Doc. 179). This remaining conspiracy claim, based upon allegations that Superior conspired with Ellis to suppress, conceal, and withhold information concerning the application of collateral, is the subject of the motion for summary judgment filed by the FDIC. (Doc. 224).

## II. ANALYSIS

### A. Motion to Strike

The FDIC moves to strike the declaration of Wiggins in its entirety or, in the alternative, strike portions of the declaration. (Doc. 271). Federal Rule 56(c)(2) of Civil Procedure was revised in 2010 and provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes state:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that

would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Fed. R. Civ. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments). *See Campbell v. Shinseki,* 546 F. App'x 874, 879 (11th Cir. 2013) ("Before this amendment, parties properly challenged evidence used in a summary judgment motion by filing a motion to strike. The plain meaning of these provisions show that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily."). Accordingly, the undersigned construes the FDIC's motion to strike as objections to the evidence presented in opposition to summary judgment.

The FDIC challenges paragraphs 23, 26, 29, 31, and 32 of Wiggins's declaration on the grounds they contradict his deposition testimony. (Doc. 271 at 3-9). The FDIC also challenges paragraphs 1, 7, 10-11, 16, 18-19, 20-22, and 35-37 of Wiggins's declaration on the grounds they are conclusory statements. (*Id.* at 10-16).

"When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create

such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir. 1984). A court must "'find some inherent inconsistency between an affidavit and a deposition before disregarding an affidavit' and state that if no such inherent inconsistency exists, 'any conflict or discrepancy between the two documents can be brought out at trial and considered by the trier of fact.'" *Santhuff v. Seitz*, 385 F. App'x 939, 944-45 (11th Cir. 2010) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)). Moreover, speculation and conclusory statements in an affidavit are inadmissible. *See Reliance Nat'l Indem. Co. v. Pinnacle Cas. Assur. Corp.*, 160 F. Supp. 2d 1327, 1332 (M.D. Ala. 2001) (speculation inadmissible); *Ojeda v. Louisville Ladder, Inc.*, 410 F. App'x 213, 215 (11th Cir. 2010) (evidence presented in opposition to summary judgment motion cannot consist of conclusory allegations).

Wiggins asserts that paragraphs 26 and 32 of his declaration do not contradict his deposition because his deposition testimony "only addressed how much had been 'withdrawn from the Interest Reserve' without regard to whether it had been 'replenished' or was still depleted as of 'early 2010.'" (Doc. 300 at 4) (citations omitted). Wiggins admits that "*he did know* that around $200,000 had been '*withdrawn*' at some point," from the Interest Reserve Account. (*Id.* at 5) (emphasis in original). Accordingly, the court finds the statements contained in

paragraphs 26 and 32 are not necessarily inherently inconsistent with Wiggins's deposition testimony, and the objection to these paragraphs is overruled.

As to paragraph 23, Wiggins argues he has not contradicted his deposition testimony with respect to awareness of claims he had against Ellis and CCLLC in the Fall of 2008. (Doc. 300 at 6-7). Regardless of whether Wiggins believed he had a legally cognizable claim against Ellis and CCLLC in 2008, Wiggins's testimony confirms that he was supposed to receive the Interest Reserve Account after one year and the account was supposed to be replenished by Ellis and CCLLC as money was withdrawn. (*See* Doc. 228-1 at 264-66). Any legal conclusions about when a claim became actionable are better left to arguments in briefs and not in declarations. Accordingly, the objection to paragraph 23 is sustained.

With respect to paragraph 31, the FDIC states in its reply that "[w]hether the Court strikes the Plaintiff's Declaration or merely acknowledges that the prior request was to his own partner Raley makes no difference . . . [e]ither way, it leaves undisputed that the first time Wiggins asked the Bank for a status of the Reserve Account was in early 2010." (Doc. 304 at 3). The court believes Wiggins's deposition testimony speaks for itself. (*See* Doc. 229-1 at 375). Furthermore, the explanation Wiggins provides in his opposition to the motion to strike clears up any ambiguity created by his vague statements. (*See* Doc. 300 at 7-8). Accordingly, the objection to paragraph 31 is overruled.

As to paragraph 29, the FDIC acknowledges in its reply that Wiggins's explanation in his opposition essentially reconciles any contradictions in paragraph 29 versus Wiggins's deposition testimony. (Doc. 304 at 6). The court agrees. The court construes the statement in paragraph 29 in light of Wiggins's deposition testimony and can discern the relevant information. Accordingly, the objection to paragraph 29 is overruled.

