## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT L. WIGGINS, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:12-cv-02705-SGC |
| | ) | |
| FDIC, as Receiver of Superior | ) | |
| Bank, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER REGARDING
## CADENCE BANK'S MOTION FOR SUMMARY JUDGMENT[1]

This case is before the court on defendant Cadence Bank's ("Cadence")
motion for summary judgment as to Plaintiffs' claim of tortious interference with a
protected business relationship. (Doc. 243). Cadence moves this court to enter an
order dismissing this last remaining claim against it pursuant to Rule 56 of the
*Federal Rules of Civil Procedure*. (*Id.*). The motion is fully briefed and ripe for
review. (Docs. 243, 268, 284). After careful consideration of the parties' briefing
and for the reasons discussed below, the court finds Cadence's motion for summary
judgment is due to be granted.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73,
the parties have voluntarily consented to have a U.S. magistrate judge conduct any and all
proceedings, including trial and the entry of final judgment. (Doc. 193).

# I.   STANDARD OF REVIEW

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This action arises from a long series of loans and real estate transactions between the parties. To summarize, these are the essential facts: Plaintiffs, Robert L. Wiggins, Jr. ("Wiggins"), and Wolf Pup, LLC ("Wolf Pup"), (collectively, "Plaintiffs"), financed the purchase and construction of a real estate development in Baldwin County, Alabama through a loan with Superior Bank ("Superior"). Plaintiffs then sold the property to defendant Character Counts, LLC ("CCLLC"), a single asset entity owned primarily by defendant Frank P. Ellis, IV ("Ellis"). Plaintiffs allowed CCLLC to purchase the property by assuming their loan with Superior. Superior later sold the loan to Ellis, who financed his purchase of the loan with a personal loan from Superior. In connection with selling the original loan to Ellis, Superior paid down the outstanding balance on the loan by seizing money from accounts funded by Wiggins and Wolf Pup. Superior Bank failed, and defendant Federal Deposit Insurance Corporation ("FDIC") was named as its receiver. After Superior failed, Cadence acquired Ellis's personal loan from Superior, and Cadence eventually reached a settlement agreement with Ellis regarding payment of his personal loan. Eventually, Ellis foreclosed on the original loan and sold the property to defendant Trinity Retreat, LLC ("Trinity Retreat"), a single asset entity owned by

Ellis's wife, defendant Mihyon Ellis ("Mihyon"). Trinity Retreat financed its purchase of the property with a loan from defendant Bryant Bank ("Bryant").

### A.    Wolf Pup's Loan from Superior Bank in 2005

Wiggins is a member of Wolf Pup, a limited liability company organized under the laws of the State of Alabama. (Doc. 94 at ¶ 1; Doc. 112 at 3). Wolf Pup owned a 62-unit real estate development named Wolf Bay Landings located in Baldwin County, Alabama (the "Property"), which was financed through a loan with Superior Bank. (*Id.*). Wolf Pup's loan with Superior involved several transactions.

First, Wolf Pup borrowed $6 million from Superior in September 2005 to purchase the land for the development. (Doc. 90-5 at 1). In connection with this loan, Wolf Pup executed two promissory notes in September 2005, one note in the amount of $4.5 million and a second note in the amount of $1.5 million. (Doc. 90-5 at 1). Both promissory notes were secured by a Future Advance Mortgage, Assignment of Rents and Leases and Security Agreement dated September 30, 2005, which was recorded in the Probate Court of Baldwin County on October 10, 2005, as Instrument Number 928514 (the "Mortgage"). (Doc. 106 at 89-107). The Mortgage explicitly states it secures the entire $6 million loan, as evidenced by the two promissory notes in the amount of $4.5 million and $1.5 million. (Doc. 106 at 90). Additionally, the loan was also secured by a continuing guaranty from Wiggins.

(Doc. 90-5 at 1). Finally, the terms of the Mortgage provide that the Mortgage is not satisfied until Wolf Pup's entire indebtedness is paid. (*See* Doc. 106 at 92).

Approximately three months later, Wolf Pup borrowed an additional $11.5 million from Superior Bank to construct a condominium development on the land, which brought Wolf Pup's entire indebtedness to approximately $17.5 million. (Doc. 94 at ¶ 1; Doc. 90-5 at 1). Wolf Pup's loan with Superior Bank, including both the original $6 million borrowed in September 2005 and the additional $11.5 million borrowed in December 2005, is referred to as "the Loan."

