# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ROBERT L. WIGGINS, JR., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.: 2:12-cv-02705-SGC |
| | ) |
| FRANK ELLIS, IV, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**[1]

This case is before the court on (1) Frank P. Ellis, IV ("Ellis"), and Character Counts, LLC's ("CCLLC"), motion for summary judgment as to the claims of Linda J. Peacock ("Peacock") (Doc. 236); (2) Peacock's motion for summary judgment on all claims by Ellis and CCLLC (Doc. 242); and (3) that portion of Ellis and CCLLC's motion for summary judgment as to the counterclaim for breach of guaranty against Peacock. (Doc. 240).[2]

---

[1] The parties have consented to the dispositive jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 193).

[2] The court will address the other counterclaims in this motion, which involve Robert L. Wiggins, Jr., and Wolf Pup, LLC, by separate order. (Doc. 240). Furthermore, Ellis has confirmed that "[o]nly Ellis, not CCLLC, brings a breach of guaranty claim against Peacock . . . ." (Doc. 275 at 54, n.16).

With respect to Ellis and CCLLC's motion as to Peacock's declaratory judgment claims, Ellis and CCLLC move for summary judgment on (1) "Count One – Declaratory Judgment Releasing/Discharging Peacock as a Guarantor Pursuant to the 2007 Loan Documents and Agreements," (2) "Count Two – Declaratory Judgment Releasing Surety Pursuant to § 58-3-13 of the Code of Alabama," and (3) "Count Three – Declaratory Judgment Discharging Surety Pursuant to a Series of Loans, Loan Modifications and Extensions and Impairment of Collateral."  (Doc. 236; Doc. 183 at 43-52). As to Peacock's motion, she seeks summary judgment on the fraud and breach of guaranty counterclaims asserted against her by Ellis and CCLLC in their Amended Counterclaim and Amendment to Counterclaim.  (Docs. 242, 112, 187). Finally, Ellis moves for summary judgment on Count Three of the counterclaim for breach of guaranty against Peacock.  (Doc. 240).

All three motions are fully briefed and ripe for review.  (Docs. 237, 272, & 295; 254, 275, & 291; 241, 272, & 295).  After careful consideration of the parties' briefs and for the reasons set forth below, the court finds: (1) Ellis and CCLLC's motion for summary judgment on Peacock's claims for declaratory judgment (Doc. 236) is due to be granted; (2) Peacock's motion for summary judgment (Doc. 242) is due to be granted in part and denied in part; and (3) the motion for summary judgment by Ellis on his counterclaim for breach of guaranty against Peacock (Doc. 240) is due to be granted in part and denied in part.

2

## I.    STANDARD OF REVIEW

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a series of loans and transactions related to a real estate development in Baldwin County, Alabama.   In 2005, Plaintiff Wolf Pup, LLC ("Wolf Pup"), borrowed approximately $17,500,000.00 from Superior Bank (the "Loan") to purchase land and construct a 62-unit condominium development named Wolf Bay Landings in Baldwin County, Alabama (the "Property").   (Doc. 112 at ¶¶ 6, 8 & 10).   Plaintiff Robert L. Wiggins, Jr. ("Wiggins"),[3] and third-party defendant/counterclaim plaintiff Peacock are indirect owners and members of Wolf Pup.   (Doc. 187 at ¶¶ 2 & 4).

The Loan was secured by a mortgage on the Property; Wiggins and Peacock also executed unlimited continuing guaranties to secure the Loan (the "Guaranties"). (Doc. 112 at ¶¶ 7 & 9).   Under the Guaranties, the guarantors "jointly and severally unconditionally guarantee and promise to pay the Bank" the indebtedness under the Loan.   (Doc. 117-2 at 29).   The Guaranties further provide in part:

> This Guaranty may not be revoked or terminated, other than with the prior written consent of the Bank, except upon strict compliance with the conditions and requirements heretofore set forth in this Section (2), and this Guaranty will not be revoked or terminated by any action, event or circumstance, including payment in full of all of the indebtedness.

---

[3] Wolf Pup and Wiggins are collectively referred to as "Plaintiffs" in this Memorandum Opinion.

> The obligations of the Guarantors hereunder are joint and several, and independent of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against any one or more of the Guarantors whether action is brought against Borrowers or any other Guarantor . . . .
>
> It is the intent hereof that this obligation of Guarantors shall be and remain unaffected, (a) by the existence or non-existence, validity or invalidity, of any pledge, assignment or conveyance given as security; or (b) by any understanding or agreement that any other person, firm or corporation was or is to execute this or any other guaranty, . . . or any other document or instrument or was or is to provide collateral for any indebtedness.
>
> No right or power of Bank hereunder shall be deemed to have been waived by any act or conduct or failure or delay to act on the part of the Bank . . . .  Bank may without notice assign this Guaranty in whole or in part and each reference herein to Bank shall be deemed to include its successors and assigns.

(Doc. 117-2 at 29-31).

In October 2007, CCLLC purchased the Property from Wolf Pup by assuming the Loan.  (*See* Doc. 112 at ¶ 14).  In connection with the sales transaction for the Property, CCLLC, Wolf Pup, and Superior Bank executed a Loan Assumption and Modification Agreement dated October 5, 2007 (the "Modification Agreement").[4] (*Id.*).  The Modification Agreement provides that Wolf Pup remained liable under the Loan:

---

[4] In addition to the Modification Agreement, the parties executed several other agreements on October 5, 2007, in connection with CCLLC's assumption of the Loan.  Those agreements include a contract simply entitled "Agreement" between Ellis, CCLLC, and Wolf Pup (Doc. 117-7) and a Membership Interest Pledge Agreement between Ellis, Joseph Scott Raley (another indirect owner and member of Wolf Pup), and Wolf Pup (Doc. 117-8).

> It is the intent of this instrument, and [Wolf Pup], [Superior,] and CCLLC agree, that [Wolf Pup] shall remain liable under the Note and the other Loan Documents, and upon the occurrence of an Event of Default by CCLLC under the Note or the other Loan Documents, and in addition to [Superior]'s right to enforce the Loan Documents and pursue its remedies against CCLLC, [Superior] may enforce the terms of the Note against and collect the indebtedness evidenced by the Note from [Wolf Pup], all to the same extent as if this instrument had never been executed.

(Doc. 117-3 at 5).   The Modification Agreement required Ellis to execute an unlimited continuing guaranty to secure the loan and required that the Guaranties executed by Wiggins and Peacock "shall continue in full force and effect and shall continue to secure the Loan . . . ."  (*Id.* at 10).

After the notes for the Loan matured in September 2009, Superior Bank offered to sell the Loan to Ellis and each of the other guarantors.  (Doc. 112 at ¶¶ 20-21).  On December 23, 2010, Superior sold the Loan to Ellis and assigned the Loan Documents to him, including the note, mortgage, and the Guaranties executed by Wiggins and Peacock.[5]  (Doc. 112 at ¶ 22).  Ellis later foreclosed on the mortgage on the Property in June 2104 and sold the Property to Trinity Retreat, LLC.  (*See* Doc. 119-8).

---

[5] To finance his purchase of the Loan, Ellis borrowed money from Superior Bank.  (Doc. 119-5 at 5).  As collateral for his personal loan, Ellis granted a security interest in the Loan Documents, including the Guaranties, back to Superior.  (*Id.*).

**A. The State Court Litigation**

Before CCLLC assumed the Loan in October 2007, Wolf Pup entered into pre-construction sales contracts for each of the condominium units at the Property. (Doc. 112 at ¶ 11).  After the purchasers of the units refused to close, Wolf Pup filed suit in Alabama state court against the purchasers in February 2007, seeking specific performance of the sales contracts (the "State Court Litigation").  (*Id.* at ¶ 12).  In May 2007, the purchasers filed a counterclaim against Wolf Pup asserting claims for breach of contract, suppression, fraud, and deceit.  (*Id.* at ¶ 13; Doc. 127-1). According to Ellis and CCLLC, the purchasers' counterclaim in the State Court Litigation alleged "defects in the creation of the condominium units that rendered [the purchasers'] sales contracts invalid."[6]  (Doc. 112 at ¶ 13).

In December 2009, the defendants in the State Court Litigation moved for summary judgment on Wolf Pup's claims for specific performance on the grounds the sales contracts could not have closed because Wolf Pup failed to legally create the condominium units for the Property.  (Doc. 132-2 at 3).  On December 9, 2010, the judge in the State Court Litigation granted the defendants' motion for summary judgment and entered an order holding the April 17, 2007 Declaration of

---

[6] The counterclaim filed in May 2007 contended the purchasers were told each condominium unit would come with a deeded boat slip and Wolf Pup breached a contract with the purchasers by failing to contract and properly permit the deeded boat slips.  (*See* Doc. 127-1 at ¶¶ 23-31).

Condominium of Wolf Bay Landing failed to comply with all mandatory requirements of the Alabama Uniform Condominium Act and, therefore, the Declaration did not legally create separate condominium units that could exist and be conveyed as separate parcels of real estate.  (Doc. 106 at 40-43).

Ellis and CCLLC allege that after CCLLC purchased the Property, they learned the Declaration of Condominium for the Property was defective and failed to legally create any condominium units for resale.  (See Doc. 187 at ¶ 45).  CCLLC and Ellis contend Wiggins and Peacock directed Raley to inform Ellis that the Property "was a legally created ready-to-sell condominium project," even though they knew there were problems relating to the creation of the condominium units. (*Id.* at ¶¶ 5-6, 17, 19, 33, & 50-52).  CCLLC and Ellis also claim that Wiggins and Peacock informed them "the condominium units were properly formed under applicable law" to induce them to purchase the Property.  (Doc. 187 at ¶¶ 52, 62-63). Accordingly, Ellis and CCLLC assert the Property was worth less than the $23 million they had anticipated it was worth.  (*See id.* at ¶ 53).

### B. Procedural Posture of This Action

Plaintiffs initiated this action in 2012 against the FDIC, as receiver for Superior Bank, and amended their complaint in 2015 to assert claims against the FDIC, Ellis, and CCLLC.  (Docs. 1 & 22).  After Plaintiffs filed a second amended complaint in 2016 (Doc. 94), Ellis and CCLLC asserted amended counterclaims

against Plaintiffs and third-party claims against Peacock (Doc. 112).  Plaintiffs and Peacock moved to dismiss the counterclaims asserted against them pursuant to Rule 12(b)(6).  (Docs. 117 & 118).

The court granted Peacock's motion in part and denied it in part, allowing Ellis's claim for breach of guaranty to proceed.  (Docs. 180 & 181).[7]  Following the court's order, Peacock asserted counterclaims against Ellis and CCLLC, seeking a declaratory judgment releasing her as a guarantor of the loan.  (Doc. 183).  Ellis and CCLLC answered Peacock's counterclaims and reasserted their fraudulent misrepresentation claim against her as a counterclaim-in-reply to her counterclaims for declaratory judgment.  (Docs. 187 & 188).  Upon further motions to dismiss (Docs. 192 & 194), the court denied Peacock's motion to dismiss Ellis and CCLLC's counterclaim-in-reply for fraudulent misrepresentation (Doc. 210).

## III.   ANALYSIS

### A.     Fraudulent Misrepresentation Claim

Peacock moves for summary judgment on Ellis and CCLLC's claim of fraudulent misrepresentation against her.  (Doc. 242). To state a claim for fraudulent misrepresentation, Ellis and CCLLC must allege facts showing "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by [Ellis and

---

[7] The fraudulent misrepresentation claim against Peacock was dismissed based on the statute of limitations.  (Doc. 158 at 27).

CCLLC] (4) who suffered damage as a proximate consequence of the misrepresentation." *Exxon Mobil Corp. v. Ala. Dep't of Conservation and Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (quotation and emphasis omitted).

"Misrepresentation may take many forms, a verbal misrepresentation being just one form." *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345, 1351 (Ala. 1991). A fraudulent misrepresentation claim may be based on conduct or misrepresentations contained within a written document. *Id*. ("The statements and conduct of the parties must be viewed in their entirety to adequately resolve the question of whether a misrepresentation has occurred.").

Peacock argues that Ellis and CCLLC cannot assert "tort-based liability on contractual claims." (Doc. 291 at 11). This court rejected a similar argument made by Plaintiffs, noting that Ellis and CCLLC had also asserted claims that Plaintiffs made representations regarding condominium units to induce Ellis and CCLLC to purchase the Property. (*See* Doc. 214 at 11). These allegations include Peacock. (*See* Doc. 187 at ¶¶ 18-19, 33, 50-52, 62-63).[8] The court found that under Alabama

---

[8] Ellis and CCLLC allege in part that: (1) Peacock directed Raley to inform Ellis the Property "was a legally created, ready-to-sell condominium project"; (2) "Peacock continued to represent to CCLLC, Ellis, and Superior that the [condominium] units could be sold as a means of paying off the indebtedness due to Superior"; (3) "Peacock . . . informed Ellis and CCLLC that that the condominium units were properly formed under applicable law, ready for resale as 62 separate units to third party purchasers"; and (4) "in ongoing communications throughout August, September, October, and November 2007, [] Peacock . . . informed Ellis and CCLLC that [the Property] was a legally created, ready-to-sell condominium project." (Doc. 187 at ¶¶ 19, 33, 52 & 56).

law, Ellis and CCLLC may assert a counterclaim of fraudulent misrepresentation, along with their breach of contract claims; accordingly, the same analysis applies to Peacock.  (*Id.*).

In applying this analysis, however, "an alleged written misrepresentation in a contract, without more, cannot be actionable as fraud in Alabama."  *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1275 (M.D. Ala. 2007).  Furthermore, "[u]nder Alabama law, the plaintiffs must aver that there were either oral or written misrepresentations made before the signing of the contract or during the performance of the contract."  *Id.* at 1276.[9]  For example, in *Goggans v. Realty Sales & Mortgage*, 675 So. 2d 441 (Ala. Civ. App. 1996), in reversing summary judgment, the Alabama appellate court noted that, not only was there an incorrect maturity date on the loan assumption documents, but also that when buyers asked during closing if the assumption statement reflected the corrected maturity date, both owners and owners' agent indicated that it did.  *Id.* at 442-43.[10]

_____

[9] Interestingly, the *Pearson's Pharmacy* court noted that one of the cases relied upon by the plaintiffs, *Deupree v. Butner*, 522 So. 2d 242 (Ala. 1988), involved making false representations to purchasers of a townhome and to a state governmental entity about the building of a boat slip. 505 F. Supp. 2d at 1276; s*ee supra* at n.7.  The *Pearson's Pharmacy* court noted that the *Deupree* case was inapposite to the facts at hand because there was actual evidence, "*independent of the contractual promise*," of proof of fraud by the developer.  *Id.* at 1277. (emphasis in original).

[10] In *Morris v. Strickling*, 579 So. 2d 609, 610-11 (Ala. 1991), the Alabama Supreme Court affirmed summary judgment in favor of the defendants on a fraudulent misrepresentation claim. The court noted that the plaintiffs did not question the defendants regarding the suitability of the lot purchased and furthermore recognized the subdivision plans were public records and available to the plaintiffs.  *Id.* at 611.  *See also*, *Gewin v. TCF Asset Management Corp.*, 668 So. 2d 523, 529 (Ala. 1995) (holding "[t]he existence of the litigation was a matter of public record. . . . Thus,

Ellis and CCLLC admit they "base some of their fraudulent misrepresentation claim on the contracts which claim that Wolf Bay Landing was a condominium. However, there are other writings which form the basis of this claim . . . ." (Doc. 275 at 32). They argue that "Peacock made representations in multiple **writings** to Ellis and CCLLC, both in the contract themselves **and** in other documents." (*Id.* at 28) (emphasis in original). Specifically, Ellis and CCLLC assert:

> Peacock made representations to Ellis and CCLLC that condominium units were legally created in written documents, including: (a) the purported conveyance of Unit A301 from Wiggins to Ellis by warranty deed dated November 13, 2007 and notarized by Peacock (Ellis Ex. 36 (Doc. 246-11) (noting Wolf Bay Landing as "a condominium")); (b) the purported conveyance of 60 units from Wolf Pup to CCLLC by warranty deed dated October 26, 2007, with Peacock signing as Wolf Pup's Authorized Representative (Ellis Ex. 31 (Doc. 246-6) (describing the conveyance of 60 units of "Wolf Bay Landing, a condominium")); and (c) the Release Schedule (Ellis Ex. 19 (Doc. 244-19) (discussing

---

experienced real estate investors, like [plaintiffs], could have discovered it by the exercise of due diligence.") (citation omitted); *Auburn's Gameday Center at Magnolia Corner Owners Assoc. Inc. v. Murray*, 138 So. 2d 317, 331 (Ala. Civ. Ct. 2013) (affirming judgment in favor of condominium complex, noting the buyers "were placed on notice of the existence of the publicly recorded declaration and amendment" and were "familiar with and had experience in the workings of condominiums"). Here, Ellis testified about his extensive background in real estate. (Doc. 245-9 at tp. 18-23; 42). He further stated he did not ask any questions about whether the declaration had been legally created and that he was aware of the lawsuit, which was a public record, but did not investigate. (*Id.* at tp. 68-70; 75-79; 161-62; 270; 275; 315). In fact, the Real Estate Purchase Agreement dated August 9, 2007, between Wolf Pup and Ellis specifically stated that "[t]here are no suits, including the present litigation styled <u>Wolf Pup, LLC v. Linton Bowles, et al. CV 2007-900084</u> . . . which might affect the Purchaser's clear title to the Subject Property" and included an indemnification provision in which Wolf Pup indemnified Ellis against all damages incurred by Ellis arising out of the litigation "currently pending in Baldwin County, Alabama, styled as <u>Wolf Pup, LLC v. Linton D. Bowles et al.</u>, CV-2007-900084 . . . ." (Doc. 245-11 at 4, 7). A "buy back" agreement, dated October 5, 2007, executed by Wolf Pup and CCLLC also discussed Wolf Pup buying back the condominium units, which were the subject of litigation, if "Wolf Pup succeeds in the litigation seeking specific performance." (Doc. 245-12 at 2).

release prices for "individual condominium units," signed by Peacock as a guarantor)).

(*Id.* at 30-31). Ellis and CCLLC's claim of fraudulent misrepresentation as to each of these additional written documents centers on the use of the term "condominium," which is the exact argument they make with respect to the contracts.[11]  The court will address each of these documents in turn.

The first document is the conveyance of a condominium unit from Wiggins to Ellis by warranty deed, which was notarized by Peacock.  The Alabama Supreme Court has observed that "[a] notary public is not an insurer, but he is under a duty to his clients to act honestly, skillfully, and with reasonable diligence." *Butler v. Olshan,* 191 So. 2d 7, 16 (Ala. 1966).  More importantly, the Alabama Court of Civil Appeals has recognized that "'[i]n the absence of statute, a notary is held to the care and diligence of a reasonably prudent man to ascertain the acknowledger's identity, but is not an insurer of the truth of the recitals.'"  *First Bank of Childersburg v. Florey*, 676 So. 2d 324 (Ala. Civ. App. 1996) (quoting *Mfrs. Acceptance Corp. v.*

---

[11] A Florida district court addressed a similar fraudulent misrepresentation argument in *McGee v. S-Bay Dev., LLC,* No. 8:11-cv-1091-T-27TGW, 2012 WL 760797, at *1 (M.D. Fla. Mar. 8, 2012). The court found plaintiffs' argument that the development was not a condominium failed because plaintiffs had not filed an action within three years under Florida's condominium statute to determine whether the declaration or other condominium documents complied with the requirements to form a condominium. *Id.* at *2. Furthermore, the court held, "the representation that Sarasota Cay Club was a condominium was not false," noting the entire condominium would not fail because of an omission of common elements and that plaintiffs could seek relief by filing an action to correct or amend the declaration.  Notably, in the instant case, Ellis and CCLLC have taken no action to correct or amend the declaration, and Ellis testified he has not made a claim on the title policy with respect to alleged defects in the declaration.  (Doc. 245-9 at tp. 34, 87; 91-92; 131-32; 342; 359-62).

*Vaughn*, 305 S.W.2d 513, 522 (Tenn. Ct. App. 1957)).   No evidence has been presented that Peacock, as a notary, was instructed to review the documents or that she was charged with knowledge of the contents of the documents she notarized. The court will not impute a higher standard to the duty of a notary than that which has been determined by the Alabama state courts.   Accordingly, the court finds no support for Ellis and CCLLC's fraudulent misrepresentation claim based on Peacock's notarization.

Next, the court turns to the second document - the conveyance of 61 units from Wolf Pup to CCLLC by warranty deed, signed by Peacock as Wolf Pup's authorized representative.  (Doc. 246-6).  The document at issue is an "Assumption Warranty Deed" and specifically states, "WOLF PUP, L.L.C., has caused this instrument to be executed by LINDA PEACOCK, its Authorized Representative, this 26th day of October, 2007."  (*Id.* at 4).  Consistent with this statement, below the signature line, it states "By LINDA PEACOCK Authorized Representative."  (*Id.*). Again, in the LLC acknowledgment section, it states the notary "certif[ies] that LINDA PEACOCK, whose name as Authorized Representative of WOLF PUP, LLC, is signed to the above and foregoing instrument . . . as such Manager and with full authority, executed the same voluntarily . . . for and as the act of the said Wolf Pup, LLC."  (*Id.*).  Finally, the "Seller's Address" is listed as "Wolf Pup, LLC 1600 Wachovia Tower Birmingham, Alabama 35203."   (*Id.*).   Ellis and CCLLC's

argument that "Peacock engaged in misfeasance in knowingly attempting to convey condominium units which she did not properly create" misses the mark.  (Doc. 275 at 33).   Peacock, individually, cannot convey condominium units that she does not own, and it is uncontroverted that Peacock was acting as Wolf Pup's agent in this transaction.

In *Lehr's Ironworks LLC v. Rembrandt Enterprises, Inc.,* the court noted that "Alabama law provides that 'only the principal is bound and subject to suit on [a] contract' *unless* 'the agent fails to disclose the fact that he acts for a principal or fails to disclose the identify [sic] of his principal.'"  *Id.* at No. 1:11-cv-431-MEF, 2011 WL 6182092, at *4 (M.D. Ala. Dec. 13, 2011) (citations omitted).  Clearly, Peacock did not fail to disclose that she was acting for Wolf Pup, as the agency relationship is evident on the face of the document.

Furthermore, the Eleventh Circuit has held that the buyers of condominiums could not state a fraud claim against two individual members of a limited liability company for allegedly drafting a letter representing renovations would be completed by a certain date, despite knowledge of asbestos in the building.  *Lokey v. FDIC*, 608 F. A'ppx 736, 738 (11th Cir. 2015).  The Eleventh Circuit affirmed the Georgia district court's holding the appellants could not pierce the corporate veil to hold members individually liable for the acts of the limited liability company unless they could show that the members had "'abused the forms by which the LLC was

maintained as a separate legal entity. . . . '"  *Id.*  (citation omitted).  To do that, appellants would have to show the individuals "'conduct [] [their personal and LLC business as if they were one by commingling the two on an interchangeable or joint basis or confusing otherwise separate properties, records, or control,' with the purpose of 'defeat[ing] justice or perpetrat[ing] fraud.'"  *Id.* (citation omitted).  The Eleventh Circuit found that even if the individual members had perpetrated a fraud by making representations in the letter, appellants failed to explain how the individuals' actions abused the LLC form since appellants had not suggested any commingling of personal and LLC business or other such conduct.  *Id.*  Likewise, here, Ellis and CCLLC have not even hinted at any abuse by Peacock with respect to the Wolf Pup LLC form.  Accordingly, the court will not pierce the corporate veil to hold Peacock liable on the basis of her signature as an authorized representative of Wolf Pup on the Assumption Warranty Deed.

Finally, the court turns to the third writing relied upon by Ellis and CCLLC: a Release Schedule, discussing release prices for individual condominium units, signed by Peacock as a guarantor.  (Doc. 244-19).  This document is an agreement between Superior Bank, CCLLC, and Wolf Pup that Superior will release individual condominium units from the mortgage pursuant to certain conditions being met and in accordance with the new release schedule attached.  The document replaced the previous release schedule because the parties had entered into a Loan Assumption

and Modification Agreement.  The document states that Wolf Pup enters into the agreement "with the consent of Linda J. Peacock, Joseph Scott Raley, Kelly D. Schuck, Robert L. Wiggins, Jr., and Frank P. Ellis, IV, as guarantors (collectively, the **"Guarantors"**).  (*Id.* at 2) (emphasis in original).  Accordingly, the document was signed by Wiggins and Ellis on behalf of Wolf Pup and CCLLC, respectively, and by each of the guarantors, including Peacock.  Specifically, the guarantor signature page states, "The undersigned, as Guarantor on the Loan, hereby consents to the above revised Release Schedule."  (*Id.* at 6).  Ellis and CCLLC do not provide any authority, nor has the court found any cases, which supports a finding of liability against Peacock for fraudulent misrepresentation based on her consent, as a guarantor on a loan, to a revised condominium release schedule.  Accordingly, the court rejects Ellis and CCLLC's assertion that "Peacock made representations to Ellis and CCLLC that condominium units were legally created in [the aforementioned] written documents."  (Doc. 275 at 33).

## B. Peacock's Declaratory Judgment Claims and Ellis's claim for Breach of Guaranty

Peacock moves for summary judgment on the breach of guaranty claim brought against her by Ellis.  (Doc. 242).  Likewise, Ellis moves for summary judgment on the breach of guaranty claim he asserts against Peacock.  (Doc. 240).  Furthermore, Ellis and CCLLC move for summary judgment on the declaratory

judgment claims asserted by Peacock against them, all of which deal with a release or discharge of her guaranty/surety.  (Doc. 236).

In her brief supporting her motion for summary judgment, Peacock asserts Ellis's claim for breach of guaranty should be dismissed because "(1) Peacock's guaranty is no longer valid or enforceable; (2) the 2007 agreements between the parties require Ellis and CCLLC to pay off the Superior loan; (3) Ellis has not fulfilled his contractual obligation to release the Wolf Pup guarantors . . . ; and (4) Ellis is not a holder in due course of Peacock's guaranty."  (Doc. 254 at 50). Similarly, in her counterclaim against Ellis and CCLLC, Peacock seeks a declaratory judgment that she be released/discharged as a guarantor "pursuant to the 2007 Loan Documents and Agreements," as a surety "pursuant to § 58-3-13 of the Code of Alabama,"[12] and as a surety "pursuant to a series of loans, loan modifications and extensions and impairment of collateral."  (Doc. 183 at 43-45).

The "2007 Loan Documents and Agreements" to which Peacock refers consists of the Modification Agreement and the Pledge Agreement.  (Doc. 183 at 43).  Peacock's position is that the Pledge Agreement "*requires* Ellis and CCLLC to release Peacock from her guaranty . . . ."  (Doc. 254 at 61; *see also* Doc. 272 at 45-49).  The court has already addressed and rejected such an argument in a prior ruling.  (*See* Doc. 158 at 18-20).  For example, the court noted that "Wiggins and

---

[12] It appears the reference to "§ 58-3-13" is a typo and should read "§ 8-3-13."  (Doc. 183 at 44).

Peacock's obligations under the Guaranties cannot be affected or terminated by either the Pledge Agreement between Ellis, Raley, and Wolf Pup or the Repayment Agreement between Ellis, CCLLC, and Wolf Pup." (*Id.* at 18.).  Accordingly, Ellis's motion for summary judgment on Count One of Peacock's counterclaim seeking declaratory judgment based on 2007 loan documents and agreements is due to be granted.

Furthermore, Count Three of Peacock's counterclaim refers to "a series of loans, loan modifications and extensions and impairment of collateral," which consists of the Modification Agreement, the Loan Sale Agreement, and other amendments and extensions, which Peacock argues increased the indebtedness and impaired the collateral for the Wolf Pup Loan.[13]  Peacock's assertions in Count Three continue to focus on other agreements entered into by the parties (many of which do not include Peacock as a party).  In her brief, Peacock does not actually make an argument to support her declaratory judgment claim against Ellis under Count Three.  (*See* Doc. 272 at 45-55).  Her discussion simply appears to be an extension of her argument under Count One. (*Id.*).  Finally, Peacock has not addressed Count Two, specifically Section 8-3-13 of the Code of Alabama, at all in

---

[13] Peacock's assertions related to Ellis's release as a guarantor by Superior has been addressed below, *infra* at 26.

her brief – which is the entire crux of Count Two.  (*Id.*).[14]  Based on the lack of argument and the breach of guaranty analysis below, Ellis and CCLLC's motion for summary judgment regarding Peacock's claims for declaratory judgment under Count Two and Count Three (Doc. 236) is due to be granted.

Peacock moves for summary judgment on Ellis's breach of guaranty claim against her (Doc. 242), citing an Alabama state law case involving a limited guarantee.  *See Eagerton v. Vision Bank*, 99 So. 3d 299 (Ala. 2012); (Doc. 254 at 50-55).  Peacock attempts to distinguish an Alabama district court opinion, *LSREF2 Baron, LLC v. Wyndfield Prop., LLC,* No. 2:12cv965-MHT, 2013 WL 5930546, at *5-6 (M.D. Ala. Nov. 5, 2013), which involved an unlimited guarantee.  (*Id.*; Doc. 291 at 24-27).  Peacock emphasizes that "[t]he third party that purchased the debt in *Wyndfield* was not a co-guarantor or co-investor in the underlying project," as in this situation.  (Doc. 291 at 25).  However, Peacock does not cite any authority to support or explain the significance this point.  Peacock simply argues that based on principles of contract law and promissory and equitable estoppel, Ellis should be prevented from enforcing Peacock's guaranty.  (*Id*. at 27).  In response to Peacock's arguments, Ellis insists "it is clear that *Wyndfield's* analysis is directly applicable to this case" and does not respond to Peacock's arguments regarding contract law and promissory

---

[14] Ellis and CCLLC also point out in their reply brief that "**Peacock does not respond to Ellis/CCLLC's arguments for summary judgment against her as to Counts Two and Three** of her Counterclaims for Declaratory Judgment."  (Doc. 295 at 29-30) (emphasis in original).

and equitable estoppel.  (Doc. 275 at 60).  Accordingly, the court has conducted its own research and finds several cases instructive on the issue.

In *In re Basil Street Partners, LLC v. Basil Street Partners, LLC*, No. 9:11-bk-19510-FMD, 2012 WL 6101914, (Bankr. M.D. Fla. Dec. 7, 2012), the bankruptcy court analyzed a similar situation involving unconditional guaranties executed in favor of a bank for payment of a note, a subsequent loan modification agreement, and an eventual sale and assignment of the loan (including the note, mortgage, and guaranties) to an entity owned by one of the co-guarantors.  *Id.* at *1-10 .  The *Basil* court noted that under Florida law, co-guarantors are limited to claims for contribution from each other based on the amount actually paid.  *Id.* at *16.  Although *Basil* was based on Florida law, Peacock has not provided any authority to suggest a different outcome would result under Alabama law based on equitable principles.[15]  In fact, in *Cooper v. MTA, Inc.*, 166 So. 3d 106 (Ala. 2014), the Supreme Court of Alabama reversed summary judgment in a case involving

---

[15] In *Pirani v. Baharia*, 824 F.3d 483, 499-500 (5th Cir. 2016), the Fifth Circuit noted that although Texas law allows a guarantor to purchase an underlying note and guaranty agreement and assert a claim against his co-guarantors, the "'assignment of an underlying note and guaranty agreement to a guarantor does not change the status of the guarantor in relation to his co-guarantors.'" (citation omitted).  In other words, the assignee guarantor cannot sue the co-guarantors for the full deficiency but only for their contributive share.  *Id. See also*, *Lavender v. Bunch,* 216 S.W.3d 548, 553 (Tex. App. 2007) ("When Bunch acquired the promissory note . . . he did not trade the hat of guarantor of the note for that of holder of the obligation; he wore both hats.  As between the coguarantors, he still maintained some liability to his coguarantors for the satisfaction of the debt.").

assignments, enforcement of guarantees, and contribution.  The court quoted both parties' arguments at length, which included the statement that "[t]he right to contribution against co-guarantors is a well-established, historical principle of Alabama law."  *Id.* at 109.[16]

*Basil* presented a similar fact pattern to the case at hand.  The *Basil* court noted that one of the guarantors, Antaramian, acquired the loan from the bank at a "steep discount" but then sought to collect the entire loan balance from his former co-guarantors.  *Basil,* 2012 WL 6101914, at *16.  The court held that it "cannot countenance this unjust enrichment at the expense of Antaramian's co-guarantors, who would each end up being liable to Antaramian for more than what he alone paid to [the bank].  The amount of a claim for contribution is based on the amount paid to acquire an assignment of the underlying debt."  *Id.* at 17.  The court noted that "[t]his ruling is faithful to the equitable principles that apply generally in the contribution context, and also prevents Antaramian from avoiding his percentage of liability by the immense profit he would obtain at the expense of his co-guarantors." *Id.*

Likewise, in a key case on the rights of coguarantors against each other, *Mandolfo v. Chudy*, 564 N.W.2d 266 (Neb. Ct. App. 1997), the Nebraska Court of

---

[16] The movant in *Cooper* also cited Alabama surety law, Ala. Code § 8-3-42(2)(a), and asserted that "it has been clearly established in Alabama that the terms 'surety' and 'guarantor' are interchangeable in this context." 166 So. 3d at 108.

Appeals noted, "The fact that the [plaintiffs] attempted to maneuver themselves into a different position by becoming the creditors does not erase their coguarantor status with [the defendant]. . . . [T]he [plaintiffs'] action in voluntarily buying the note from American does not affect or expand [defendant's] liability as a coguarantor." *Id.* at 271. The Nebraska Supreme Court affirmed the lower court and rejected the plaintiffs' argument that the transfer of the note vested in them the right to enforce the note under the Nebraska Uniform Commercial Code, permitting them to proceed as a creditor and recover the full amount of the note. *Mandolfo v. Chudy,* 573 N.W.2d 135, 138 (Neb. 1998). The court found that "the guaranty under which [defendant's] rights are determined is not a negotiable instrument and is not subject to the provisions of [the Uniform Commercial Code]." *Id.* at 138.[17]

Here, as in *Basil* and *Mandolfo*, the court finds the law of contribution applies. The court rejects Ellis's argument "the Guarantors owe to Ellis, as assignee of the guaranties . . . the total sum of $16,893,381.92 . . . plus attorney's fees and expenses of $340,597.38." (Doc. 241 at 16). To come to a different conclusion would not only be unfair and inequitable, it would be absurd.

Although the *Basil* court found that contribution was applicable, it was unable to determine the exact amounts under the contribution claim. *Basil,* 2012 WL

---

[17] Likewise, the undersigned rejects any argument the guaranties at issue in this case are negotiable instruments and subject to the Uniform Commercial Code under Alabama law. (*See* Doc. 254 at 55-60; Doc. 272 at 35-40; Doc. 275 at 62-63).

6101914, at *18.   The court noted that other factual and legal considerations needed to be addressed by the parties, including the value of the loan, the value of the property, the foreclosure sale, and whether pre-judgment interest was warranted.  *Id. See also, Amphibious Partners, LLC, v. Redman*, No. 06-CV-031-B, 2007 WL 9697712 (D. Wyo. Sept. 18, 2007) ("The rule of equal or *pro tanto* contribution is not absolute.   If . . . one **or more of the co-obligors have received a disproportionate benefit from the transaction, then disproportionate contribution may be allowed.**) (emphasis in original).  As in *Basil,* this court cannot make a determination as to the amount of contribution due from each guarantor because of several issues not addressed by the parties.

In 2005, Peacock, Wiggins, Raley, and Schuck *jointly and severally* signed unlimited continuing guaranties for the Loan from Superior to Wolf Pup for approximately $17,500,000.   (Doc. 117-2 at 25-40).   In 2007, when CCLLC purchased the Property from Wolf Pup and assumed the Loan, Ellis *jointly and severally* executed an unlimited continuing guaranty to secure the Loan. (*See* Doc. 112 at ¶ 14; Doc. 117-3 at 5-6, 19).  The guaranties of Peacock, Raley, Schuck, and Wiggins "continue[d] in full force and effect. . . ."   (Doc. 117-3 at 10).   It is undisputed that the guarantors are **Peacock, Wiggins, Raley, Schuck, and Ellis.**[18]

---

[18] Raley and Shuck, as co-guarantors, must be considered in the calculation of each party's contributory share.

In December 2010, Superior sold the Loan to Ellis.  (Doc. 112 at ¶ 22).  The 2010 Loan Sale Agreement states:

> [Superior] acknowledges and agrees that the Wolf Pup Loan Guaranty and the Furnishing Loan Guaranty from Frank P. Ellis, IV (collectively, the "**Ellis Guaranties**") are not being collaterally assigned by Borrower to [Superior] since such Ellis Guaranties, once purchased by Borrower (Frank P. Ellis, IV), essentially will become a guaranty from Frank P. Ellis, IV to Frank P. Ellis, IV, and, upon the closing of this transaction, such Ellis Guaranties shall be deemed cancelled and terminated by Mr. Ellis and shall be of no further force and effect, and further, because the Ellis Guaranties are not being collaterally assigned to [Superior], [Superior] consents to the termination of the Ellis Guaranties by Frank P. Ellis, IV, and Lender shall not attempt to enforce the Ellis Guaranties against Frank P. Ellis, IV.

(Doc. 255-24 at 9) (emphasis in original).[19]  At the time of the sale, Ellis borrowed approximately $16,000,000 from Superior, which Peacock claims included a $500,000 loan for furnishings in the condominiums.  (Doc. 112 at ¶ 22; Doc. 119-5 at 5). Ellis asserts "regarding the five furnishing loans in the Loan Sale Agreement from Superior to Ellis, Peacock is not obligated under such indebtedness," citing "Ex. 60 at 226-27; Ex. 47 at 15, 18-19" in support of his position.  (Doc. 237 at 35). The explanation provided by Ellis is conclusory, and the citation is ambiguous at best.  The court is unable to determine if the value of the furnishings should be taken into account in the calculation of the contribution among all the guarantors.

---

[19] Regardless of whether Superior chose not to enforce Ellis's guaranty, Ellis cannot unilaterally "cancel and terminate" his portion of the contribution due under the guaranties.  *See Basil,* 2012 WL 6101914, at **5, 10, 16-17.

Finally, the Ellis Loan was assigned to Cadence Bank.  (Doc. 94 at ¶ 34).  In 2014, Cadence and Ellis entered into a settlement agreement, and Ellis foreclosed on the Property and sold it for $5.75 million to Trinity Retreat, LLC.  (Doc. 106 at 143-160; s*ee* Doc. 119-8).  At the time, Trinity was an entity owned by Ellis's wife but is now also owned by Ellis.  (*See* Doc. 119-8; *see also* Doc. 94 at ¶ 34).  Clearly, Ellis has received the benefit of this sale since he continues to share ownership of the Property with his wife.  Furthermore, Cadence received the $5.75 million from the sale and agreed to release Ellis from his personal obligations under the Ellis Loan.  (Doc. 106 at 151-53).  Ellis asserts he "credited the outstanding indebtedness due and owing him under the Wolf Pup Loan $5,750,000.00 upon the foreclosure of the Wolf Pup Loan mortgage.  Thus, Peacock was given full credit against the amounts she owed under the Wolf Pup Loan."  (Doc. 237 at 35-36).  However, Ellis provides no citation to support his assertion.  *Id.*  The amount of contribution by each guarantor will clearly be offset by the amount of the foreclosure proceeds.

In conclusion, it is apparent from this tangled web of transactions over a nine-year period there are additional factual and legal issues concerning the amount of contribution by each guarantor the parties have not briefed. The precise amount of contribution, if any, from Peacock, cannot be determined from the record.  *See Amphibious Partners,* 2007 WL 9697712, at *2 ("Parties who received the entire benefit from the principal transaction are required to bear the entire burden and

cannot compel contribution from their co-obligors, and their co-obligors cannot have contribution between themselves but only against the parties receiving the whole benefit."); *Backman v. Hibernia Holdings, Inc.*, No. 96 Civ. 9590 (LAP), 1998 WL 427675, at *7 (S.D.N.Y. July 28, 1998) (denying summary judgment "[b]ecause the record is insufficient to determine the parties' respective pro rata shares . . as to damages" and left open the "question of what, if any, amount [plaintiff] is entitled to recover on the [] Guaranty"). Thus, the breach of guaranty claim is limited to a claim of contribution. Accordingly, both Peacock's motion for summary judgment and Ellis's motion for summary judgment on the breach of guaranty claim are denied, insofar as the issue of contribution cannot be determined.

## IV.    CONCLUSION

Based on the foregoing, Ellis and CCLLC's motion for summary judgment on Peacock's claims for declaratory judgment (Doc. 236) is **GRANTED**; Peacock's motion for summary judgment on Ellis and CCLLC's claims (Doc. 242) is **GRANTED** in part and **DENIED** in part; and the motion for summary judgment on Ellis's counterclaim for breach of guaranty against Peacock (Doc. 240) is **GRANTED** in part and **DENIED** in part.

**DONE** this 1st day of June, 2020.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE