FILED
2021 Feb-12  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT L. WIGGINS, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:12-cv-02705-SGC |
| | ) | |
| FRANK ELLIS, IV, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

This case is before the court on reconsideration[2] of: (1) Frank P. Ellis, IV ("Ellis"), and Character Counts, LLC's ("CCLLC") (together, "Defendants"), defensive motion for summary judgment as to the claims of Linda J. Peacock ("Peacock") (Doc. 236); (2) Peacock's defensive motion for summary judgment on all claims by Defendants (Doc. 242); and (3) that portion of Defendants' offensive motion for summary judgment as to their counterclaim for breach of guaranty against Peacock (Doc. 240).[3]  The motions are fully briefed.  (Docs. 237, 241, 254, 272, 275, 291, 295; *see also* Docs. 314, 315, 319-322).

---

[1] The parties have consented to the dispositive jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 193).

[2] The instant memorandum opinion and order replaces the court's withdrawn June 1, 2020 memorandum opinion and order (the "Withdrawn Opinion").

[3] The court will address the other counterclaims discussed in Defendants' motion, which involve plaintiffs Robert L. Wiggins, Jr., and Wolf Pup, LLC (together, "Plaintiffs"), in a forthcoming

With respect to Defendants' motion as to Peacock's declaratory judgment claims, Defendants move for defensive summary judgment on (1) "Count One – Declaratory Judgment Releasing/Discharging Peacock as a Guarantor Pursuant to the 2007 Loan Documents and Agreements," (2) "Count Two – Declaratory Judgment Releasing Surety Pursuant to § 58-3-13 of the Code of Alabama," and (3) "Count Three – Declaratory Judgment Discharging Surety Pursuant to a Series of Loans, Loan Modifications and Extensions and Impairment of Collateral."  (Doc. 236; Doc. 183 at 43-52).  As to Peacock's motion, she seeks defensive summary judgment on the fraud and breach of guaranty counterclaims asserted by Defendants in their Amended Counterclaim and Amendment to Counterclaim.  (Docs. 242, 112, 187).  Finally, Ellis moves for offensive summary judgment on Count Three of the counterclaim for breach of guaranty against Peacock.  (Doc. 240).

As explained below, the court concludes: (1) Peacock's defensive motion for summary judgment (Doc. 242) is due to be granted in its entirety; (2) Defendants' defensive motion for summary judgment on Peacock's claims for declaratory judgment (Doc. 236) is due to be granted in part and denied in part; and (3) Ellis's

---

opinion.  (Doc. 240).  Defendants confirm the breach of guaranty claim against Peacock is asserted by Ellis alone.  (Doc. 275 at 54, n.16).

offensive motion for summary judgment on his breach of guaranty counterclaim against Peacock (Doc. 240) is due to be denied.[4]

## I.   STANDARD OF REVIEW

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

---

[4] The court has federal subject matter jurisdiction over the instant claims and counterclaims by virtue of Plaintiffs' claims against FDIC. 12 U.S.C. § 1819(b)(2)(A). While all claims against FDIC have been dismissed, the court retains original jurisdiction over pendent claims between non-FDIC parties. *See Lindley v. Fed. Deposit Ins. Corp.*, 733 F.3d 1043, 1050-51 (11th Cir. 2013); *Bishop v. Darby Bank & Trust Co.*, 2011 WL 4499575, at *1 (S.D. Ga. 2011). This conclusion is more thoroughly discussed in the forthcoming opinion regarding Plaintiffs' and Defendants' cross-motions for summary judgment.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a series of loans and transactions related to a real estate development in Baldwin County, Alabama. In 2005, Plaintiff Wolf Pup, LLC ("Wolf Pup"), borrowed approximately $17,500,000.00 from Superior Bank (the "Loan") to purchase land and construct a 62-unit condominium development named Wolf Bay Landing in Baldwin County, Alabama (the "Property"). (*E.g.* Doc. 237 at 3-4). Plaintiff Robert L. Wiggins, Jr. ("Wiggins"),[5] and third-party defendant/counterclaim plaintiff Peacock are indirect owners and members of Wolf Pup. (*Id.*).

The Loan was secured by a mortgage on the Property; Wiggins and Peacock also executed unlimited continuing guaranties to secure the Loan (the "Guaranties").

---

[5] Wolf Pup and Wiggins are collectively referred to as "Plaintiffs" in this Memorandum Opinion.

(*E.g.* Doc. 237 at 4).  Under the Guaranties, the guarantors "jointly and severally

unconditionally guarantee and promise to pay the Bank" the indebtedness under the

Loan.  (Doc. 117-2 at 33).  The Guaranties further provide in part:

> [T]his Guaranty may not be revoked or terminated, other than with the prior written consent of the Bank, except upon strict compliance with the conditions and requirements heretofore set forth in this Section (2), and this Guaranty will not be revoked or terminated by any action, event or circumstance, including payment in full of all of the indebtedness. . . .
>
> The obligations of the Guarantors hereunder are joint and several, and independent of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against any one or more of the Guarantors whether action is brought against Borrowers or any other Guarantor . . . .
>
> It is the intent hereof that this obligation of Guarantors shall be and remain unaffected, (a) by the existence or non-existence, validity or invalidity, of any pledge, assignment or conveyance given as security; or (b) by any understanding or agreement that any other person, firm or corporation was or is to execute this or any other guaranty, . . . or any other document or instrument or was or is to provide collateral for any indebtedness.
>
> . . . .
>
> No right or power of Bank hereunder shall be deemed to have been waived by any act or conduct or failure or delay to act on the part of the Bank . . . .  Bank may without notice assign this Guaranty in whole or in part and each reference herein to Bank shall be deemed to include its successors and assigns.

(Doc. 117-2 at 33-35).

In late 2007, CCLLC purchased the Property from Wolf Pup by assuming the

Loan.  (*See* Doc. 112 at ¶ 14).  In connection with the sales transaction for the

Property, CCLLC, Wolf Pup, and Superior Bank executed a Loan Assumption and

Modification Agreement dated October 5, 2007 (the "Modification Agreement").

(Doc. 246-1 at 5).  The Modification Agreement provides that Wolf Pup remained

liable under the Loan:

> It is the intent of this instrument, and [Wolf Pup], [Superior,] and
> CCLLC agree, that [Wolf Pup] shall remain liable under the Note and
> the other Loan Documents, and upon the occurrence of an Event of
> Default by CCLLC under the Note or the other Loan Documents, and
> in addition to [Superior]'s right to enforce the Loan Documents and
> pursue its remedies against CCLLC, [Superior] may enforce the terms
> of the Note against and collect the indebtedness evidenced by the Note
> from [Wolf Pup], all to the same extent as if this instrument had never
> been executed.

(Doc. 246-1 at 5).  The Modification Agreement required Ellis to execute an

unlimited continuing guaranty to secure the loan and required that the Guaranties

executed by Wiggins and Peacock "shall continue in full force and effect and shall

continue to secure the Loan . . . ."  (*Id.* at 10).

In addition to the Modification Agreement, certain parties to this litigation

executed several other agreements effective as of on October 5, 2007, in connection

with CCLLC's assumption of the Loan.  Those agreements include: (1) a contract

simply entitled "Agreement" (the "Repayment Agreement") between Ellis,

CCLLC,[6] and Wolf Pup (Doc. 246-5); and (2) the Membership Interest Pledge

Agreement (the "Pledge Agreement") between Ellis, Joseph Scott Raley (another

---

[6] The Repayment Agreement defines Ellis and CCLLC as the "Borrower."  (Doc. 246-5 at 2).

indirect owner and member of Wolf Pup) as "Pledgors," and Wolf Pup as "Pledgee."

(Doc. 246-2 at 2, 6).  Paragraph 12 of the Pledge Agreement provides, in part:

> All indebtedness to Superior Bank shall be refinanced, or otherwise
> paid in full, on or before one (1) year from the date hereof, and the
> current guarantors thereof released, or the Borrowers shall be
> considered in default, and in default of the Loan Documents.

(Doc. 246-2 at 6).  The Modification Agreement explicitly names Peacock as a

guarantor.  (Doc. 246-1 at 2, 9).  Ellis's testimony confirms that the parties' intent

was to release Peacock and the other guarantors.   (Doc. 255-1 at 24, 82).

After the notes for the Loan matured in September 2009, Superior Bank

offered to sell the Loan to Ellis and each of the other guarantors.  (*E.g.* Doc. 237 at

19-20).   On December 23, 2010, Superior sold the Loan to Ellis and assigned the

Loan Documents to him, including the note, mortgage, and the Guaranties executed

by Wiggins and Peacock.[7]   (Doc. 245-28; *see, e.g.,* Doc. 254 at 19).   Ellis later

foreclosed on the mortgage on the Property in June 2014 and sold the Property to

Trinity Retreat, LLC, an entity owned by Ellis's wife.  (*See* Doc. 119-8; Doc. 255-1

at 5-6).  Ellis subsequently became a member of Trinity Retreat.  (Doc. 255-1 at 5-

6).

---

[7] To finance his purchase of the Loan, Ellis borrowed money from Superior Bank.  (*E.g.* Doc. 119-
5 at 5).  As collateral for his personal loan, Ellis granted a security interest in the Loan Documents,
including the Guaranties, back to Superior.  (*Id.*).

A.      **The State Court Litigation**

Before CCLLC assumed the Loan in October 2007, Wolf Pup entered into pre-construction sales contracts for each of the condominium units at the Property. (*See* Doc. 237 at 2).  After the purchasers of the units refused to close, Wolf Pup filed suit in Alabama state court against the purchasers in February 2007, seeking specific performance of the sales contracts (the "State Court Litigation").  (Doc. 244-5).  In May 2007, the purchasers filed a counterclaim against Wolf Pup asserting claims for breach of contract, suppression, fraud, and deceit.  (Doc. 127-1).  The counterclaims focused on the Wolf Pup's failure to properly construct and permit deeded boat slips.  (*Id.*).

In December 2009, the defendants in the State Court Litigation moved for summary judgment on Wolf Pup's claims for specific performance on the grounds the sales contracts could not have closed because Wolf Pup failed to legally create the condominium units for the Property.  (Doc. 132-2 at 3).  On December 9, 2010, the judge in the State Court Litigation granted the defendants' motion for summary judgment and entered an order holding the April 17, 2007 Declaration of Condominium of Wolf Bay Landing failed to satisfy the requirements of the Alabama Uniform Condominium Act; therefore, the court concluded the Declaration did not legally create separate condominium units that could exist and be conveyed as separate parcels of real estate.  (Doc. 127-2).

Defendants allege that after CCLLC purchased the Property, they learned the Declaration of Condominium for the Property was defective and failed to legally create any condominium units for resale. (*See* Doc. 237 at 20). Defendants contend, despite Wiggins and Peacock's knowledge of problems relating to the creation of the condominium units, "Ellis was informed and led to believe that Wolf Bay Landing was a legally created ready-to-sell condominium project." (*Id.* at 7; *see id* at 8-19). Defendants claim their belief "that Wolf Bay Landing was validly created under Alabama law" induced them to purchase the Property. (Doc. 237 at 8). Finally, Defendants assert the Property was worth less than the $23 million they had anticipated it was worth. (*See* Doc. 240 at 3).

**B.     Procedural Posture of This Action**

Plaintiffs initiated this action in 2012 against the FDIC, as receiver for Superior Bank, and amended their complaint in 2015 to assert claims against the FDIC, Ellis, and CCLLC. (Docs. 1, 22). After Plaintiffs filed a second amended complaint in 2016 (Doc. 94), Defendants asserted amended counterclaims against Plaintiffs and third-party claims against Peacock (Doc. 112). Plaintiffs and Peacock moved to dismiss the counterclaims against them pursuant to Rule 12(b)(6). (Docs. 117, 118).

The court granted Peacock's motion in part and denied it in part, allowing Ellis's claim for breach of guaranty to proceed. (Docs. 180, 181).[8]  Following the court's order, Peacock asserted counterclaims against Defendants seeking a declaratory judgment releasing her as a guarantor of the loan.  (Doc. 183). Defendants answered Peacock's counterclaims and reasserted their fraudulent misrepresentation claim against her as a counterclaim-in-reply to her counterclaims for declaratory judgment. (Docs. 187, 188).  Upon further motions to dismiss (Docs. 192, 194) the court denied Peacock's motion to dismiss Defendants' counterclaim-in-reply for fraudulent misrepresentation (Doc. 210).

## III.   DISCUSSION

### A.   <u>Fraudulent Misrepresentation Claim</u>

Peacock moves for summary judgment on Defendants' claim for fraudulent misrepresentation against her.  (Doc. 242).   To state a claim for fraudulent misrepresentation, Defendants must allege facts showing "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by [Defendants] (4) who suffered damage as a proximate consequence of the misrepresentation."  *Exxon Mobil Corp. v. Ala. Dep't of Cons. and Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (quotation and emphasis omitted).

---

[8] The fraudulent misrepresentation claim against Peacock was dismissed based on the statute of limitations.  (*See* Doc. 158 at 27).

"Misrepresentation may take many forms, a verbal misrepresentation being just one form." *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345, 1351 (Ala. 1991).   A fraudulent misrepresentation claim may be based on conduct or misrepresentations contained within a written document.  *Id.*  ("The statements and conduct of the parties must be viewed in their entirety to adequately resolve the question of whether a misrepresentation has occurred.").

Peacock argues that Defendants cannot assert "tort-based liability on contractual claims."  (Doc. 291 at 11).  This court rejected a similar argument made by Plaintiffs, noting Defendants had also asserted claims that Plaintiffs made representations regarding condominium units to induce Defendants to purchase the Property.  (*See* Doc. 214 at 11).  These allegations include Peacock.  (*See* Doc. 187 at ¶¶ 18-19, 33, 50-52, 62-63).[9]  The court found, under Alabama law, Defendants may assert a counterclaim of fraudulent misrepresentation, along with their breach of contract claims; accordingly, the same analysis applies to Peacock.  (Doc. 244 at 11).

---

[9] Defendants allege in part: (1) Peacock directed Raley to inform Ellis the Property "was a legally created, ready-to-sell condominium project"; (2) "Peacock continued to represent to CCLLC, Ellis, and Superior that the [condominium] units could be sold as a means of paying off the indebtedness due to Superior"; (3) "Peacock . . . informed Ellis and CCLLC that the condominium units were properly formed under applicable law, ready for resale as 62 separate units to third party purchasers"; and (4) "in ongoing communications throughout August, September, October, and November 2007, [] Peacock . . . informed Ellis and CCLLC that [the Property] was a legally created, ready-to-sell condominium project."  (Doc. 187 at ¶¶ 19, 33, 52,  56).

In applying this analysis, however, "an alleged written misrepresentation in a contract, without more, cannot be actionable as fraud in Alabama." *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1275 (M.D. Ala. 2007). Furthermore, "[u]nder Alabama law, the plaintiffs must aver that there were either oral or written misrepresentations made before the signing of the contract or during the performance of the contract." *Id.* at 1276.[10] For example, in reversing summary judgment in *Goggans v. Realty Sales & Mortg.*, 675 So. 2d 441 (Ala. Civ. App. 1996), the Alabama appellate court noted that, not only was there an incorrect maturity date on the loan assumption documents, but also that when buyers asked during closing if the assumption statement reflected the corrected maturity date, both owners and their agent indicated that it did. *Id.* at 442-43.[11]

---

[10] Interestingly, the *Pearson's Pharmacy* court noted that one of the cases relied upon by the Plaintiffs, *Deupree v. Butner*, 522 So. 2d 242 (Ala. 1988), involved making false representations to purchasers of a townhome and to a state governmental entity about the building of a boat slip. 505 F. Supp. 2d at 1276; s*ee supra* at n.7. The *Pearson's Pharmacy* court noted that the *Deupree* case was inapposite to the facts at hand because there was actual evidence, "*independent of the contractual promise,*" of proof of fraud by the developer. *Id.* at 1277.

[11] In *Morris v. Strickling*, 579 So. 2d 609, 610-11 (Ala. 1991), the Alabama Supreme Court affirmed summary judgment in favor of the defendants on a fraudulent misrepresentation claim. The court noted the plaintiffs did not question the defendants regarding the suitability of the lot purchased and furthermore recognized the subdivision plans were public records and available to the plaintiffs. *See also*, *Gewin v. TCF Asset Mgmt. Corp.*, 668 So. 2d 523, 529 (Ala. 1995) ("The existence of the litigation was a matter of public record. . . . Thus, experienced real estate investors, like [plaintiffs], could have discovered it by the exercise of due diligence.") (citation omitted); *Auburn's Gameday Ctr. at Magnolia Corner Owners Assoc. Inc. v. Murray*, 138 So. 2d 317, 331 (Ala. Civ. App. 2013) (affirming judgment in favor of condominium complex, noting the buyers "were placed on notice of the existence of the publicly recorded declaration and amendment" and were "familiar with and had experience in the workings of condominiums"). Here, Ellis testified about his extensive background in real estate. (Doc. 245-9 at 18-23; 42). He further stated he did not ask any questions about whether the declaration had been legally created and that he was aware

Defendants admit they "base some of their fraudulent misrepresentation claim on the contracts which claim that Wolf Bay Landing was a condominium.  However, there are other writings which form the basis of this claim . . . ."  (Doc. 275 at 32). They argue that "Peacock made representations in multiple **writings** to Ellis and CCLLC, both in the contract themselves **and** in other documents."  (*Id.* at 28). Specifically, Ellis and CCLLC assert:

> Peacock made representations to Ellis and CCLLC that condominium units were legally created in written documents, including:  (a) the purported conveyance of Unit A301 from Wiggins to Ellis by warranty deed dated November 13, 2007 and notarized by Peacock (Ellis Ex. 36 (Doc. 246-11) (noting Wolf Bay Landing as "a condominium")); (b) the purported conveyance of 60 units from Wolf Pup to CCLLC by warranty deed dated October 26, 2007, with Peacock signing as Wolf Pup's Authorized Representative (Ellis Ex. 31 (Doc. 246-6) (describing the conveyance of 60 units of "Wolf Bay Landing, a condominium")); and (c) the Release Schedule (Ellis Ex. 19 (Doc. 244-19) (discussing release prices for "individual condominium units," signed by Peacock as a guarantor)).

(*Id.* at 30-31).  Ellis and CCLLC's claim of fraudulent misrepresentation as to each of these additional written documents centers on the use of the term "condominium,"

---

of the lawsuit, which was a public record, but did not investigate.  (*Id.* at 68-70; 75-79; 161-62; 270; 275; 315).  In fact, the Real Estate Purchase Agreement dated August 9, 2007, between Wolf Pup and Ellis specifically stated that "[t]here are no suits, including the present litigation styled Wolf Pup, LLC v. Linton Bowles, et al. CV 2007-900084 . . . which might affect the Purchaser's clear title to the Subject Property" and included a provision in which Wolf Pup indemnified Ellis against all damages incurred by Ellis arising out of the litigation "currently pending in Baldwin County, Alabama, styled as Wolf Pup, LLC v. Linton D. Bowles et al., CV-2007-900084 . . . ." (Doc. 245-11 at 4, 7).  A "buy back" agreement, dated October 5, 2007, executed by Wolf Pup and CCLLC also discussed Wolf Pup buying back the condominium units, which were the subject of litigation, if "Wolf Pup succeeds in the litigation seeking specific performance."  (Doc. 245-12 at 2).

which is the exact argument they make with respect to the contracts.[12]   The court will address each of these documents in turn.

The first document is the conveyance of a condominium unit from Wiggins to Ellis by warranty deed, which was notarized by Peacock.  The Alabama Supreme Court has observed that "[a] notary public is not an insurer, but he is under a duty to his clients to act honestly, skillfully, and with reasonable diligence."  *Butler v. Olshan,* 191 So. 2d 7, 16 (Ala. 1966).  More importantly, the Alabama Court of Civil Appeals has recognized that "'[i]n the absence of statute, a notary is held to the care and diligence of a reasonably prudent man to ascertain the acknowledger's identity, but is not an insurer of the truth of the recitals.'"  *First Bank of Childersburg v. Florey*, 676 So. 2d 324 (Ala. Civ. App. 1996) (quoting *Mfrs. Acceptance Corp. v. Vaughn,* 305 S.W.2d 513, 522 (Tenn. Ct. App. 1957)).  No evidence has been presented that Peacock, as a notary, was instructed to review the documents or that she was charged with knowledge of the contents of the documents she notarized.

---

[12] A Florida district court addressed a similar fraudulent misrepresentation argument in *McGee v. S-Bay Dev., LLC,* No. 11-1091, 2012 WL 760797, at *1 (M.D. Fla. Mar. 8, 2012).  The court found plaintiffs' argument that the development was not a condominium failed because plaintiffs had not filed an action within three years under Florida's condominium statute to determine whether the declaration or other condominium documents complied with the requirements to form a condominium.  *Id.* at *2.  Furthermore, the court held, "the representation that Sarasota Cay Club was a condominium was not false," noting the entire condominium would not fail because of an omission of common elements and that plaintiffs could seek relief by filing an action to correct or amend the declaration.  Notably, in the instant case, Ellis and CCLLC took no action to correct or amend the declaration, and Ellis testified he has not made a claim on the title policy with respect to alleged defects in the declaration.  (Doc. 245-9 at 34, 87, 91-92, 131-32, 342, 359-62).  Furthermore, Trinity Retreat filed a new declaration of condominium on June 25, 2014, after the foreclosure sale.  (Doc. 183-6).

The court will not impute a higher standard to the duty of a notary than that which has been determined by the Alabama state courts.  Accordingly, the court finds no support for Ellis and CCLLC's fraudulent misrepresentation claim based on Peacock's notarization.

Next, the court turns to the second document—the conveyance of 60 units[13] from Wolf Pup to CCLLC by warranty deed, signed by Peacock as Wolf Pup's authorized representative.  (Doc. 246-6).  The document at issue is an "Assumption Warranty Deed" and specifically states, "WOLF PUP, L.L.C., has caused this instrument to be executed by LINDA PEACOCK, its Authorized Representative, this 26th day of October, 2007."  (*Id.* at 4).  Consistent with this statement, below the signature line, it states "By LINDA PEACOCK Authorized Representative." (*Id.*).  Again, in the LLC acknowledgment section, it states the notary "certif[ies] that LINDA PEACOCK, whose name as Authorized Representative of WOLF PUP, LLC, is signed to the above and foregoing instrument . . . as such Manager and with full authority, executed the same voluntarily . . . for and as the act of the said Wolf Pup, LLC."  (*Id.*).  Finally, the "Seller's Address" is listed as "Wolf Pup, LLC 1600 Wachovia Tower Birmingham, Alabama 35203."   (*Id.*).   Ellis and CCLLC's

---

[13] The Assumption Warranty Deed actually lists 61 units.  (Doc. 246-6 at 2).  This appears to be a typo in the instrument.  The parties uniformly refer to Wolf Bay Landing as consisting of 62 units. Two of those units—A301 and A110—were conveyed separately to Ellis and Raley, respectively. Neither A301 or A110 is referenced in the Assumption Warranty Deed.

argument that "Peacock engaged in misfeasance in knowingly attempting to convey condominium units which she did not properly create" misses the mark.  (Doc. 275 at 33).  Peacock, individually, cannot convey condominium units that she does not own, and it is uncontroverted that Peacock was acting as Wolf Pup's agent in this transaction.

In *Lehr's Ironworks LLC v. Rembrandt Enters., Inc.,* the court noted "Alabama law provides that 'only the principal is bound and subject to suit on [a] contract' *unless* 'the agent fails to disclose the fact that he acts for a principal or fails to disclose the identify [sic] of his principal.'"  No. 11-0431, 2011 WL 6182092, at *4 (M.D. Ala. Dec. 13, 2011) (citations omitted).  Clearly, Peacock did not fail to disclose that she was acting for Wolf Pup, as the agency relationship is evident on the face of the document.

Furthermore, the Eleventh Circuit has held that the buyers of condominiums could not state a fraud claim against two individual members of a limited liability company for allegedly drafting a letter representing renovations would be completed by a certain date, despite knowledge of asbestos in the building.  *Lokey v. FDIC*, 608 F. A'ppx 736, 738 (11th Cir. 2015).  The Eleventh Circuit affirmed the Georgia district court's holding the appellants could not pierce the corporate veil to hold members individually liable for the acts of the limited liability company unless they could show that the members had "abused the forms by which the LLC was

16

maintained as a separate legal entity. . . ." *Id.* To make that showing, a party must demonstrate the individuals "conduct their personal and LLC business as if they were one by commingling the two on an interchangeable or joint basis or confusing otherwise separate properties, records, or control, with the purpose of defeating justice or perpetrating fraud." *Id.* (quotation omitted; alterations incorporated). The Eleventh Circuit found that even if the individual members had perpetrated a fraud by making representations in the letter, appellants failed to explain how the individuals' actions abused the LLC form since appellants had not suggested any commingling of personal and LLC business or other such conduct. *Id.* Likewise, here, Ellis and CCLLC have not even hinted at any abuse by Peacock with respect to the Wolf Pup LLC form. Accordingly, the court will not pierce the corporate veil to hold Peacock liable on the basis of her signature as an authorized representative of Wolf Pup on the Assumption Warranty Deed.

Finally, the court turns to the third writing relied upon by Defendants: a Release Schedule, discussing release prices for individual condominium units, signed by Peacock as a guarantor. (Doc. 244-19). This document is an agreement between Superior Bank, CCLLC, and Wolf Pup that Superior will release individual condominium units from the mortgage pursuant to certain conditions being met and in accordance with the new release schedule attached. The document replaced the previous release schedule because the parties had entered into the Modification

Agreement.  The document states Wolf Pup entered into the agreement "with the consent of Linda J. Peacock, Joseph Scott Raley, Kelly D. Schuck, Robert L. Wiggins, Jr., and Frank P. Ellis, IV, as guarantors (collectively, the **"Guarantors"**)."  (*Id.* at 2).  Accordingly, the document was signed by Wiggins and Ellis on behalf of Wolf Pup and CCLLC, respectively, and by each of the guarantors, including Peacock.  Specifically, the guarantor signature page states, "The undersigned, as Guarantor on the Loan, hereby consents to the above revised Release Schedule."  (*Id.* at 6).  Defendants do not provide any authority, nor has the court found any, which supports a finding of liability against Peacock for fraudulent misrepresentation based on her consent, as a guarantor on a loan, to a revised condominium release schedule.  Accordingly, the court rejects Defendants' assertion that "Peacock made representations to Ellis and CCLLC that condominium units were legally created in [the aforementioned] written documents."  (Doc. 275 at 33).

For the foregoing reasons, there are no genuine issues of material fact, and Peacock is entitled to judgment as a matter of law as to Defendants' claim for fraudulent misrepresentation.  Peacock's motion for summary judgment is due to be granted in this respect.  (Doc. 242).

### B.     Claims and Counterclaims Under the Guaranties

The remaining claims and counterclaims all revolve around Peacock's status as a guarantor.  Ellis's sole remaining claim against Peacock asserts breach of the

18

Guaranties; this claim is the subject of both Ellis's offensive motion for summary judgment (Doc. 240) and Peacock's defensive motion for summary judgment (Doc. 242). Peacock's three counterclaims seek a declaration that she is released from the Guaranties; while seeking the same relief, each counterclaim asserts a distinct rationale. Specifically, Peacock seeks release: (1) pursuant to the "2007 Loan Documents and Agreements" (Count I); (2) as a surety pursuant to § 8-3-13 of the *Alabama Code* (Count II); and (3) pursuant to a series of loans, modifications, and extensions, as well as impairment of collateral (Count III). (Doc. 183 at 43-55).

In her combined response to Ellis's motions for summary judgment, Peacock does not actually make an argument to support her declaratory judgment claim against Ellis under Count III. (*See* Doc. 272 at 45-55). Instead, her discussion appears to be an extension of her argument under Count I. (*Id.*). Likewise, as noted by Defendants, Peacock's brief does not address § 8-3-13, which is the entire crux of her Count II. (*Id.*; Doc. 295 at 29-30). Because Peacock has abandoned her Counts II and III, Defendants are due summary judgement on these claims for declaratory judgment. (Doc. 236).

Regarding Count I, the 2007 loan documents and agreements to which it refers consist of the Modification Agreement and the Pledge Agreement. (Doc. 183 at 43). Peacock contends paragraph 12 of the Pledge Agreement "*requires* Ellis and CCLLC to release Peacock from her guaranty . . . ." (Doc. 254 at 61; *see also* Doc.

272 at 45-49).  Similarly, among the arguments Peacock asserts in her summary judgment brief is that Ellis's claim for breach of guaranty should be dismissed because: (1) "the 2007 agreements between the parties require Ellis and CCLLC to pay off the Superior loan"; and (2) "Ellis has not fulfilled his contractual obligation to release the Wolf Pup guarantors."  (Doc. 254 at 50).

Following Peacock's arguments with regard to her Count I requires further discussion of a December 20, 2016 Report and Recommendation ("R&R") the court entered prior to the parties' unanimous consent.  (Doc. 158, *adopted and accepted by* Docs. 180, 181).   The court will first address the import of the December 2016 R&R—as well as Ellis's arguments regarding that decision—before turning to a discussion of *In re Pirani*, 824 F.3d 483 (5th Cir. 2016), and other arguments presented in the briefing on summary judgment.

### 1.   The December 2016 R&R

The R&R addressed Plaintiffs' and Peacock's motions to dismiss Defendants' counterclaims for breach of guaranty.  (Doc. 158).  At the motion to dismiss stage, Plaintiffs and Peacock argued Ellis's breach of guaranty claims failed because he was "contractually obligated to personally repay the Loan and release the Guaranties."  (*Id.* at 17).  The R&R noted Peacock's failure to address the terms of the Guaranties and the failures of the other arguments presented in the motions to dismiss, before stating the Guaranties "could not be affected or terminated by either

the Pledge Agreement . . . or the Repayment Agreement." (*Id.* at 18). A subsequent portion of the R&R analyzed the Pledge Agreement's language and concluded it indicated "the consequence of a failure to pay the Loan and release the guarantors within one year is that the borrowers will be in default such that Wolf Pup could exercise the remedies provided in the Pledge Agreement . . . not [] that the Guaranties would be released or unenforceable after one year." (Doc. 158 at 19-20).

Defendants' summary judgment briefing argues the R&R forecloses relief under Peacock's Claim I. (Doc. 237 at 26-27; Doc. 241 at 15-16 (citing Doc. 158 at 15, n.16, 18, 20)). Defendants returned to this argument in their opposition to Peacock's motion to reconsider. (Doc. 320 at 4-5).[14] Specifically, Defendants contend the R&R conclusively held: (1) the Pledge Agreement could not affect the Guaranties; and (2) Ellis's failure to pay off or refinance the loan within one year only constituted a default under the Pledge Agreement, not a breach justifying release of the Guaranties.

Defendants are correct that the R&R stated the Guaranties could "not be affected or terminated by" the Pledge Agreement. (Doc. 158 at 18). However, the undersigned reached this conclusion under the Rule 12(b)(6) standard, and the discussion was couched in those terms. (*Id.* at 2-4 (standard of review); *id.* at 15

---

[14] Defendants' motion to reconsider also cites to the now-withdrawn opinion, which adopted their argument that the Pledge Agreement could not affect the Guaranties. (Doc. 320 at 5) (*citing* Doc. 312 at 18-19). Having been withdrawn, that opinion cannot support Defendants' arguments.

("Plaintiffs and Peacock argue Ellis still has not *alleged cognizable claims* against them because he has contractual obligations to repay the Loan and release the Guaranties.") (emphasis added); *Id.* at 20 at n.20 (motions failed to show "Ellis cannot, as a matter of law, *assert plausible* breach of contract and breach of guaranty *claims*") (emphasis added)).   Contrary to Defendants' assertion, the foregoing discussion in the R&R at the motion to dismiss stage did not pretermit any arguments regarding the impact of the Pledge Agreement on the Guaranties at a later stage, under a different standard of review, supported by evidence extraneous to the complaint.

Similarly, Defendants rely on the R&R as definitively establishing that the consequence of Ellis's failure to release the guarantors is limited to the remedies on default specified in the Pledge Agreement.   In that portion of the R&R, the undersigned noted the Pledge Agreement:

> indicates that the consequence of a failure to pay the Loan and release the guarantors within one year is that the borrowers will be in default such that Wolf Pup could exercise the remedies provided in the Pledge Agreement . . . not [] that the Guaranties would be released or unenforceable after one year.

(Doc. 158 at 19-20).   As was the case with regard to the R&R's statement regarding the Pledge Agreement's impact on the Guaranties, the court arrived at its conclusion regarding remedies under the Pledge Agreement under the Rule 12(b)(6) standard, and the discussion was couched in those terms.   (*Id.* at 2-4, 15, 20 ("the Pledge

Agreement does not *clearly show on its face* that Ellis cannot enforce the Guaranties"

and concluding "Wiggins and Peacock have not established *at this stage in the*

*litigation* that Ellis . . . cannot recover under the Guaranties as a matter of law)

(emphasis added).

Paragraph 6 of the Pledge Agreement, entitled "REMEDIES UPON

DEFAULT," does specify remedies available in the event Ellis breached or failed to

perform. (Doc. 246-2 at 3). Specifically, the Pledge Agreement provides in the

event Ellis breached or failed to perform:

> Pledgee shall have all rights and remedies of a secured party under the
> Uniform Commercial Code and all other applicable laws, including,
> without limitation, additionally shall have the express right to sell the
> Pledged Interest . . . .

(*Id.*). Paragraph 6 continues by describing the ways in which the right to sell could

be exercised. (*Id.* at 3-4). What is not addressed by Defendants—or by the R&R—

is paragraph 8 of the Pledge Agreement, entitled "NO WAIVER." (*Id.* at 4).

Paragraph 8 provides:

> No failure on the part of Pledgee to exercise, and no delay in exercising,
> any right, power, or remedy hereunder shall operate as a waiver thereof,
> nor shall any single or partial exercise of any such right, power or
> remedy by Pledgee preclude any other or further exercise of any other
> right, power or remedy. All remedies hereunder are cumulative and are
> not exclusive of any other remedies provided by law.

(*Id.* at 4).

The plain language of the Pledge Agreement reveals the parties did not intend to restrict the available remedies to those listed in paragraph 6 in the event Ellis breached (or defaulted).  *E.g. Ex parte Textron, Inc.*, 67 So. 3d 61, 71 (Ala. 2011) ("When interpreting a contract, this Court must first look to the plain language of the contract and determine whether that language is ambiguous.  A court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.") (alteration incorporated, quotation marks omitted) (quoting *Turner v. W. Ridge Apartments, Inc.*, 893 So. 2d 332, 335 (Ala. 2004)).  A fair reading of paragraph 6 could interpret the reservation of remedies under "all other applicable laws . . . without limitation" as being narrowed to the rights held by a secured party.  However, even reading paragraph 6 in isolation, it does not operate to foreclose remedies not mentioned within that provision under black-letter contract law.

> Although the parties may, in their contract, specify a remedy for a breach, that specification does not necessarily exclude other legally recognized remedies.  An agreement to limit remedies must be clearly expressed in the contract, and a contract will not be construed as taking away a common-law remedy unless that intention is clear or that result is imperatively required.

17A Am. Jur. 2d *Contracts* § 708 (footnotes omitted); *see id* at § 709 (where contract specifies remedies but "there is no express or implied limitation in the contract making the stated remedy exclusive, the prevailing view is that a party may pursue either the prescribed remedy or any other remedy the law provides") (footnotes

omitted); *Shatton Indus. Ltd. v. Edwards*, No. 07-051, 2008 WL 11320073, at \*3 (N.D. Ga. May 15, 2008) ("Even if a contract specifies a remedy for breach of that contract, a contractual remedy cannot be read as exclusive of all other remedies if it lacks the requisite expression of exclusivity.") (alterations incorporated; quotation marks omitted)).  Here, neither paragraph 6 nor any other portion of the Pledge Agreement indicates the specified remedies are exclusive.  Accordingly, while paragraph 6 reserves some specific remedies, it does not preclude other, unmentioned remedies.

Any doubt regarding the foregoing conclusion is completely assuaged by paragraph 8, which explicitly states the Pledge Agreement does not preclude "any other right, power or remedy." (Doc. 246-2 at 4).  Moreover, paragraph 8 provides all remedies under the Pledge agreement "are cumulative and are not exclusive of any other remedies provided by law."  (*Id.*).  The Alabama Supreme Court, faced with materially identical language, has held such a "'cumulation of remedies' clause could hardly be interpreted as words of restriction." *Spanish Fort Mobile Homes, Inc. v. Sebrite Corp.*, 369 So. 2d 777, 779 (Ala. 1979) (in contract providing for specific remedies, provision that contract remedy "shall be cumulative and not exclusive" constituted a "cumulation of remedies" clause).[15]  Accordingly, the

---

[15] At least one other provision of the Pledge Agreement indicates the remedies available on Ellis's breach or default are not limited to those specified in Paragraph 6:

remedies available for Ellis's breach or default of the Pledge Agreement are not limited to the remedies specified in paragraph 6.

For the foregoing reasons, the R&R does not foreclose relief under Peacock's Count I.

## 2.    Peacock's Third-Party Beneficiary Status

Next, it is undisputed that Peacock did not sign the Pledge Agreement; instead the signatories were Ellis, Scott Raley, and Wiggins (on behalf of Wolf Pup).  (Doc. 246-2 at 6).  Additionally, while Peacock is one of the guarantors to be released after one year, the Pledge Agreement does not explicitly name her as a guarantor.  (*Id.*). Nevertheless, Peacock contends she is a third-party beneficiary under the Pledge Agreement.  (Doc. 272 at 46-49; Doc. 315 at 13-15).

In response, Defendants contend Peacock is not entitled to third-party beneficiary status.  (Doc. 237 at 23-26; Doc. 275 at 55, n.17; Doc. 295 at 30-32; *see also* Doc. 320 at 6-7).[16]  To the extent Defendants contend Peacock has not pled

---

> In the event that it becomes necessary for Pledgee to initiate litigation for the purpose of enforcing any of its rights hereunder *or for the purpose of seeking damages* for any violation hereof, then*, in addition to all other judicial remedies that may be granted*, Pledgee shall be entitled to recover reasonable attorneys' fees and all other cost that may be sustained by it in connection with such litigation.

(Doc. 246-2 at 5) (emphasis added).

[16]  In their opposition to Peacock's motion to reconsider, Defendants contend the motion inappropriately repeats summary judgment arguments the court considered and rejected.  (Doc. 320 at 6-7).  Contrary to Defendants' assertion, the Withdrawn Opinion did not make any conclusions regarding Peacock's third-party beneficiary status.  (Doc. 312).  The Withdrawn Opinion noted Peacock's claims focused on other agreements to which she was not a party.  (*Id.*

third-party beneficiary status, a third-party beneficiary "must allege 'facts in the complaint suggesting that either party to the contract intended it to directly benefit him at the time they executed the contract.'" *Walker v. Allstate Prop. & Cas. Ins. Co.*, No. 19-0701-RDP, 2020 WL 1235626, at *7 (N.D. Ala. Mar. 10, 2020) (alterations incorporated) (quoting *Thomas v. Am.'s Servicing Co.*, No. 15-0019-AKK, 2015 WL 4729792, at *2 (N.D. Ala. Aug. 10, 2015)).   Here, Peacock's counterclaim complaint alleged facts showing the Pledge Agreement was intended to benefit her directly by releasing her as a guarantor after one year; her counterclaim complaint seeks this relief under this provision.  (Doc. 183 at 40, 43-44).  The foregoing is sufficient to plead third-party beneficiary status.[17]   Accordingly, Defendant's contention that Peacock has "never claimed third party beneficiary status" is incorrect.  (Doc. 275 at 55, n.17).  Additionally, Defendants' opposition on this point relies only on *Fuller v. Winn-Dixie Montgomery, LLC,* No. 16-363, 2017 WL 3098104 (S.D. Ala. July 19, 2017).  (*See id.*; Doc. 237 at 23).  *Fuller* addressed the failure to plead the underlying claim, not merely the failure to plead capacity.

---

at 19).  However, the Withdrawn Opinion did not address the legal import of Peacock's status as a non-signatory.

[17] Likewise, Peacock's earlier motion to dismiss Defendants' claims was based on the same rationale under the Pledge Agreement.  (Doc. 43 at 7-44).

Moreover, the undisputed facts—gleaned from both the contractual language and Ellis's testimony—reveal the parties to the Pledge Agreement "intended it to directly benefit [Peacock] at the time they executed the contract.'" *Walker*, 2020 WL 1235626, at *7. The Modification Agreement explicitly names Peacock as a guarantor. (Doc. 246-1 at 2, 9). The Modification Agreement was effective as of October 5, 2007, the same day Ellis signed the Pledge Agreement. (*Id.* at 2; Doc. 246-2 at 2, 6).[18] In turn, the Pledge Agreement's benefit to Peacock is obvious; paragraph 12 provides for her release from the Guaranties within one year. (Doc. 246-2 at 6). Ellis's testimony confirms that the parties' intent expressed in the Pledge Agreement was to release Peacock and the other guarantors. (Doc. 255-1 at 24, 82). Accordingly, that Peacock was not a party to the Pledge Agreement does not prevent her recovery as a third-party beneficiary.

### 3. *In re Pirani*

While the Withdrawn Opinion cited *Pirani*, the discussion there was limited to the Fifth Circuit's application of the theory of contribution. (Doc. 312 at 21, n.15). Due to the material factual similarities between *Pirani* and the instant case, further discussion of the case is required.

---

[18] Ellis did not execute the Modification Agreement until October 20, 2007. (Doc. 246-1 at 14). However, the identity of the guarantors referenced in the Pledge Agreement was no secret when Ellis executed it on October 5, 2007. Ellis testified the parties' intent was to release the guarantors, including Peacock. (Doc. 255-1 at 24, 82). Accordingly, Defendants' arguments based on the timing of the execution of the various agreements fail. (*See* Doc. 295 at 30, n.13).

In *Pirani,* two brothers—Pirani and Aziz (together, the "Brothers")—formed Circle Sherman, LLC, in order to purchase and renovate a Texas hotel. Three investors—Baharia, Gilani, and Lalani (together, the "Investors")—bought a fifty-percent stake in Circle Sherman; the Investors formed HMN Partners, LLC, to hold their membership interest. The Brothers and Investors then obtained a $2.5 million loan from One World Bank. Each of the Brothers and Investors signed a guaranty agreement in which they jointly and severally agreed to pay the entire loan in the event of default. *In re Pirani*, 824 F.3d at 489.

Shortly after obtaining the loan, the Brothers and Investors disagreed regarding the hotel renovations. HNM—the Investors' LLC—sued the Brothers in Texas state court (the "Hotel Litigation"). The parties settled the Hotel Litigation; one term of the settlement (the "Hotel Litigation Settlement Agreement") provided the Brothers would release the Investors from the guaranty to One World Bank by a date certain. Specifically, the Hotel Litigation Settlement Agreement provided:

> In the event that [Pirani] obtains a third party investor for the purpose of purchasing HNM's Membership Interest, [Pirani] shall in good faith make best efforts to have the Bank release [the Investors] from their personal guaranties of the Loan. If [Pirani] is unable to obtain a release from the Bank of the guaranties, [the Investors] agree to continue to be guarantors of the Loan until July 9, 2012 at which time they shall be released either through [Pirani]'s refinancing of the Loan or sale of the Hotel.

*Id.* at 489.[19]

Following the Hotel Litigation Settlement Agreement, Circle Sherman defaulted on the note. One World Bank foreclosed on the hotel and sued all of the guarantors—including the Investors—seeking the deficiency between the foreclosure proceeds and the balance of the note (the "Foreclosure Litigation"). The Investors filed crossclaims against the Brothers, including a breach of contract claim for failing to secure their release from the guaranty under the Hotel Litigation Settlement Agreement. Prior to trial, the Brothers settled with One World Bank. Under the settlement agreement, One World Bank sold the note, the guaranties, and the Bank's claims to a third-party entity owned by Pirani. The third-party entity subsequently transferred these assets to Pirani. The court hearing the Foreclosure Litigation subsequently dismissed without prejudice One World Bank's remaining claims against the Investors and HNM. *Id.* at 489-90.

Nearly three years later, Pirani filed for bankruptcy and initiated an adversary proceeding against the Investors, claiming breach of the guaranty assigned from One World Bank during the Foreclosure Litigation. The Investors counterclaimed for breach of the Hotel Litigation Settlement Agreement. After a trial in the adversary

---

[19] This portion of the Hotel Litigation Settlement Agreement referred to "the Company," rather than Pirani. *In re Pirani*, 824 F.3d at 496. The agreement defined "the Company" in several different ways, but the Fifth Circuit concluded the references to "the Company" in the portion quoted above were sufficient to bind Pirani personally. *Id.*

proceeding, the bankruptcy court concluded Pirani's breach of the Hotel Litigation Settlement Agreement precluded his claim for breach of the Guaranties. Specifically, the bankruptcy court held, under the Hotel Litigation Settlement Agreement[20]:

> Pirani agreed to release the defendants no later than July 9, 2012, through the sale of the Hotel or the refinancing of Circle Sherman's indebtedness to One World Bank ("OWB"). Pirani did not have the ability to release the defendants at the time of the Settlement Agreement, but he obtained that ability when he acquired the Note and guarantees from OWB in March 2012. He failed to do so. Instead, he has pursued the defendants, embroiling them in years of litigation and the attendant expenses, for what he claims they should have paid to OWB under the guaranty agreement.

*Id.* at 496 (alterations incorporated).   The district court affirmed the bankruptcy court's judgment, and Pirani appealed to the Fifth Circuit.  *Id.* at 490-91.

Among the arguments Pirani pursued on appeal was that the Hotel Litigation Settlement Agreement's provision regarding release of the guaranty was subject to unfulfilled conditions precedent.  *Id.* at 496.  More specifically, Pirani contended the language regarding how the Investors were to be released—"either through [his] refinancing of the loan or sale of the Hotel"—were conditions precedent to release.

---

[20] This holding was based on the following language in the Hotel Litigation Settlement Agreement:

> If [Pirani] is unable to obtain a release from the Bank of the guaranties, [the Investors] agree to continue to be guarantors of the Loan until July 9, 2012 at which time they shall be released either through [Pirani]'s refinancing of the Loan or sale of the Hotel.

*Id.* at 496.

*Id.* at 496-97. Pirani further argued it was impossible to sell the hotel or refinance the loan after One World Bank foreclosed; therefore, the promise to release was never triggered. *Id.* at 497. The Fifth Circuit—relying on Texas contract law—rejected this argument, concluding the language mandated release by July 9, 2012. *Id.*

Pirani also challenged the lower court's conclusion that his breach of the Hotel Litigation Settlement Agreement barred his claims for breach of the guaranties. The Fifth Circuit also rejected this argument, finding:

> The bankruptcy court dismissed the breach-of-guaranty claim on the ground that Pirani should not be permitted to sue the defendants for breach of a guaranty agreement from which he had promised to have them released. This result was correct with respect to [the Investors]. As shown above, Pirani promised to have them released from their personal guaranties—a promise he had the power to fulfill as soon as he received title to the note and guaranty agreement. He cannot "profit from his own breach," *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 186 (Tex. App. 2013), by suing them under a guarantee agreement that he had the obligation and power to release them from.

*Id.* at 498 (alteration incorporated).

Here, the court has already considered and rejected a number of the arguments Defendants presented in opposition to the application of *Pirani*: (1) its non-mandatory precedential value as a Fifth Circuit case based on Texas law; (2) the Pledge Agreement cannot alter the Guaranties under Defendants' reading of the R&R; (3) Ellis's failure to pay off or refinance the loan and release the guaranties

constituted a default—not a breach of the Pledge Agreement—for which release of the Guaranties was not a remedy; and (4) Peacock's non-signatory status vis-à-vis the Pledge Agreement.  (Doc. 320 at 3-7).  As noted, *supra*: (1) *Pirani* is highly-persuasive authority;[21] (2) the R&R did not foreclose Peacock's arguments that the Pledge Agreement affected the enforceability of the Guaranties; (3) the remedies reserved in the Pledge Agreement were not exclusive; and (4) Peacock was a third-party beneficiary under the Pledge Agreement.

Defendants assert two additional arguments against applying *Pirani* which the court has not yet addressed: (1) differences between the release language in the Hotel Litigation Settlement Agreement and the Pledge Agreement; and (2) the lack of discussion by the Fifth Circuit concerning the terms of the guaranty agreement there.  (Doc. 320 at 4-5).  Each argument is addressed in turn.

Regarding differences in the terms of the releases, Defendants point to the release language in the Hotel Litigation Settlement Agreement compared to the Pledge Agreement.  (Doc. 320 at 4-5).  Defendants contend, unlike the mandatory release language at issue in *Pirani*, the following italicized language in the Pledge Agreement created an option to release the guarantors:

> All indebtedness to Superior Bank shall be refinanced, or otherwise paid in full, on or before one (1) year from the date hereof, and the current guarantors thereof released, *or the Borrowers shall be considered in default, and in default of the Loan Documents*.

---

[21] This conclusion is explained in the accompanying order granting the motions to reconsider.

(Doc. 246-2 at 6) (emphasis added).  As Defendants would have it, this provision rendered the failure to release the guarantors a default, rather than a breach.  (Doc. 320 at 4).

The terms of the Pledge Agreement unambiguously reflect Ellis's promise to pay or refinance the debt within one year, releasing the guarantors.  It is undisputed that Ellis did not perform—i.e. *breached*—that promise.  *Seybold v. Magnolia Land Co.*, 376 So. 2d 1083, 1085 (Ala. 1979) ("'Breach' consists of the failure without legal excuse to perform any promise forming the whole or part of the contract."); (*see* Doc. 158 at 17) (noting the "mandatory language" of the Pledge Agreement).  That this breach also operated as a default under the Pledge Agreement and Loan Documents does not render it any less of a breach.

Next, Defendants note the Fifth Circuit did not discuss the terms of the guaranty in *Pirani*—whether it was a limited guaranty or, like the Guaranties here, continuing and unlimited.  (Doc. 320 at 5).  Defendants are correct that the Fifth Circuit's decision is silent on this point; however, Defendants do not argue how this distinction, if it exists at all, would render *Pirani* any less potent here.  Indeed, the most illuminating feature of the case is its description of Pirani's machinations to insert himself as both a creditor and a guarantor.  Accordingly, *Pirani* is no less persuasive for its failure to describe the precise terms of the guaranty in that case.

34

*Pirani* presents facts which are strikingly similar to those presented in the instant case.  Moreover, the Fifth Circuit's reasoning when confronted with these facts sheds light on the significance of Ellis's position on both sides of the creditor/guarantor divide.  In *Pirani*, the Hotel Litigation Settlement Agreement required the release of the Investors' guaranties by a date certain.  This tracks with the facts here, where the Pledge Agreement included a promise to release the guarantors within one year—by October 5, 2008.  Next, Pirani subsequently purchased the note and guaranty from One World Bank, just as Ellis purchased the Loan and Guaranties in this case.  Finally, Pirani did not release the Investors' guaranties as promised, even though it was in his power to do so once he purchased the debt; instead he sued the Investors under the guaranties.  This mirrors Ellis's conduct here, where he did not release the guarantors despite his power to grant a release after he purchased the Loan in 2010; instead, Ellis has counter-sued the guarantors to enforce the Guaranties.

*Pirani* elucidates Peacock's argument that Ellis cannot enforce the Guaranties under principles of contract law and promissory and equitable estoppel.  (*E.g.* Doc. 291 at 26-27).  Here, the Pledge Agreement reflects the parties' intentions as of October 2007; Ellis would pay off or refinance the Loan within one year, releasing the guarantors.  (Doc. 246-2 at 6).  Ellis's deposition testimony confirms the intent behind the contractual language:

> Q.  Was there ever any intention by you to get the Wolf Pup members off these loans?
> []
> A.   By the nature of the documents themselves, those personal guaranties would be extinguished once Superior Bank, the first mortgage holder, was satisfied.

(Doc. 255-1 at 24) (attorney instruction omitted).

> Q. . . .  So can we agree that within one year, you either had to pay off the loan or get it refinanced?
> []
> A.  That was the intent.
>
> Q.  And then the second was that the current guarantors, that would be Mr. Wiggins, Linda Peacock, Kelly Shuck, and Scott Raley, that they would be released?
> []
> A.  That was the intent, but I could not release them.  Superior Bank would have to release them.

(Doc. 255-1 at 82) (form objections omitted).

Defendants contends the foregoing "piecemeal citation" to Ellis's testimony contradicts Peacock's arguments.  (Doc. 320 at 5, n.3).  Specifically, Defendants point to tension between Peacock's arguments that: (1) the Pledge Agreement required release of the guarantors by October 5, 2008; and (2) Ellis had the power and obligation to release the guarantors once he acquired the Loan in 2010.   (*Id.*).  Contrary to Defendants' interpretation, the Pledge Agreement unambiguously reflects Ellis's promise to either refinance or pay off the Loan within one year, thereby releasing the guarantors.  *Ex parte Textron, Inc.*, 67 So. 3d at 71.  Ellis's own testimony supports this straightforward interpretation of the Pledge Agreement.

Additionally, once Ellis procured the Loan in 2010, he had the power to release the guarantors.

In 2014, Ellis foreclosed on the Property and sold it to Trinity Retreat, LLC. (Doc. 106 at 143-160; s*ee* Doc. 119-8).  At the time, Trinity Retreat was an entity owned by Ellis's wife; it is now also owned by Ellis.  (Doc. 155-1 at 5-6).  Ellis has received the benefit of this sale since he continues to share ownership of the Property with his wife.  Indeed, Ellis has enjoyed the benefits of the use, possession, and ownership of the Property since 2007.  Accordingly, Ellis cannot benefit from his breach of the Pledge Agreement by enforcing the Guaranties against Peacock or the other guarantors.

### 4.    Defendants' Other Arguments

Because the Withdrawn Opinion blazed its own trail down the path of contribution, it did not address all of the arguments presented in the 362 pages of Peacock's and Defendants' briefing.  (Doc. 312; *see* Docs. 237, 241, 254, 272, 275, 291, 295).  Having reconsidered the Withdrawn Opinion and substituted it with the instant opinion, Defendants' additional arguments regarding the enforceability of the Guaranties are briefly addressed below.

In their defensive motion for summary judgment, Defendants—in addition to the other arguments addressed above—contend Peacock's counterclaims seeking declaratory relief fail due to: (1) failure of consideration; (2) Peacock's own breach;

(3) failure of a condition precedent; (4) impossibility or frustration of purpose; and (5) unclean hands. (Doc. 237 at 36-40, 47-49; Doc. 295 at 36-43). All of these defenses are based on the failure of the Condominium Declaration to create valid condominiums under Alabama law. It is undisputed that Peacock did not own and thus did not convey anything to Defendants. Accordingly, these defenses are more properly directed toward Plaintiffs, not Peacock. To the extent any of the foregoing defenses could apply to Peacock, they fail for the same reasons discussed in the forthcoming memorandum opinion and order concerning the cross-motions for summary judgment between Plaintiffs and Defendants.

Accordingly, there are no genuine issues of material fact and, in light of the Pledge Agreement, the Guaranties are unenforceable as a matter of law. This holding corresponds to Peacock's Count I and Ellis's Count III, asserting breach of guaranty. Defendants are entitled to judgement as a matter of law as to Peacock's Counts II and III.

## IV.   CONCLUSION

For all of the foregoing reasons: (1) Peacock's defensive motion for summary judgment (Doc. 242) is **GRANTED**, and Defendants' remaining third-party claims against Peacock are due to be dismissed; (2) Defendants' offensive motion for summary judgment (Doc. 240) is necessarily **DENIED**; and (3) Defendants' defensive motion for summary judgment (Doc. 236) is **GRANTED IN PART** and

**DENIED IN PART** insofar as Peacock's Counts II and III are due to be dismissed.

Peacock's Count I survives.

      **DONE** this 12th day of February, 2021.

                            STACI  G. CORNELIUS
                            U.S. MAGISTRATE JUDGE