The FDIC objects to paragraphs 1, 7, 11, 20, and 21 as being conclusory opinions contrary to the correspondence of August 12, 2010. (Doc. 271 at 10). The court agrees that several of the statements in these paragraphs are Wiggins's conclusory opinions about the August 12, 2010 letter from Superior in response to a letter from Wiggins's attorney. (*See* Doc. 266-8 at ¶¶ 1, 7, 11, 20-21). The court finds that the letter speaks for itself, and Wiggins's unsupported legal conclusions will not be considered by the court for purposes of summary judgment. Accordingly, to the extent paragraphs 1, 7, 11, 20, and 21 contain legal conclusions, those objections are sustained.

The FDIC challenges paragraph 16 on the grounds Wiggins's interpretation of the Pledge Agreement, Repayment Agreement, and Real Estate Purchase Agreement are contrary to the provisions of the contract. (Doc. 271 at 13). Plaintiffs respond that their statements "are not offered as 'legal interpretations' of those contract provisions, but as identification of what Plaintiffs relied upon and

was impaired from exercising." (Doc. 300 at 15). In its reply brief, the FDIC recognizes Plaintiffs' clarification of their statements. (Doc. 304 at 9). Furthermore, the court can distinguish between legal conclusions and personal opinions. Accordingly, the court overrules the FDIC's objection to paragraph 16.

The FDIC's objection to paragraph 18 of Wiggins's declaration is due to be sustained. The court agrees with the FDIC that statements made by Wiggins in his declaration about what the POC "alleges" are irrelevant. (*See* Doc. 271 at 13-14; Doc. 304 at 9). The POC speaks for itself, and the court will not rely on Wiggins's interpretation of the POC.

Likewise, the FDIC's objection to paragraph 19 is sustained insofar as Wiggins submits it as a legal conclusion. Wiggins admits that it is "not offered as a 'legal interpretation' . . . but as a preliminary point of reference for the factual statement that follows in the next paragraph (¶ 20) . . . ." (Doc. 300 at 16). Again, the Modification Agreement speaks for itself, and the court need not rely on Wiggins's interpretation.

As for paragraph 10, Wiggins simply remarks about his personal experience regarding the seizure of his CD and Interest Reserve Account. (*See* Doc. 266-8 at ¶ 10). As the statements do not constitute legal conclusions or interpretations, the FDIC's objection is overruled.

Finally, the FDIC objects to paragraphs 22 and 35-37 on the grounds that the statements are opinions, contradict Wiggins's deposition testimony, and are essentially argumentative. (Doc. 271 at 15-16). As to paragraph 22, Wiggins oversteps by asserting a legal conclusion about a key element of his claim: causation. (*See* Doc. 266-8 at ¶ 22). Accordingly, the FDIC's objection to paragraph 22 is sustained. However, the court agrees with Wiggins that his statements in paragraphs 35-37 concerning damages, even if they "'lack[] a sound basis, . . . go only to the weight of the testimony and thus are to be challenged through cross-examination and refuting evidence.'" (Doc. 300 at 18) (quoting *U.S. v. An Easement & Right-of-way Over 6.09 Acres of Land, More or Less, in Madison Cty., Ala.*, 140 F. Supp. 3d 1218, 1239 (N.D. Ala. 2015)). Therefore, the FDIC's objection to paragraphs 35-37 is overruled.

### B.     Motion for Summary Judgment

#### 1.     Standard of Review

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of

the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

The FDIC argues it is entitled to summary judgment because Plaintiffs' underlying cause of action of suppression is not viable and, thus, their conspiracy claim fails. (Doc. 225).[6]

---

[6] Although the FDIC also asserts the court does not have jurisdiction over any claim made by Plaintiffs relating to the sale of the loan (Doc. 225), Plaintiffs concede their claim "is not that Superior sold or assigned the loan standing alone, but that it conspired to thwart Plaintiffs' independent contract rights with Ellis that would have protected them against seizure and other abuses that might occur from Ellis's actions or defaults." (Doc. 265 at 32-33). Accordingly, the court does not address this argument further.

## 2. Conspiracy Claim

The FDIC asserts Plaintiffs' conspiracy claim is not an independent cause of action and there must be an underlying wrong for the conspiracy claim to be viable. (Doc. 225 at 18).

"Alabama recognizes [civil conspiracy] as a substantive tort. In essence, civil conspiracy is a combination of two or more persons to do: (a) something that is unlawful; [or] (b) something that is lawful by unlawful means." *DGB, LLC v. Hinds*, 55 So. 3d 218, 234 (Ala. 2010) (internal quotes and citation omitted) (citing *Purcell Co. v. Spriggs Enters., Inc.,* 431 So. 2d 515, 522 (Ala. 1983) and *Ex parte Reindel,* 963 So. 2d 614, 621 n.11 (Ala. 2007)).

However, a plaintiff who alleges a conspiracy claim must have a valid underlying cause of action. *Hinds*, 55 So. 3d at 234 (citing *Drill Parts & Serv. Co. v. Joy Mfg. Co.,* 619 So. 2d 1280 (Ala. 1993). A conspiracy claim fails if the underlying act or acts do not support a cause of action. *Id.* (citing *Triple J Cattle, Inc. v. Chambers,* 621 So. 2d 1221, 1225 (Ala. 1993); *Callens v. Jefferson Cty. Nursing Home,* 769 So. 2d 273, 280 (Ala. 2000).

As previously noted by the court, Plaintiffs' Proof of Claim focuses on Superior's alleged concealment of information it purportedly had a duty to disclose. (*See* Doc. 28-2). Plaintiffs' Proof of Claim alleges Superior acted in conspiracy with Ellis to withhold information "concerning the application of collateral for purposes

of servicing the loan, which application of the collateral had, in fact, triggered obligations of Ellis . . . to Wiggins . . . ." (Doc. 28-2 at 1). This court found Plaintiffs' allegations suggest Superior and Ellis conspired to undermine Ellis's contractual obligations to Wiggins and prevent Wiggins from exercising his contractual rights against Ellis. (Doc. 156 at 39). Specifically, Plaintiffs' allegations in the Proof of Claim focus on Superior withholding, suppressing, and/or actively concealing material information from Plaintiffs. (Doc. 28-2 at 1-2).

Alabama Code Section 6-5-102 states: "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." Consistent with this statute, Plaintiffs allege fraud in their Proof of Claim. (Doc. 28-2 at 2). Accordingly, the court will consider whether a genuine issue of material fact exists with respect to Plaintiffs' claim for suppression.

### 3. Suppression

The elements of a suppression claim are "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." *Aliant Bank, a Div. of US Ameribank v. Four Star Inv., Inc.*, 244 So. 3d

896, 930 (Ala. 2017) (citations omitted). Plaintiffs do not discuss the elements of suppression at all in their brief but cite Section 6-5-102. (Doc. 265).

The FDIC does not dispute the second element, the concealment or nondisclosure of material facts by Superior; instead, the FDIC argues Plaintiffs cannot establish Superior had a duty to disclose those facts to Plaintiffs. Whether a party has a duty to disclose is a question of law to be determined by the trial court. *Freightliner LLC v. Whatley Contract Carriers, LLC*, 932 So. 2d. 883, 891 (Ala. 2005). The *Aliant* Court recognized previous holdings which analyzed duty in this context: "A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but <u>mere silence in the absence of a duty to disclose is not fraudulent</u>." 244 So. 3d at 931 (citations omitted) (emphasis in original). The Court further reiterated, "whether one has a duty to speak depends upon a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case . . . . <u>When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested.</u>" *Id.* (emphasis in original) (internal citations omitted).

In the instant case, the Loan Modification Agreement states in part:

Upon the occurrence of an Event of Default under the Loan, which has not been cured within thirty (30) days after notice to CCLLC and Wolf

Pup, LLC, [Superior] shall have the right to draw upon the Certificate of Deposit and apply the proceeds thereof towards payment of the principal, interest and other charges under the loan.

(Doc. 226-1 at 7, ¶ (l)). The FDIC argues Superior was only required to give notice of default, which Superior did when it gave Wolf Pup notice on May 19, 2010, that the loan was in default. (Doc. 225 at 27).

On May 19, 2010, Wiggins received notice of the default from Superior by way of being copied on two letters addressed to Ellis. (Doc. 228-1 at 285-87; Doc. 246-21; Doc. 267-109). One letter was from Superior, and the other letter was from Superior's attorney. (Doc. 246-21; Doc. 267-109). In the letter from Superior's attorney, Superior specifically made demand on Wolf Pup and Wiggins, in addition to other people and entities. (Doc. 267-109). The letter from Superior gave notice of default and stated failure to satisfy obligations may result in Superior pursuing rights and remedies **"without further notice to you."** (Doc. 246-21) (emphasis added).[7] The letter further stated: "This Loan is FIRST being offered for sale to the

---

[7] Plaintiffs argue "Superior's top officials met with Wiggins at the Bank's offices in early 2010 and, during the course of such meeting, told him that Superior *would not* attempt to seize his CD involuntarily or otherwise pursue remedies against him under the Loan Documents without his consent due to the repercussions that might cause the Bank and Ellis" under the Repayment and Pledge Agreements. (Doc. 265 at 4-5) (emphasis in original). Plaintiffs provide no particulars as to who the top officials were, the exact wording of what was said, or the date of such meeting. *See Freightliner*, 932 So. 2d at 893 (concluding corporate head's comments and inquiries were not specific enough to impose a duty to disclose where corporate head also failed to identify when and with whom such conversations occurred). Furthermore, Plaintiffs cite no authority for the proposition that these alleged oral statements imposed a duty on Superior to obtain Wiggins's consent before seizing his CD or pursuing other remedies, when no such written requirement existed. Regardless, the alleged statements and meeting occurred in "early 2010," and Superior's

guarantors of the Loan . . . .  By copy of this letter, this offer is also being made to the other guarantors of the Loan." (*Id.*) (emphasis in original).[8]

In response to the notice of default, Plaintiffs sent a letter to Superior on July 15, 2010.  (Doc. 226-11; Doc. 228-1 at 221, 287-88).  In the letter, Wiggins's attorney demanded Superior give Wiggins an accounting of all funds securing the loan, including the guaranty – the Wiggins CD and the Interest Reserve Account. (Doc. 226-11).  Superior's attorney responded by letter, dated August 12, 2010, noting Wiggins had received more than one notice of default under the loan and the loan remained unpaid.  (Doc. 255-59).[9]  The August 2010 letter also stated:

> SUPERIOR BANK IS NOT AT THIS TIME MAKING DEMAND ON MR. WIGGINS ON HIS GUARANTY OR OTHERWISE NOTIFYING YOU OF ANY ELECTION TO PURSUE REMEDIES UNDER THE LOAN DOCUMENTS.  THIS LETTER IS SOLELY TO RESPOND TO YOUR LETTER OF JULY 15, 2010.

(*Id.*) (emphasis in original).

---

letter, giving notice of default and stating it may pursue rights and remedies "without further notice," is dated May 19, 2010.  (Doc. 265 at 4; Doc. 246-21).

[8] Plaintiffs acknowledge they were aware, through Superior's "written and oral communications with Wiggins and Wolf Pup," of the eventual "loan sale and assignment to Ellis."  (Doc. 265 at 9, 21).

[9] Plaintiffs are simply incorrect in stating "no default notice has been issued since the August 12, 2010 disavowal even to this day."  (Doc. 265 at 8).  Notice of default was given in the May 19, 2010 letters.  (Doc. 246-21; Doc. 267-109).  Plaintiffs acknowledge Superior mailed a default notice on May 19, 2010, but argue "it lapsed even before August 12, 2010 . . ."  (Doc. 265 at 9). Plaintiffs' "lapse" argument is conclusory and unsupported.  Accordingly, Superior was under no obligation to send "reminder" notices of default to Plaintiffs.

Based on the above language in the August 2010 letter, Plaintiffs assert the duty to disclose "arose when [Superior] sent Wiggins the [] disavowal of intent to 'pursue remedies under the loan documents'" (Doc. 265 at 3). Plaintiffs argue "[o]nce Superior told Wolf Pup and Wiggins that it was not 'pursu[ing] remedies under the Loan Documents' on August 12th, it had 'an obligation to communicate' any contrary plan or intent under Alabama Code Section 6-5-102 and the **30 day pre-seizure notice requirement of its Loan Assumption and Modification Agreement.**" (Doc. 265 at 10) (emphasis added).

As an initial matter, the court is not persuaded by Plaintiffs' interpretation of the language in the Modification Agreement (in bold above), i.e., that it requires Superior to give Plaintiffs 30 days' notice before seizing collateral. First, the court notes the language quoted above in the Modification Agreement makes no mention of the Interest Reserve Account, only the Wiggins CD. (Doc. 48-3 at 7).[10] Second, Wiggins testified he could not find a requirement in the Modification Agreement to give notice of a withdrawal from the Interest Reserve Account. (Doc. 228-1 at

---

[10] Plaintiffs assert, "[t]he plain words of that 30 day notice requirement stated that the notice would be given to 'Wolf Pup, LLC,'" which is true. (Doc. 265 at 22). However, Plaintiffs' interpretation that the Modification Agreement contained a "contractual 30 day pre-seizure notice" is convoluted and incorrect. (*Id.*). The notice requirement to Wolf Pup concerns only default of the Loan and not seizure of the Interest Reserve Account. (Doc. 226-1 at 7, ¶ (l)).

283).[11]   Accordingly, the language in the Modification Agreement referenced by Plaintiffs is inapplicable to the Interest Reserve Account.

Next, with respect to the CD, the Modification Agreement clearly required Superior to give notice of *default* to Wolf Pup so Wolf Pup would have a 30 day "grace period" to cure the default before Superior seized the CD. (Doc. 226-1 at 7, ¶ (l)). However, a plain reading of the provision at issue states no requirement of giving notice (let alone a 30 day notice) before *seizing* the CD. (*Id.*). *See Penick v. Most Worshipful Prince Hall Grand Lodge F&AM of Ala., Inc.,* 46 So. 3d 416, 428 (Ala. 2010) ("In interpreting a contract, the 'words of the agreement will be given their ordinary meaning.'") (citations omitted).

As to the August 2010 letter, Plaintiffs have not cited any cases which support their argument that the language in the letter created an obligation or duty upon Superior to notify Plaintiffs before pursing remedies under the loan documents. As

---

[11] Wiggins also testified that, through face-to-face meetings with employees of Superior in February, March, and April in 2010, he became aware that almost $200,000 had been withdrawn from the Interest Reserve Account. (Doc. 228 at 279-80). The August 2010 letter, which Wiggins received, stated "Interest Reserve Account – current available balance is $374,114.10. Disbursements have been made from the interest reserve account from time to time to pay attorney's fees and loan expenses." (Doc. 255-59 at 2). Under the terms of the Modification Agreement, if Superior debited the Interest Reserve Account for payment of Loan interest and expenses, CCLLC had an obligation to deposit funds into the Interest Reserve Account within ten days to restore the balance of the Account to $560,000. (Doc. 48-3 at 7). Plaintiffs' statement that "Wolf Pup and Wiggins did not, in fact, know that the Interest Reserve had been partially depleted and not replenished by CCLLC as required by Superior's Loan Assumption and Modification Agreement" is in direct conflict with Wiggins's deposition testimony combined with the August 2010 letter. (Doc. 265 at 25).

to duty, Plaintiffs quote cases dealing primarily with securities fraud. (Doc. 265 at 7, citing *Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1268 (11th Cir. 1998) (quoting *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986); *In re Miller Indus. Sec. Litig.,* 120 F. Supp 2d 1371, 1378 (N.D. Ga. 2000)). In *Clay,* the Eleventh Circuit analyzed elements of fraud in the context of securities transactions. *Clay,* 157 F.3d at 1268. The *Rudolph* Court analyzed whether accountants owe a duty to investors with respect to financial statements and reports. *Rudolph*, 800 F.2d at 1042-1045. The *In re Miller* Court found a corporation did not have a duty to disclose to shareholders the effect of a judgment on earnings for a three-month period after having first disclosed that the judgment would not affect income for a six-month period. *Miller*, 120 F. Supp. 2d at 1378. And *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977), cited by Plaintiffs (Doc. 265 at 7), involved claims brought pursuant to the Securities Act and an Alabama statute codifying common law fraud in connection with a merger. None of these cases are factually on point with this case and thus provide little support for Plaintiffs' position.

*Aliant* provides additional guidance on the legal question of whether a party has a duty to disclose. The *Aliant* Court noted, although "[a] duty to disclose is more likely to be found where there is a special or confidential relationship between the parties, [] a duty to disclose may still be found when the parties engage in an arm's

length business transaction and there are special circumstances or when specific information is requested." 244 So. 3d at 931. The Court emphasized, "[h]owever, it will be the rare situation and only under the most extreme special circumstances that a duty to disclose is imposed upon parties that have no relationship with each other." *Id.* The Court also instructed, "once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated," and furthermore, "even if one is not under a duty to speak, if he decides to do so, 'he must make a full and fair disclosure,' without concealing any facts within his knowledge." *Id.* at 932 (citations omitted).[12] Likewise, in *Shutter Shop, Inc. v. Amersham Corp.,* 114 F. Supp. 2d 1218 (M.D. Ala. 2000), the District Court stated:

> In commercial transactions involving parties to arm's length negotiations, however, a bright line rule generally applies: The parties have no general obligation to disclose, . . . but each has an affirmative duty to respond "truthfully and accurately" to direct questions from the other . . .
>
> Thus, Alabama law presumes that the parties are capable of handling their own affairs and guarding their interests by asking reasonably specific, direct questions that will satisfy their need for information. The parties decide what information they need, and the law protects their rights to receive it.

*Id.* at 1225 (citations omitted).

---

[12] In *Aliant,* the company president voluntarily represented to the bank how bond proceeds would be used but did not reveal he would receive the majority of the bond proceeds for work that had already been performed. 244 So. 3d at 932.

In addition, "[w]hile the law still requires, even in the present adversarial world of commercial transactions, that direct questions be responded to truthfully and accurately, the law also generally allows a business to keep confidential its internal operating procedures." *Ex parte Ford Motor Credit Co.,* 717 So. 2d 781, 787 (Ala. 1997).

In the instant case, Plaintiffs requested information, and Superior responded. Superior emphasizes specific language in the August 2010 letter, which states Superior is not "AT THIS TIME" making a demand on Wiggins or notifying him of an election to pursue remedies under the loan documents. (Doc. 255-59). The letter also states: "THIS LETTER IS SOLELY TO RESPOND TO YOUR LETTER OF JULY 15, 2010." (*Id.*). The FDIC's argument that the wording in the August 2010 letter did not change the contract language in the Modification Agreement (requiring only a 30-day notice of default) is persuasive. (Doc. 270 at 10). Superior applied the funds in the Wiggins CD and the Interest Reserve Account to the loan on December 23, 2010. (Doc. 225 at ¶¶ 17, 37; Doc. 226-3; Doc. 115 at 2).[13] Without any case law to support Plaintiffs' argument, the court is hard-pressed to interpret the narrowly worded language in the August 2010 letter as creating an *ongoing* duty

---

[13] A little over a month later, on January 28, 2011, Wiggins received notice that the CD and Interest Reserve Account had been applied to the loan. (Doc. 228-1 at 257-59). About a year and half later, in June of 2012, Plaintiffs filed suit against Ellis and CCLLC based on the seizures of the CD and Interest Reserve Account. (Doc. 226-15).

on Superior, especially four months later, to notify Plaintiffs before seizing the collateral.

In conclusion, the terms of the Modification Agreement and the language in the August 2010 letter do not support Plaintiffs' position that Superior had a duty to give notice to Plaintiffs before applying the Interest Reserve Account and/or CD to the loan. Furthermore, as noted by the court in its Report and Recommendation, nothing in Plaintiffs' allegations or in the parties' agreements indicate the parties dealt with one another on unequal terms, that Superior acted as an advisor or counselor to Plaintiffs, or that special circumstances gave rise to a fiduciary relationship. (Doc. 156 at 46-48). And after a thorough analysis of the particular facts in this case, construed in the light most favorable to Plaintiffs, Plaintiffs have failed to show Superior had an "obligation to communicate [] aris[ing] from the confidential relations of the parties or from the particular circumstances of the case." Ala. Code § 6-5-102. Accordingly, because Plaintiffs do not have a valid underlying cause of action, their conspiracy claim fails.

## III. CONCLUSION

Based on the foregoing, the FDIC's motion to strike (Doc. 271), construed as objections to Wiggins's declaration, are **SUSTAINED** in part and **OVERRULED** in part. Furthermore, the FDIC's motion for summary judgment (Doc. 224) is

**GRANTED**.  (Doc. 224).   Accordingly, Plaintiffs' conspiracy claim against the

FDIC is **DISMISSED WITH PREJUDICE**.

　　　　**DONE** this 30th day of September, 2019.


　　　　　　　　　　　　　　　　　_Staci G. Cornelius_
　　　　　　　　　　　　　　　　　STACI  G. CORNELIUS
　　　　　　　　　　　　　　　　　U.S. MAGISTRATE JUDGE