In connection with the additional amount borrowed, Wolf Pup executed a $15.9 million promissory note dated December 22, 2005, which amended, restated, and replaced the $4.5 million note. (Doc. 90-5 at 1). Further, the Mortgage was amended to account for and secure the additional loan amount, and Wolf Pup executed a first amendment to the Future Advance Mortgage, Assignment of Rents and Leases and Security Agreement on December 22, 2005 (the "First Amendment"). (*See id.*; Doc. 121-2). The First Amendment was recorded on January 20, 2006, in the Probate Court of Baldwin County as Instrument Number 950888. (Doc. 121-2 at 5). The First Amendment states Wolf Pup and Superior "intend for the Mortgage to secure, in addition to the $1.5 [million] Note, the Restated [$15.9 million] Note. . . ." (*Id.* at 2). The recorded amendment then explicitly states again "[i]t is the intent hereof that the Mortgage shall secure both

the Restated [$15.9 million] Note and the $1.5 [million] Note." (*Id.* at 3). Finally, the First Amendment provides that "[e]xcept as modified herein, all other terms and conditions of the Mortgage shall remain in full force and effect." (Doc. 121-2 at 3).

### B. CCLLC's Purchase of the Property and Assumption of the Loan

In 2007, Wolf Pup sold the Property to CCLLC, an entity owned by Ellis and Joseph Scott Raley ("Raley"). (Doc. 94 at ¶ 2; Doc. 90-2). Wolf Pup allowed Ellis and CCLLC to finance the purchase of the Property by assuming the Loan. (Doc. 94 at ¶ 2; Doc. 90-5). In connection with the sale of the Property, Wolf Pup, CCLLC, and Superior Bank executed a Loan Assumption and Modification Agreement (the "Modification Agreement"), which was dated October 5, 2007. (Doc. 94 at ¶ 3; Doc. 90-5).

Under the terms of the Modification Agreement, CCLLC obtained title to the Property, subject to the Mortgage, and CCLLC agreed to be bound by and perform all of the obligations of the Borrower under the loan documents.[2] (Doc. 90-5 at 2-3). Ellis was added as a guarantor when CCLLC assumed the Loan, but Wiggins remained a guarantor of the Loan. (*Id.* at 4-5, 17-18). Additionally, even though CCLLC assumed the Loan, Wolf Pup remained liable under the promissory notes and loan documents. (*Id.* at ¶ 5(c)).

---

[2] Wolf Pup is defined as the Borrower in the Modification Agreement. (Doc. 90-5 at 1).

The Modification Agreement recognized that CCLLC delivered a promissory note to Wolf Pup to finance the sale of the Property (the "Purchase Note") but stated the Purchase Note was not secured by any interest in the Property. (*Id.* at ¶ 5(g)). In addition, the agreement provided that nothing contained in it or done pursuant to it "shall affect or be construed to affect the encumbrance of, or warranty of title in, or conveyance effected by, the Mortgage, or priority thereof over other liens . . . ." (*Id.* at ¶ 1).

The Modification Agreement required Wolf Pup to establish an interest reserve account at Superior in an amount not less than $560,000 (the "Interest Reserve Account") and gave Superior the right to debit the Account to make monthly interest payments on the Loan. (*Id.* at 6). The Modification Agreement also required that a $1.5 million certificate of deposit funded by Wiggins (the "Wiggins CD") would continue to secure the Loan. (*Id.*). Under the agreement, Superior had the right to apply funds from the Wiggins CD towards the Loan in the event of a default that had not been cured within thirty days after notice of the default to CCLLC and Wolf Pup. (*Id.*).

Ellis, Raley, and Wolf Pup also entered into a membership interest pledge agreement (the "Pledge Agreement") in connection with CCLLC's purchase of the Property and assumption of the Loan. (Doc. 90-2 at 1). In the Pledge Agreement, Ellis and Raley pledged their 100% membership interest in CCLLC to Wolf Pup as

security for their obligations under the loan documents, and Ellis granted Wolf Pup a security interest in the membership interest in CCLLC. (*Id.* at ¶ 1). The Pledge Agreement provided that Ellis and Raley "shall be deemed to have executed a due and timely proxy in favor of [Wolf Pup] to be effective upon any [default by Ellis, Raley, or CCLLC under the Pledge Agreement or loan documents]." (*Id.* at ¶ 3). Also under the Pledge Agreement, Wolf Pup "shall have all rights and remedies of a secured party under the [UCC] . . . [and] additionally shall have the express right to sell the [membership interest in CCLLC], or any part thereof, and the express right to sell any condominium units at Wolf Bay Landing Condominiums owned by CCLLC." (*Id.* at ¶ 6). Wolf Pup filed a UCC Financing Statement with the Alabama Secretary of State on October 25, 2007, reflecting Ellis's pledge of his membership interest in CCLLC to Wolf Pup. (*Id.* at 6).

Finally, Ellis, CCLLC, and Wolf Pup executed a repayment agreement dated October 5, 2007, in connection with CCLLC's purchase of the Property and assumption of the Loan. (Doc. 90-3). Under the terms of this agreement, Ellis and CCLLC agreed to immediately repay Wolf Pup for any portion of the Interest Reserve Account or the Wiggins CD drawn upon by Superior and applied to the indebtedness under the Loan. (*Id.* at ¶¶ 2-3).

### C.     Ellis's Purchase of the Loan in 2010

After CCLLC assumed the Loan, Superior and CCLLC extended the Loan's maturity date on several occasions.  (Doc. 94 at ¶ 17).  Then, on December 23, 2010, Superior sold the Loan to Ellis and assigned the loan documents, including the Mortgage and First Amendment, to Ellis without notifying Wolf Pup or Wiggins. (*Id.* at ¶ 18; Doc. 106 at 127-141).  Ellis financed his purchase of the Loan with a personal loan from Superior in his individual name (the "Ellis Loan").  (Doc. 94 at ¶¶ 18 & 21).  As part of Ellis's purchase of the Loan, Superior seized the funds from the Interest Reserve Account and the Wiggins CD, and it applied those funds to the principal indebtedness under the Loan without informing either Wiggins or Wolf Pup.  (*Id.* at ¶¶ 24 & 26).

### D.     Cadence Bank's Acquisition of the Ellis Loan in 2011

Superior failed and was taken over by the FDIC as receiver.  (Doc. 94 at ¶ 34). The FDIC assigned all of Superior's rights and interests in the Ellis Loan to a new entity, Superior Bank, N.A., and that entity was purchased by and merged with Cadence Bank on November 11, 2011.  (*Id.*).  Accordingly, Cadence became the holder of the Ellis Loan.

Cadence, Ellis, and CCLLC reached a settlement agreement in May 2014, regarding repayment of the Ellis Loan.  (Doc. 106 at 143-160).  Under the terms of the settlement agreement, Cadence, CCLLC, and Ellis agreed the Property would be

sold to a third party before June 30, 2014, with Cadence receiving a cash payment of $5.75 million from the sale.  (*Id.* at 151).  Cadence agreed to release Ellis from his personal obligations under the Ellis Loan upon receiving the cash payment.  (*Id.* at 153).  Ellis and CCLLC agreed to assign to Cadence certain litigation proceeds they may receive from Wiggins and Wolf Pup in a lawsuit pending in the Circuit Court of Jefferson County, Alabama.  (*Id.* at 147-151).  Finally, Ellis represented in the settlement agreement that "all company action required to be taken by [CCLLC] . . . for the authorization, execution, delivery and performance of [the settlement agreement] have been taken" and Ellis had authority to bind CCLLC to the terms of the agreement.  (*Id.* at 156).

### E.     The 2014 Foreclosure Sale of the Property

Ellis foreclosed on the Mortgage in June 2014 and sold the Property (the "2014 Foreclosure Sale") to Trinity Retreat, LLC ("Trinity Retreat"), a single asset entity owned by Ellis's wife, Mihyon Ellis ("Mihyon").  (Doc. 94 at ¶¶ 34 & 36). Trinity Retreat purchased the Property at the Foreclosure Sale for $5.75 million and financed the purchase with a loan from Bryant Bank ("Bryant").  (*Id.* at ¶ 35; Doc. 106 at 162-165).  Plaintiffs allege the 2014 Foreclosure Sale was a "sham transaction jointly structured and executed by Cadence [], Ellis, Mihyon [], Trinity Retreat, [] and Bryant []." (Doc. 94 at ¶ 35).  Plaintiffs further allege the defendants "conspired together to attempt to shift Ellis's and CCLLC's loan repayment obligations to

[P]laintiffs and to take ownership of [the Property] from Wolf Pup [] without ever paying the agreed-upon purchase price for such sale." (*Id*.).

### F. Procedural Posture of This Action

Plaintiffs filed this action on August 14, 2012, against the FDIC, as receiver of Superior Bank. (Doc. 1). In their original six-count complaint, Plaintiffs sought a declaratory judgment releasing them as sureties for the Loan and asserted claims against the FDIC based on Superior's alleged wrongful seizure of funds from the Interest Reserve Account and the Wiggins CD in December 2010. (*Id*.). After the FDIC moved to dismiss the complaint, this court ordered Plaintiffs to join Ellis and CCLLC as defendants, dismissed Plaintiffs' breach of the implied-in-law duty of good faith and fair dealing claim, and ordered Plaintiffs to state a claim for breach of contract to the extent possible. (Doc. 21).

Plaintiffs then filed an eleven-count Amended Complaint on March 9, 2015, asserting claims against the FDIC, as receiver of Superior Bank, Ellis, and CCLLC. (Doc. 22). Ellis and CCLLC answered the amended complaint and asserted counterclaims against Wiggins, Wolf Pup, and counterclaim defendant Linda J. Peacock ("Peacock"), who is a member of Wolf Pup and was involved in some of the transactions described above. (Doc. 26).

Plaintiffs sought leave to file a Second Amended Complaint, requesting to add claims against Mihyon, Trinity Retreat, Bryant, and Cadence (collectively referred

to as the "New Defendants"), and the undersigned granted Plaintiffs' motion to amend.  (Docs. 90, 93).  Plaintiffs then filed their thirteen-count Second Amended Complaint on February 22, 2016, asserting claims against the FDIC, Ellis, CCLLC, Mihyon, Trinity Retreat, Bryant, and Cadence.  (Doc. 94).  The New Defendants filed motions to dismiss, and the court granted Mihyon, Trinity Retreat, and Bryant's motions to dismiss.  (Docs. 106, 107, 155).  Cadence's motion to dismiss was granted in part and denied in part.  (Doc. 155).  Specifically, the court found Plaintiffs had stated a plausible claim for tortious interference with a protected business relationship against Cadence, which is the subject of this motion for summary judgment.  (*Id*.).

## III.  ANALYSIS

Plaintiffs assert a claim for tortious interference with a protected business relationship against Cadence.  (Doc. 94 at ¶¶ 110-116).  Plaintiffs allege Cadence interfered with Plaintiffs' contractual relationship with Ellis and CCLLC by entering into a settlement agreement with Ellis and CCLLC.  (Doc. 94 at ¶¶ 39-40, 114).[3]

---

[3] Plaintiffs also allege that Ellis did not have the authority to act unilaterally on CCLLC's behalf, that Cadence knew Ellis did not have such authority, and that Cadence knew Ellis's representation in the settlement agreement was false and contrary to Ellis's pledge of his membership interest in CCLLC to Wolf Pup.  (Doc. 94 at ¶¶ 39-40, 114).  As discussed below, Plaintiffs cannot establish the third element of a tortious interference claim, i.e., that Cadence was a stranger to the business relationship. *See infra,* at 14.  Accordingly, the court has not further analyzed these allegations in this motion for summary judgment.

"[T]he elements of [a tortious interference] claim are: (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Grp., LLC v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). Cadence argues it is entitled to summary judgment because Plaintiffs cannot establish these elements. (Doc. 243).

## A. Existence of a Business Relationship, of which Cadence Knew

As an initial matter, Cadence does not dispute the first and second elements of the tortious interference claim as set forth above: (1) the existence of a protectible business relationship; (2) of which the defendant knew. (Doc. 243). Accordingly, the existence of a protectible business relationship, which encompassed the Pledge Agreement, is not at issue.[4]

Furthermore, Tim Hamner, the Rule 30(b)(6) representative for Cadence, testified that he received the Pledge Agreement from Balch Bingham attorneys in October 2013, to prepare for his deposition in the state court proceedings involving this matter. (Doc. 255-43 at 6-7, 15, 18). On October 22, 2013, Hamner emailed the Pledge Agreement to Aubrey Oliver, Hamner's supervisor at Cadence, indicating to Oliver that Cadence was not a party to the document. (*Id.* at 18). Hamner later

---

[4] Ellis pledged his membership interest in CCLLC to Wolf Pup as security for payment and performance of the Loan under the Loan Assumption Agreement. (Doc. 90-2 at 1).

reaffirmed that Cadence was aware of the contracts between Ellis and Wolf Pup. (*Id.* at 22). Hamner also testified that when he negotiated the settlement agreement with Ellis, Hamner knew about the Pledge Agreement and about the lawsuit involving the parties. (*Id.* at 30-31). Accordingly, there is no question that Cadence knew about the business relationship between Ellis and Wolf Pup.

### B. Whether Cadence Was a Stranger to the Business Relationship

This brings the court to the third element, which the parties dispute: whether Cadence was a stranger to the business relationship. Cadence argues it was not a stranger to the relationship because Plaintiffs, Cadence, and Ellis were all part of "interwoven" contractual arrangements, including the Pledge Agreement, from which Cadence derived an economic benefit. (Doc. 243 at 42).[5] Plaintiffs, on the other hand, submit that while Cadence purports to have obtained an interest in the collateral backing the Ellis personal loans when it assumed the Ellis loans, that interest did not "interject Cadence into the existing contractual and business relationship between Plaintiffs and Ellis/CCLLC." (Doc. 268 at 20).[6] The court

---

[5] In its motion to dismiss, Cadence argued it could not be a stranger to the relationship between Plaintiffs, CCLLC, and Ellis because Cadence held a security interest in the documents evidencing and securing the Loan. (Doc. 106 at 33). However, the court found that the Pledge Agreement was not listed among the loan documents that were assigned to Ellis when he purchased the Loan from Superior and, therefore, Cadence was unable to show it had a security interest in the Pledge Agreement between Wolf Pup and Ellis. (*See id.* at 127-141).

[6] Plaintiffs list the collateral as the Wolf Bay Landing Loan, the mortgage on Wolf Bay Landing, and the Wiggins guaranty agreements. (Doc. 268 at 20).

rejects Plaintiffs' attempt to narrowly construe Cadence's position and relationship to these transactions.

In *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143 (Ala. 2003), the Alabama Supreme Court recognized decisions from both Alabama and Georgia courts analyzing the "stranger" element. The *Waddell* Court noted, "when tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized." (*Id.* at 1153) (internal quotes and citations omitted).

Although this court has not found a case on all fours with the facts of the instant case (and neither party has referenced a case on point), *Waddell* quotes a Georgia case which comes close:

> "In order to be liable for interference with a contract, a defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract.[7] One is not a stranger to the contract just because he is not a party to the contract. A tortious interference claim requires, among other things, wrongful conduct by the defendant without privilege; 'privilege' means legitimate economic interests of the defendant or a legitimate relationship of the defendant to the contract, so that he is not considered a stranger, interloper, or meddler. *A person with a direct economic interest in the contract is not a stranger to the contract. Parties to an interwoven contractual*

---

[7] This court cited *Waddell* in another case involving tortious interference, recognizing that a plaintiff must show how "not only a defendant's distance from the contract, *but also distance from 'the business relationship giving rise to and underpinning the contract.*'" *North Jackson Pharmacy, Inc. v. McKesson Corp.*, No. 5:14-cv-02371, 2015 WL 5011346, at *4 (N.D. Ala. Aug. 24, 2015) (emphasis added) (citations omitted).

*arrangement are not liable for tortious interference with any of the contracts or business relationships.*

It is clear that Chase Mortgage was not a stranger to the sales contract between LaSonde and McGregor. Chase Mortgage held the note and security deed to the property at issue. Indeed, Chase Mortgage was responsible for deciding whether to permit McGregor or LaSonde to assume the loan on the property. Chase Mortgage had a direct economic interest in the property which was the subject of the sales contract."

(*Id.* at 1157) (quoting *LaSonde v. Chase Mortgage Co.,* 577 S.E.2d 822, 824 (Ga. Ct. App. 2003)) (emphasis in original). The *Waddell* court went on to explain:

For the sake of clarity, we adopt the term "participant" to describe an individual or entity who is not a party, but who is essential, to the allegedly injured relationship and who cannot be described as a stranger. One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract. In such an instance, the participant is not a stranger to the business relationship and the interwoven contractual arrangements define the participant's rights and duties with respect to the other individuals or entities in the relationship. If a participant has a legitimate economic interest in and a legitimate relationship to the contract, then the participant enjoys a privilege of becoming involved without being accused of interfering with the contract. We conclude that UILIC's argument—that one can be considered a stranger to the relationship if one does not effectively control performance under the contract—is too narrow.

(*Id.*).[8]

---

[8] *Waddell* also noted the following four-part test, applied by the Northern District of Georgia, in determining whether a defendant is a stranger to a contract:

"[A] defendant is not a 'stranger' to a contract or business relationship when: (1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations."

Superior, like Chase Mortgage in *LaSonde,* held the original notes and security interests in the property at issue. Superior was responsible for allowing CCLLC and Ellis to assume the Loan from Plaintiffs, whereby the Pledge Agreement came into existence.[9] Although Superior later sold the loan to CCLLC and Ellis,[10] Superior (and later Cadence) continued to have a direct economic interest in the property.

---

*Waddell*, 875 So. 2d at 1156 (quoting *Britt/Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, Inc.*, 952 F. Supp. 1575, 1584 (N.D. Ga. 1996), *aff'd* 137 F.3d 1356 (11th Cir. 1998)); *see also, MAC East, LLC v. Shoney's,* 535 F.3d 1293, 1297 (11th Cir. 2008) (applying the same test).

[9] The Pledge Agreement was executed as security for repayment of the underlying loan: "WHEREAS, to induce [Wolf Pup] to enter into and accept the Loan Documents, [Ellis and Raley] have agreed to pledge their . . . membership interests in CCLLC . . . as security for the full payment and performance of all [Ellis and Raley's] obligations under the Loan Documents and all of the Obligations." (Doc. 90-2 at 1). Proceeds from any sale of the membership interest, the property, or condominium units would be applied to the Loan, which would directly benefit Cadence because Cadence had a security interest in the note. (Doc. 106 at 114, ¶ 7; Doc. 243-10 at 131). *See Brooks v. Branch Banking and Trust Co.,* 107 F. Supp. 1290, 1301 (N.D. Ga. 2015) (holding that although bank did not sign lease agreements between plaintiff and tenants, the bank was not a stranger to the business relationship where bank was entitled to revenues from the property pursuant to the security deed until the loan was paid off); *Nimbus v. Tech., Inc. v. SunData Prod., Inc.*, 484 F.3d 1305, 1309-10 (11th Cir. 2007) (lender was not a stranger to the business relationship between borrower and plaintiff because lender had an economic interest in the borrower's success and in the borrower's relationship with the plaintiff); *Daily v. The Rawlings Co., LLC,* No. 2:15-CV-1138, 2016 WL 192071, at *20, n.17 (N.D. Ala. Jan. 15, 2016) ("The defendants' subrogation interest provides them with a very real and economic interest in the settlement negotiations, and, of course, in the settlements themselves," and thus, defendants were not strangers to the settlement.).

[10] Plaintiffs make a two-sentence argument in their brief with respect to this transaction: "[A]s Plaintiffs explain in Doc. 253 at 16-25, the assignment of the [Wolf Bay Landing] Loan from Superior to Ellis was invalid. Therefore, Cadence's alleged interest in the collateral for the Loan is also invalid and Cadence could not have legally enforced its perceived rights to any collateral or the Loan Documents." (Doc. 268 at 29). Plaintiffs fail to state their argument in its entirety in their brief. The court will not analyze an argument summarily stated in two sentences, which refers to Plaintiffs' motion for summary judgment on claims and counterclaims related to the Wiggins

Plaintiffs agree that "[t]he Ellis loans were secured by a First Real Estate Mortgage (FREM), on 60 of the 62 units at WBL. Cadence held the mortgage." (Doc. 268 at 7). Plaintiffs' expert, J.F. "Chip" Morrow, testified that Cadence had a legitimate economic interest in the loans that Ellis was obligated on to Cadence. (Doc. 243-10 at 132-33). More importantly, Morrow also testified that **because Cadence held the original note for Wolf Pup, Cadence could foreclose on that mortgage at any time.** (Doc. 243-10 at 135).[11] Cadence clearly had a direct economic interest in the property.

Moreover, the Pledge Agreement was interwoven with the other contracts. The Loan Modification Agreement specifically referenced the Pledge Agreement, stating "Lender hereby consents to a pledge and a grant of a security interest in the membership interests in Character Counts to [Wolf Pup] . . . ." (Doc. 90-5 at 5, ¶ 5(g)). Morrow testified that the underlying loan documents (original loan documents, the note, the mortgage, and the Loan Assumption Agreement), along with the Pledge Agreement, were part of the relationship between Cadence Bank,

---

guaranty. Furthermore, even if the assignment is somehow invalid, Cadence still held an "Assignment of Notes, Mortgage and Other Loan Documents," permitting Cadence to "direct in writing Wolf Pup, Character Counts and the WPCC Guarantors . . . to make any such payments directly to Assignee." (Doc. 243-32 at 175, 178). Regardless of whether Cadence could have "legally forced its perceived rights," Plaintiffs still have not established the element at issue: that Cadence was a stranger to the contracts or business relationship in this case. (Doc. 267 at 29).

[11] Plaintiffs agreed that "one of the last acts of Superior Bank before the FDIC closed it was to approve a foreclosure by Ellis on the WBL property and setting the bid price at $6,990,000." (Doc. 268 at 9).

Wolf Pup, Wiggins, CCLLC, and Ellis. (Doc. 243-10 at 128). Morrow further

testified that the Pledge Agreement was "part and parcel" or "adjunct" to the loan

documents. (Doc. 243-10 at 129).[12]

Like the defendant in *Waddell*, Cadence is essential to the allegedly injured

relationship, is a participant in the business relationship that arose from interwoven

contractual arrangements, and has a *legitimate* economic interest in and relationship

to the contract. Accordingly, Cadence enjoys the *privilege* of becoming involved in

the relationship without interfering with the contract, even though Cadence may not

control every aspect of the contractual arrangement. *See Waddell, supra; see also,*

*Lynn v. Romar Marina Club, LLC*, No. 07-0173, 2009 WL 4667387, at *18 (S.D.

Ala. Dec. 1, 2009) (finding that the lender was not a stranger to the business

relationship because his financing was essential to the parties' ability to close on the

real estate transaction). Accordingly, Plaintiffs' argument that Cadence did not have

---

[12] The *Waddell* Court also recognized the holding in *Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting, Ltd. of Atlanta,* 421 S.E.2d 295 (Ga. Ct. App. 1992), which is instructive in this case:

> While it is true that Jefferson–Pilot did not acquire any obligation in regard to repayment of the loans, there were other rights and duties flowing between each of the parties. We cannot agree that Jefferson–Pilot was a stranger to the partnership's contractual relationship with the lenders. Rather, the buyer, seller, and lenders were all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership of the radio station. Therefore, Jefferson–Pilot could not have tortiously interfered with that contractual relationship between the partnership and its lenders.

*Jefferson-Pilot*, 421 S.E.2d at 298-99 (quoted in part by *Waddell*, 875 So. 2d at 1154).

"authority to control or even influence the parties' performance under the subject contracts" is without merit. (Doc. 268 at 25).

Finally, Plaintiffs' argument that Cadence is a stranger to the interwoven contracts and business relationship because it did not acquire the loan documents until 2011 is simply off the mark. Cadence stepped into the shoes of Superior when Superior failed and the FDIC, as receiver, sold the loans to Cadence. In fact, Plaintiffs recite in their statement of undisputed facts that "[w]hen Cadence took over the loans from Superior Bank [], just the name on the door changed and nothing else. . . . . The subject loan files remained in the same office space and even the same filing cabinets." (Doc. 268 at 2) (citations to record omitted). Plaintiffs cite no cases to support their position that Cadence does not enjoy the same status, rights, and remedies as Superior.[13] *See Tom's Foods, Inc. v. Carn*, 896 So. 2d 443, 455-56 (Ala. 2004) (finding that "Tom's Foods had a legitimate economic interest in the security agreements and promissory notes at issue," even after they were assigned to a third party because Tom's Foods remained liable on the notes). To hold to the contrary would mean no bank would be willing to purchase loans from a failed bank when the FDIC has stepped in as a receiver. The court will not so hold in this case when Plaintiffs have put forth no authority to suggest otherwise.

---

[13] In fact, in all of the cases cited by Plaintiffs, the courts found the defendant was *not* a stranger to the business relationship. (Doc. 286 at 22-26).

Because Plaintiffs cannot establish the third element of its claim – that Cadence was a stranger to the business relationship – Plaintiffs' claim for tortious interference is due to be dismissed.

## IV.    CONCLUSION

Based on the foregoing, the undersigned **GRANTS** Cadence Bank's motion for summary judgment (Doc. 243). Accordingly, Plaintiffs' claim for tortious interference with a protectible business relationship against Cadence is **DISMISSED WITH PREJUDICE**.

**DONE** this 30th day of September, 2019.

_Staci G. Cornelius_
STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE