FILED
2021 Feb-12  PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT L. WIGGINS, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:12-cv-02705-SGC |
| | ) | |
| FRANK ELLIS, IV, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

"For want of a nail the shoe was lost."  Thus begins the proverb describing a cascading series of increasingly catastrophic events—ultimately leading to the loss of a kingdom—precipitated by a seemingly insignificant failure of a horseshoe nail.  If some misguided soul were inspired to distill the story of this confounding lawsuit to a proverb, it would begin: "For want of a valid condominium declaration . . . ."  While the defective condominium declaration in this case has not yet led to the loss of a kingdom, it has spawned numerous lawsuits in both state and federal courts in Alabama spanning more than a decade.  This memorandum opinion does not bring this matter to its merciful end, but it does cull the herd of claims and counterclaims to the core of the dispute: the consequences flowing from want of a valid condominium declaration.

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  (Doc. 193).

# I.    JURISDICTION

The original complaint filed in this district more than eight years ago—asserting only claims arising under state law—did not specify the basis for federal jurisdiction; nor did it include any jurisdictional allegations. (Doc. 1). Subsequent iterations of the complaint were likewise silent as to federal subject matter jurisdiction.  (Docs. 22, 94).[2]  Because every version the complaint named as a defendant Federal Deposit Insurance Corporation ("FDIC"), the lack of jurisdictional allegations was proper under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1819.

Under FIRREA, civil suits in which FDIC is a party "in any capacity" are deemed to arise under the laws of the United States.  § 1819(b)(2)(A).  This provision overrides the general "well-pleaded complaint rule," which requires the basis for federal-question jurisdiction to appear on the face of the complaint.  *See Lindley v. Fed. Deposit Ins. Corp.,* 733 F.3d 1043, 1050-51 (11th Cir. 2013).  The Eleventh Circuit has noted § 1819 "evince[s] a clear congressional intent to provide a federal forum when the FDIC is made a party." *Castleberry v. Goldome Credit Corp.,* 408 F.3d 773, 788 (11th Cir. 2005); *see Fed. Deposit Ins. Corp. v. N. Savannah Props., LLC,* 686 F.3d 1254, 1258 (11th Cir. 2012) ("Federal-question

---

[2] While Defendants' operative counterclaim complaint purports to allege the citizenship of the parties, it does not allege the citizenship of either party-limited liability company's respective members.  (Doc. 112 at 3-4).

jurisdiction generally exists whenever the FDIC is a party to litigation."). Indeed, where FDIC is a party, the party challenging federal jurisdiction has the burden of overcoming the presumption of its existence. *See Lindley,* 733 F.3d at 1050-51; *Bishop v. Darby Bank & Trust Co.,* No. 10-0295, 2011 WL 4499575 *1 (S.D. Ga. Sept. 27, 2011).[3]   The court has previously noted the existence of federal jurisdiction.   (Doc. 16 at 16, *adopted in relevant part* by Docs. 20, 21) (acknowledging Plaintiffs could have brought this claim in state court, but FDIC would likely have removed it under 12 U.S.C. § 1819); (Doc. 156 at 15 *adopted by* Docs. 178, 179) (recognizing 12 U.S.C. § 1821(d)(6) provides federal jurisdiction for administratively exhausted claims against FDIC).[4]

By virtue of the court's memorandum opinion granting summary judgment as to the claims against it, FDIC is no longer a party to this lawsuit.  (Doc. 308).

---

[3] FDIC did attack subject matter jurisdiction at the motion to dismiss stage.   (Docs. 5, 28, 100). However, FDIC's challenges were premised on 12 U.S.C. § 1821, based on: (1) Plaintiffs' failure to include their claims in an administrative proof of claim they submitted; and (2) the unavailability of declaratory relief.

[4] FIRREA does provide a narrow exception to the creation of federal jurisdiction by virtue of FDIC's involvement where: (1) the FDIC is acting "as receiver of a State insured depository institution by the exclusive appointment by State authorities, [and] is a party other than a plaintiff"; (2) the action "involves only the preclosing rights against the State insured depository institution, or obligations owing to, depositors, creditors, or stockholders by the State insured depository institution"; and (3) only the interpretation of state law is necessary to resolve the claims. 12 U.S.C. § 1819(b)(2)(D)(i-iii).  All three conditions are required to preclude federal question jurisdiction. *See, e.g., Castleberry,* 408 F.3d at 785.  Even if the court were required to consider this exception *sua sponte*, it would not apply because—as discussed at length below— this matter challenges more than "only the preclosing rights against the State insured depository institution, or obligations owing to, depositors, creditors, or stockholders by the State insured depository institution."

However, the Eleventh Circuit has held a district court retains original jurisdiction over pendent claims under state law against non-FDIC parties, even after FDIC is dismissed.  *See, e.g., Lindley,* 733 F.3d at 1058.  (reversing trial court's dismissal of state law claims against non-FDIC defendants under 28 U.S.C. § 1367(c)(3)). Accordingly, the court has subject matter jurisdiction over the remaining claims in this lawsuit.

## II.    RELEVANT FACTUAL BACKGROUND[5]

This action arises from a long series of loans related to real estate transactions between the parties.  Plaintiffs, Robert L. Wiggins, Jr. ("Wiggins"), and Wolf Pup, LLC ("Wolf Pup"), (collectively, "Plaintiffs"), financed the purchase and construction of Wolf Bay Landing, a real estate development in Baldwin County, Alabama, through a loan (the "Loan") with Superior Bank ("Superior") in 2005.   In 2007, Plaintiffs sold the property (the "2007 Transaction") to Defendant Character Counts, LLC ("CCLLC"), a single asset entity owned by Defendant Frank P. Ellis, IV ("Ellis"), and Joseph Scott Raley ("Raley").   CCLLC purchased the property by assuming Plaintiffs' Loan with Superior.

---

[5] To be sure, the 655 pages of briefing concerning Plaintiffs' and Defendants' motions for summary judgment—not including their motions to strike—present myriad facts not reflected in the instant opinion.  (Docs. 239, 241, 248, 253, 256-57, 276-79, 282-83, 292-94, 298-99). In the interest of judicial economy, the court has omitted recitation of facts that are unnecessary and/or irrelevant to resolution of the pending motions.  In addition to the extensive paper record, the court heard lengthy oral arguments on November 17, 2020.

In 2010, Superior sold the Loan to Ellis, who financed the purchase with a personal loan from Superior.  In connection with selling the original Loan to Ellis, Superior paid down the outstanding balance on the Loan by seizing money from accounts funded by Plaintiffs during the 2007 Transaction.[6]   In 2014, Ellis foreclosed on the original Loan and sold the property to Trinity Retreat, LLC ("Trinity Retreat"), a single asset entity owned by Ellis's wife, Mihyon Ellis.  Ellis subsequently became a member of Trinity Retreat, which still owns Wolf Bay Landing.  Having provided this overview, the following pages discuss the facts of this case in more detail.

## A.   2005: Superior's Loan to Wolf Pup and the Guaranties

Wiggins is a member of one of the entity-members of Wolf Pup; Raley is also a member.  (*E.g.* Doc. 257 at 12; Doc. 255-1 at 18).  Wolf Pup built and owned Wolf Bay Landing, a 62-unit real estate development, which was financed through Superior.  (Doc. 257 at 1).  The Loan with Superior involved several transactions in September and December 2005, and Wolf Pup's entire indebtedness to Superior was approximately $17.5 million.  (*Id.* at 1-2).

The Loan was secured by a mortgage on the Property and also by continuing guaranties (the "Guaranties") from Wiggins and others associated with Wolf Bay

---

[6] Superior Bank later failed, and FDIC was named as its receiver. After Superior failed, Cadence Bank ("Cadence") acquired Ellis's personal loan from Superior, and Cadence eventually reached a settlement agreement with Ellis regarding payment of his personal loan.

Landing.  (Doc. 244-2; *see, e.g.,* Doc. 257 at 2).[7]  Under the Guaranties, Wiggins

and the other guarantors "jointly and severally unconditionally guarantee and

promise to pay the Bank" the indebtedness under the Loan.  (Doc. 244-2 at 14).

The Guaranties further provide in part:

> [T]his Guaranty may not be revoked or terminated, other than with the
> prior written consent of the Bank, except upon strict compliance with
> the conditions and requirements heretofore set forth in this Section
> (2), and this Guaranty will not be revoked or terminated by any action,
> event or circumstance, including payment in full of all of the
> indebtedness. . . .
>
> The obligations of the Guarantors hereunder are joint and several, and
> independent of the obligations of Borrowers, and a separate action or
> actions may be brought and prosecuted against any one or more of the
> Guarantors whether action is brought against Borrowers or any other
> Guarantor . . . .
>
> It is the intent hereof that this obligation of Guarantors shall be and
> remain unaffected, (a) by the existence or non-existence, validity or
> invalidity, of any pledge, assignment or conveyance given as security;
> or (b) by any understanding or agreement that any other person, firm
> or corporation was or is to execute this or any other guaranty, . . . or
> any other document or instrument or was or is to provide collateral for
> any indebtedness . . . .
>
>     . . . .
>
> No right or power of Bank hereunder shall be deemed to have been
> waived by any act or conduct or failure or delay to act on the part of
> the Bank . . . .  Bank may without notice assign this Guaranty in
> whole or in part and each reference herein to Bank shall be deemed to
> include its successors and assigns.

(Doc. 244-2 at 14-16).

---

[7] The other guarantors were Third-Party Defendant Linda Peacock, as well as Kelly Schuck and
Raley.  (Doc. 244-2 at 4, 8, 12).

### B.    2007: CCLC Purchased Wolf Bay Landing

Construction of Wolf Bay Landing was completed in late 2006 or early 2007, and Wolf Pup had secured a number of pre-construction sales contracts for condominium units.  (Doc. 239 at 5; Doc. 241 at 5).  Meanwhile, the Gulf Coast condo market deteriorated in 2007, and the buyers refused to close on their sales contracts.  (Doc. 250-2 at 8-9; Doc. 255-2 at 8-9; *see, e.g.,* Doc. 239 at 6).[8]  Wolf Pup initiated litigation (the "*Bowles* Litigation")[9] in February 2007 in Baldwin Count Circuit Court, seeking the buyers' specific performance of the sales contracts.  (*See* Doc. 239 at 6).

On April 17, 2007, Wolf Pup recorded a Declaration of Condominium (the "Condo Declaration"), purporting to establish Wolf Bay Landing as a condominium under Alabama law.  (Doc. 244-10).  Peacock drafted and filed the Condo Declaration.  (*Id.* at 2).  By the summer of 2007, facing past-due notices from Superior regarding interest payments under the Loan, Wolf Pup was looking to sell Wolf Bay Landing.  (*See* Doc. 239 at 8).[10]

---

[8] Ellis testified adverse conditions in the condo market did not recover until sometime after 2010.  (*See* Doc. 255-1 at 87).

[9]  The *Bowles* Litigation is discussed in more detail, *infra*.

[10]  On July 27, 2007, Plaintiffs entered a tolling agreement with Peacock, Schuck, and several entities, tolling the statute of limitations for claims between the parties in state court, including claims relating to the Condo Declaration.  (Doc. 158 at 24, n.21).

In late July or early August 2007, Wolf Pup began communicating with Ellis regarding the possibility of purchasing Wolf Bay Landing.  (Doc. 239 at 9).[11]  Ellis was under the impression the Condo Declaration was valid under Alabama law and testified he did not know the "full nature" of the *Bowles* Litigation.  (*Id.* at 10).  Ellis did not investigate the *Bowles* litigation and never performed due diligence on Wolf Bay Landing; he testified he had no reason to look behind the curtain because he trusted the people with whom he was dealing.  (*See* Doc. 276 at 5).  Ellis also testified he never inquired about the status of the Condo Declaration and that no one with Wolf Pup ever told him it was valid under Alabama law.  (Doc. 255-1 at 18-19; *see* Doc. 276 at 6).[12]  Ellis further testified he had no direct contact with Wiggins in 2007.  (Doc. 257 at 3).  However, Ellis assumed he was negotiating with Wiggins because many of the documents they exchanged bore Wiggins's signature.  (*Id.*).

During their negotiations, the parties at one time contemplated Ellis's outright purchase of Wolf Bay Landing.  (*See* Doc. 277 at 15-16).  In preparation

---

[11]  Ellis has been in the real estate business since 1975.  (Doc. 255-1 at 5-6).  After starting in residential sales, Ellis eventually became a developer and entrepreneur who has turned around several "hopeless situations," including troubled condominium developments  (*Id.*).  Ellis owns multiple businesses in at least five states, as well as four condominium developments other than Wolf Bay Landing; three of these other condominium developments are located in Alabama, and one is in Maryland. (Doc. 257 at 16-17).   Ellis hired attorneys to prepare condominium declarations for his other developments.  (*Id.*).

[12]  As discussed in greater detail *infra*, Ellis interpreted the words "condominium" and "unit" appearing in different documents and contracts as representing the validity of the Condo Declaration.  (Doc. 276 at 6).

for that plan, the parties drafted and circulated a Real Estate Purchase Agreement in August 2007.  (Doc. 259-1 SEALED).[13]  Indeed, both Wolf Pup and Ellis signed the Real Estate Purchase Agreement on August 9, 2007.  (*Id.* at 7 SEALED).  However, the legal effect of the Real Estate Purchase Agreement is unclear.  (*See* Doc. 276 at 29).  In any event, rather than pursue Ellis's outright purchase, the parties opted for CCLLC—formed by Raley and Ellis on October 5, 2007—to assume the Loan under the Loan Assumption and Modification Agreement (the "Modification Agreement") (*see* Doc. 276 at 3-4; Doc. 257 at 4-5); during the same time period, the interested parties executed a number of other agreements.  These agreements, all of which effectuated the 2007 Transaction, are described in more detail below. (*See* Doc. 257 at 3; *see also* Doc. 276 at 3-4; Doc. 255-1 at 22).

### 1.    Modification Agreement

Under the Modification Agreement—dated as effective on October 5, 2007[14]—Wolf Pup conveyed Wolf Bay Landing to CCLLC; CCLLC assumed

---

[13] The Real Estate Purchase Agreement specifically cites the *Bowles* litigation in two places, listing the case number and name.  (Doc. 259-1 at 4, 7 SEALED).  The second reference to *Bowles* appears immediately above the signature blocks Ellis and Wolf Pup signed.  (*Id.* at 7 SEALED).  Although Peacock had already drafted and filed the Condo Declaration at the time the parties were negotiating the Real Estate Purchase Agreement, it describes Wolf Bay Landing on a metes and bounds basis and did not refer to it as a condominium.  (*Id.* at 14 SEALED).

[14] On October 20, 2007 Ellis signed: (1) the Modification Agreement in his capacity as CCLLC's manager; and (2) the consent and joinder to the Modification Agreement in his personal capacity as a guarantor.  (Doc. 246-1 at 14, 19).  Superior Bank executed the Modification Agreement on November 27, 2007.  (*Id.* at 12).  Wiggins signed the Modification Agreement on behalf of Wolf Pup on October 5, 2007, the same day he signed his individual consent and joinder as a guarantor.  (*Id.* at 13, 18).  The remaining guarantors signed their consent and joinder forms on

Wolf Pup's obligations to Superior under the $17.5 million Loan. (*See* Doc. 276 at

3). However, Wolf Pup remained liable under the Loan:

> It is the intent of this instrument, and [Wolf Pup], [Superior,] and
> CCLLC agree, that [Wolf Pup] shall remain liable under the Note and
> the other Loan Documents, and upon the occurrence of an Event of
> Default by CCLLC under the Note or the other Loan Documents, and
> in addition to [Superior]'s right to enforce the Loan Documents and
> pursue its remedies against CCLLC, [Superior] may enforce the terms
> of the Note against and collect the indebtedness evidenced by the
> Note from [Wolf Pup], all to the same extent as if this instrument had
> never been executed.

(Doc. 246-1 at 5). The Modification Agreement required Ellis to execute an

unlimited continuing guaranty to secure the loan and specified the Guaranties

executed by Wiggins and the other guarantors "shall continue in full force and

effect and shall continue to secure the Loan . . . ." (*Id.* at 10).

The Modification Agreement also required Wolf Pup to establish an account

with Superior with a minimum balance of $560,000, from which Superior could

withdraw monthly interest payments on the Loan (the "Interest Reserve Account").

(Doc. 246-1 at 7). When Superior withdrew interest payments from the Interest

Reserve Account, CCLLC was required to restore the minimum balance. (*Id.*).

Accordingly, Defendants were responsible for assuming the interest payments to

---

October 16 and 17, 2007. (*Id.* at 15-17). It is undisputed that, as of November 27, 2007, CCLLC owned Wolf Bay Landing. (Doc. 276 at 8-9). Plaintiffs contend CCLLC owned Wolf Bay Landing as of October 26, 2007, when the Assumption Warranty Deed was filed. (*E.g.* Doc. 257 at 5). Defendants disagree, arguing the 2007 Transaction was not complete until Superior signed on November 27, 2007. (*E.g.* Doc. 276 at 9).

Superior under the Loan.  (*See* Doc. 257 at 6).  The Interest Reserve Account also secured the Loan.  (Doc. 246-1 at 7).[15]

Similarly, the Modification Agreement provided Superior would continue to hold a $1.5 million certificate of deposit funded by Wiggins to secure the Loan (the "Wiggins C.D.").  (Doc. 246-1 at 7).  The Modification Agreement provided Superior could apply the Wiggins C.D. to the Loan in the event of a default that Plaintiffs did not cure within thirty (30) days of notice.  (*Id.*).  The instant memorandum opinion refers to the Interest Reserve Account and the Wiggins C.D. together as the "Pledged Collateral."

### 2.    Side Agreements

As previously mentioned, the parties signed other agreements in conjunction with the 2007 Transaction.  The relevant agreements are discussed in turn.

#### a.    Repayment Agreement

On October 5, 2007, Wolf Pup, Ellis, and CCLLC executed a document entitled "Agreement" (the "Repayment Agreement").  (Doc. 246-5).[16]

---

[15] It is not clear how much of the $560,000 minimum balance Wolf Pup deposited into the Interest Reserve Account.  Tim Hamner, a banker with Cadence who later handled the account, testified the account never held the minimum balance.  (Doc. 250-11 at 42; *see* Doc. 246-13; Doc. 243-29 at 117-62).  Hamner further testified the initial deposit into the account in September 2007 was $269,875; by November 2007 the account held $461,620.95.  (Doc. 250-11 at 42; Doc. 246-13).  However, a November 21, 2008 Fourth Amendment to Loan Documents signed by Ellis, Superior, and CCLLC, reflects the establishment of the $560,000 Interest Reserve Account.  (Doc. 255-35 at 3).  In any event, it appears the sale of Unit A301 to Ellis provided at least some of the initial proceeds Wolf Pup deposited into the Interest Reserve Account.  (Doc. 243-5 at 148; 243-8 at 106, 133-34; *see* Doc. 246-13; *see generally* Doc. 239 at 18-19; Doc. 241 at 9).

Defendants—collectively defined in the contract as the "Borrower"—executed the Repayment Agreement in favor of Wolf Pup and its members with regard to the Pledged Collateral and liability under the Loan.   (*Id.*).   As relevant here, Defendants promised to: (1) repay Wolf Pup and its members any portion of their Pledged Collateral, plus interest, in the event Superior seized it; and (2) refrain from selling Wolf Bay Landing in its entirety without paying off the Loan and returning any seized Pledged Collateral with interest.   (*Id.*).   Specifically, the Repayment Agreement provides:

> 2.   **Interest Reserve.** Borrower agrees to immediately repay to Wolf Pup any portion of the $560,000.00 interest reserve posted by Wolf Pup to Superior Bank to secure the Indebtedness (defined in the Superior Bank Loan Assumption and Modification Agreement executed by Borrower), together with interest thereon at the default rate defined in the Superior Bank documents, to the extent same is seized or drawn upon by Superior Bank or otherwise applied to such Indebtedness.
>
> 3.   **$1,500,000.00 Pledged Collateral.** Borrower agrees to immediately repay to Wiggins any portion of the $1,500,000.00 collateral and interest accrued thereon posted by Wiggins to Superior Bank to secure the Indebtedness, together with interest thereon at the default rate defined in the Superior Bank documents, to the extent same is seized or drawn upon by Superior Bank or otherwise applied to such Indebtedness.
>
>         . . . .

---

[16] While the parties did not date their signatures, the line immediately above the signature block states it was "executed as of the day and year first above written."  (Doc. 246-5 at 3).  That date is October 5, 2007.  (*Id.* at 2).  Accordingly, Defendants' contention that no evidence supports that the Repayment Agreement was signed on October 5, 2007, is devoid of colorable merit and does not create a factual dispute.  (*See* Doc. 276 at 20).

6.    **Sale of Project or Units**

a.    Borrower agrees that the Wolf Bay Landing Condominium project contemporaneously herewith deeded to Borrower by Wolf Pup shall not be sold in its entirety absent payment in full of the existing Superior Bank indebtedness by Borrower and return in full of the interest reserve and pledged collateral, and any accrued interest thereon.

(Doc. 246-5 at 2).[17]

b.    Pledge Agreement

Also on October 5, 2007, Ellis, Raley, and Wolf Pup executed the Membership Interest Pledge Agreement (the "Pledge Agreement"). (Doc. 246-2).[18]   Under the Pledge Agreement, Ellis and Raley pledged their 100% membership interest in CCLLC to Wolf Pup as security for their obligations under the Loan Documents. (*Id.* at 2).   The Pledge Agreement also reserved certain specified remedies for Wolf Pup in the event of a default and provided for attorney's fees. (*Id.* at 3-5).   Finally, paragraph 12 of the Pledge Agreement provided:

All indebtedness to Superior Bank shall be refinanced, or otherwise paid in full, on or before one (1) year from the date hereof, and the current guarantors thereof released, or the Borrowers shall be considered in default, and in default of the Loan Documents.

_____

[17] Peacock and another guarantor also entered a November 13, 2007 agreement with Wiggins to repay the Wiggins C.D. in the event Superior seized it. (*See* Doc. 239 at 18).

[18] The parties' signatures are not dated. (Doc. 246-2 at 6). However, as with the Repayment Agreement, the line preceding the signature blocks states the document was executed "as of the date first written above:" October 5, 2007. (*Id.* at 2, 6).

(Doc. 246-2 at 6).  Ellis testified that, at the time the parties executed the Pledge Agreement, they all intended that Ellis would pay off or refinance the Loan within one year, releasing the guarantors—including Wiggins.  (*See* Doc. 255-1 at 24, 82).

### c.    Other Relevant Agreements

The parties also executed other documents in connection with the 2007 Transaction, including another document dated October 5, 2007, entitled "Agreement" (the "Specific Performance Agreement").[19]   The Specific Performance Agreement, signed by Wolf Pup, CCLLC, and Ellis, concerned the units which were the subject of the *Bowles* Litigation; among other terms, it provided Wolf Pup the option to purchase certain units in the event it prevailed against the buyers in that lawsuit.  (Doc. 246-3).   Likewise, the title insurance binder CCLLC procured referenced the *Bowles* Litigation, and Ellis was aware the title insurer initially wanted to except coverage from issues arising from that lawsuit.  (*See* Doc. 257 at 13, 15).

Also included among the agreements effectuating the 2007 Transaction was a "Release Schedule," dated October 5, 2007, and executed by Superior, CCLLC,[20] and Wolf Pup.  (Doc. 244-19 at 3-5).  The Release Schedule provided pricing for individual condominium units.   Finally, Wiggins conveyed Unit A301 to Ellis via

---

[19] The signatures are undated, but the document states it was "entered into effective 10/5/07." (Doc. 246-3 ).

[20] Ellis signed the Release Schedule on behalf of CCLLC on October 20, 2007.  (Doc. 244-19 at 5).  Superior signed the document on October 27, 2007.  (*Id.* at 3).

a November 13, 2007 Warranty Deed.  (Doc. 246-11).  Again, it appears Plaintiffs used the proceeds from this sale to fund the Interest Reserve Account.  (*See, e.g.,* Doc. 241 at 9).

> d.   <u>Assumption Warranty Deed</u>

On October 26, 2007, Wolf Pup executed and filed in Baldwin County Probate Court an Assumption Warranty Deed.  (Doc. 246-6).  The Assumption Warranty Deed incorporated the Condo Declaration and provided Wolf Pup did "grant, bargain, sell, and convey" to CCLLC "in fee simple," sixty units at Wolf Bay Landing, described by their unit numbers.  (*Id.*).[21]  As to express covenants of title, the Assumption Warranty Deed provides:

> AND GRANTOR [Wolf Pup] DOES FOR ITSELF, and for its successors and assigns covenant with the said grantee [CCLLC], and with grantee's successors and assigns, that grantor is lawfully seized in fee simple of the said premises; that they are free from all encumbrances, except as otherwise noted above; that it has a good right to sell and convey the same as aforesaid; and that it will and its successors and assigns shall warrant and defend the same unto the said grantee, and unto grantee's successors and assigns, forever, against the lawful claims of all persons.

(*Id.* at 4).

---

[21] The parties uniformly refer to the Assumption Warranty Deed as conveying sixty units to CCLLC.  It is worth noting the document actually lists sixty-one units.  (Doc. 246-6 at 2).  This appears to be a typo in the Assumption Warranty Deed, particularly because Units A301 and A110 are not listed in the instrument.

### 3.      The *Bowles* Litigation and Issues Surrounding Unit A301

Meanwhile, Wolf Pup had previously initiated the *Bowles* Litigation in the Circuit Court of Baldwin County in February 2007, seeking specific performance of pre-construction sales contracts with buyers.  (Doc. 244-5).  On May 7, 2007, the purchaser-defendants in the *Bowles* Litigation filed counterclaims against Wolf Pup, asserting breach of contract, suppression, fraud, and deceit.   The counterclaims focused on Wolf Pup's failure to properly construct and permit deeded boat slips.   (Doc. 127-1).   The purchaser-defendants in the *Bowles* Litigation also asserted affirmative defenses, including unclean hands due to violations of numerous portions of the Alabama Condominium Act, including § 35-8A-205 (concerning declaration and recordation) and § 35-8A-209 (subsection (g) concerns the certificate of substantial completion).  *Wolf Pup v. Bowles*, No. 07-900084 (Baldwin Cty. Cir. Ct.), Doc. 111.[22]   Wiggins entered a notice of appearance in that case on June 4, 2007. (Doc. 244-8).   Ellis testified he was unaware of the nature of the *Bowles* Litigation or the purchaser-defendants' counterclaims, which he never investigated.  (*See* Doc. 276 at 19-20; Doc. 257 at 14).

Prior to the conveyance of Unit A301 to Ellis via the Assumption Warranty Deed, Wolf Pup had an August 31, 2007 contract to sell the unit to a different

---

[22] These are two of the many code sections cited by the Baldwin County Circuit Court more than three years later, when it held the Condo Declaration was invalid.  (Doc. 127-2).

purchaser.  (*See* Doc. 239 at 11-12).[23]  This purchaser was not a party to the *Bowles* Litigation; he was represented by Gregory Leatherbury, who averred the purchaser was willing and able to close but had been unable to obtain title insurance.  (*See id.* at 12).  Among the evidence of record is an affidavit from Leatherbury describing an October 24, 2007 telephone conversation with Peacock.  (Doc. 244-23).  Leatherbury avers he told Peacock the Condo Declaration was defective and failed to create a valid condominium.  (*Id.* at 4).[24]  Attached to the affidavit is a November 2, 2007 letter Leatherbury sent Peacock.  (Doc. 244-23 at 18-20).  The letter primarily addresses concerns with the deeded boat slips.  However, it also states, "[T]he condominium documents are not valid as filed" and memorializes Leatherbury's understanding that Peacock was taking "curative efforts."  (*Id.* at 20).  On November 9, 2007, Wolf Pup and the guarantors entered a confidential settlement agreement and mutual release with the previous purchasers of Unit A301.  (Doc. 239 at 17).  Defendants were never made aware of these events.  (*Id.*).

---

[23] Wolf Pup conveyed Unit A110 to Raley's company via Warranty Deed on September 13, 2007.  (Doc. 244-22).

[24] Thus, the conversation took place after many of the documents surrounding the 2007 Transaction had been executed.  Additionally, the call occurred just two days before Wolf Pup filed the Assumption Warranty Deed (Doc. 246-6), twenty days before Unit A301 was conveyed to Ellis (Doc. 246-11), and thirty-four days before Superior signed off on the Loan Assumption Agreement—which the other parties had already executed.  (Doc. 246-1).

More than three years later, on December 9, 2010, the Baldwin County Circuit Court granted the purchaser-defendants' motion for summary judgment in the *Bowles* Litigation.  (Doc. 127-2).  The court concluded the Condo Declaration was invalid because it failed to create separable, transferrable condominium units. (*Id.*).  Thus, the court entered judgment in favor of the purchaser-defendants, holding Wolf Pup was not entitled to specific performance of the sales contracts. The parties dispute when Ellis became aware of the judgment in the *Bowles* Litigation.  (*See* Doc. 276 at 9, 16).

### 4.    Other Litigation

As briefly alluded to in the opening paragraph of this opinion, the invalid Condo Declaration has spawned other litigation.  Among these lawsuits is one filed by Wolf Pup and other parties-plaintiff against Peacock and her law firm for legal malpractice with regard to Peacock's drafting and filing of the defective Condo Declaration.  *Galapagos, LLC v. Peacock*, No. CV-2009-1219 (Jefferson Cty. Cir. Ct. *filed* April 16, 2009); (*see* Doc. 246-19).  A search of Alabama's online case management system reflects this lawsuit (the "Malpractice Litigation") remains pending.

### 5.    CCLLC Operated Wolf Bay Landing

On November 20, 2007—a week before Superior executed the Loan Modification Agreement but after all of the other parties had signed—Raley

received a letter stating the construction at Wolf Bay Landing was substantially complete. (Doc. 245-25 at 2; *see* Doc. 239 at 19). Accompanying the letter was a partial set of drawings (the "As-Builts") of Wolf Bay Landing. (Doc. 245-25 at 3-8). One of Raley's employees filed the As-Builts in Baldwin County Probate Court on December 21, 2007, after the 2007 Transaction was complete. (*Id.* at 3; *see* Doc. 239 at 19). The parties dispute whether Raley directed his employee to file the As-Builts in his role as a member of CCLLC or as a member of Wolf Pup. (Doc. 257 at 8; Doc. 276 at 13-14).

Following the 2007 Transaction, CCLLC furnished twelve condo units and placed them into service as rentals in 2007 in order to receive accelerated depreciation under the Gulf Opportunity Zone Act of 2005. (Doc. 276 at 11-12). These so-called "GO Zone" depreciation credits passed through CCLLC to Ellis's (80%) and Raley's (20%) personal tax returns. (*Id.*). Ellis initially attempted to use the GO Zone credits to attract buyers for the unfurnished units. (*Id.* at 12). When no buyers appeared, Ellis placed the remaining units in service as rentals in 2008. (*Id.*). Over $6.75 million in GO Zone credits passed through CCLLC in 2007 and 2008. (*Id.*; Doc. 257 at 7). If a unit subsequently sold, CCLLC would have had to return to the IRS the pro rata share of depreciation received. (Doc. 257 at 7; Doc. 276 at 12; *see* Doc. 297-19). Ultimately, CCLLC did not sell any units while it owned Wolf Bay Landing. (Doc. 257 at 8; *see* Doc. 276 at 13).

C.   **2010: Ellis Purchased Loan & Superior Seized Pledged Collateral**

After Superior and CCLLC repeatedly extended the Loan's maturity date, Superior declared the Loan in default and demanded payment from the obligors and guarantors on May 19, 2010.  (Doc. 239 at 22).  On the same day, Superior inquired whether any of the guarantors, including Ellis, were interested in purchasing the Loan.  (*Id.*).  The only guarantor to express interest in purchasing the Loan was Ellis.  (Doc. 239 at 23).[25]

On December 23, 2010, Ellis personally entered a Loan Sale Agreement with Superior; under it, Ellis acquired the Loan and related documents, including the Guaranties.  (Doc. 246-22).  Ellis financed his purchase of the Loan with approximately $16 million in personal loans from Superior Bank.  (Doc. 257 at 8).  Superior simultaneously seized the Pledged Collateral from its accounts and applied it to the principal indebtedness under the Loan.  (*See* Doc. 239 at 24; Doc. 257 at 9; *see* Doc. 276 at 15).  Ellis and Superior completed this transaction without Plaintiffs' knowledge or consent.  (Doc. 257 at 10; *e.g.* Doc. 266-8 at 3).  It is undisputed that Superior maintained exclusive control over the accounts holding the Pledged Collateral from the consummation of the 2007 Transaction

---

[25] Plaintiffs contend Superior began conspiring with Defendants, timing its seizure of the Pledged Collateral to ensure Plaintiffs would be unable to exercise their rights to declare a default and remove Ellis as the manager of Wolf Bay Landing.  (Doc. 282 at 48-53).  There is evidence to support this contention—at least with regard to Superior.  (*See* Doc. 259 SEALED).  However, in light of the following discussion, it is not necessary to recite the facts—primarily gleaned from emails amongst Superior personnel—in support of this theory.

until Superior seized them on December 23, 2010.  (*See* Doc. 255-1 at 28-29; *see also* Doc. 250-12 at 29).  Superior seized a total of $2,077,408.49, consisting of: (1) $1,742,126.70 on the Wiggins C.D., including accrued interest; and (2) the $335,281.79 balance in the Interest Reserve Account.  (Doc. 259-2 at 3).

While CCLLC did not sell any units while it owned Wolf Bay Landing, Ellis and his wife did buy Unit A110 from individuals who had acquired it at a foreclosure sale.  (Doc. 276 at 23-34).[26]  The Ellises purchased the unit on March 31, 2011, months after the judgment in the *Bowles* Litigation, which concluded the Condo Declaration was invalid.  (*Id.*).[27]  Unit A110 was conveyed via a deed which identified it as a condominium and referred to the Condo Declaration.  (*Id.*). The Ellises received title insurance on Unit A110.  (*Id.*).

### D.   2014: Wolf Bay Landing Sold to Trinity Retreat

After the Loan Sale Agreement, Superior failed and was taken over by FDIC as receiver.  (*See* Doc. 257 at 11).  FDIC subsequently assigned Superior's rights in Ellis's personal loan to an entity that merged with Cadence Bank on November 11, 2011.  Accordingly, Cadence became the holder of Ellis's Loan.  (*See* Doc. 138 at 11).  Ellis and Cadence eventually reached a "Second Settlement Agreement"

---

[26] Raley owned Unit A110 at some point prior to foreclosure.  (Doc. 244-22; *see* Doc. 244-23 at 4).  Although the parties' statements of fact refer to this unit as A101, the deposition testimony confirms it was unit A110.  (Doc. 255-1 at 63).

[27] Defendants assert there is no evidence Ellis knew about the judgment in the *Bowles* Litigation as of March 31, 2011.  (Doc. 276 at 24).  Ellis testified he did not know when he learned the Condo Declaration had been declared invalid.  (*See id.*).

regarding Ellis's personal loan.  (Doc. 255-21).  Under the terms of the Second Settlement Agreement, Wolf Bay Landing was to be sold to a third-party by June 30, 2014, and Cadence was to receive a $5.75 million payment from the sale.  (*Id.* at 10).  In turn, Cadence would release Ellis from his personal loan.  (*Id.* at 12).

On June 25, 2014, Defendants' counsel in the instant case conducted a foreclosure sale of Wolf Bay Landing on a metes and bounds basis.  (Doc. 255 at 2-3).  Mihyon Ellis's limited liability company, Trinity Retreat, made the highest bid: $5.75 million.  (*Id.*).  Trinity Retreat financed the purchase with a loan from Bryant Bank.  (*See* Doc. 138 at 12).  Upon receipt of the foreclosure sale proceeds, Cadence released Ellis from his personal loan on June 26, 2014.  (Doc. 255-31; *see* Doc. 255-21 at 12; Doc. 276 at 18; Doc. 277 at 12; Doc. 279 at 14).

The day after the foreclosure sale, Ellis's attorney filed a new declaration of condominium.  (*See* Doc. 255-1 at 45; Doc. 299 at 10).  Ellis testified he could have cured the defects in the Condo Declaration earlier but chose not to because he was "flat broke" and having a valid declaration was not a priority in 2010 and 2011.  (Doc. 255-1 at 45; *see id.* at 87).  Defendants have not repaid Plaintiffs for the Pledged Collateral Superior seized in 2010, nor have they released the guarantors.  (Doc. 257 at 12; *see* Doc. 276 at 19).

## III.   PROCEDURAL HISTORY AND POSTURE

This case, filed in 2012, was already a year-and-a-half-old when it was reassigned to this court's docket; it greeted the undersigned on her first day on the bench.  (Doc. 14).  At that time, the only parties were Plaintiffs and FDIC.  Nearly a year later, on the court's order, Plaintiffs amended their complaint, adding Ellis and CCLLC as defendants.  (Doc. 22).  Nearly another year later, on February 22, 2016, Plaintiffs filed the Second Amended Complaint—the operative complaint in this matter.  (Doc. 94).

The Second Amended Complaint named seven defendants; in addition to Ellis, CCLLC, and FDIC, it named Mihyon Ellis, Trinity Retreat, Bryant Bank, and Cadence Bank.  (Doc. 94).  At the motion to dismiss stage, all claims against Mihyon Ellis, Trinity Retreat, and Bryant Bank were dismissed; as to Cadence, the claim for tortious interference survived.   (Doc. 155, *adopting Report & Recommendation ("R&R") at* Doc. 138).  This remaining claim against Cadence was dismissed on summary judgment.  (Doc. 309).  The only claim against FDIC that survived its motion to dismiss alleged conspiracy.  (Doc. 179, *adopting R&R at* Doc. 156).   The conspiracy claim against FDIC did not survive summary judgment.  (Doc. 308).

As to Ellis and CCLLC, the only remaining defendants, the Second Amended Complaint asserts thirteen claims.   (Doc. 94).   In response to

Defendants' pending motions for summary judgment, Plaintiffs have conceded five claims: (1) two counts for breach of the implied duty of good faith and fair dealing (Counts IV and VI); (2) breach of fiduciary duty (Count VII); (3) tortious interference (Count XI); and (4) declaratory judgment concerning the Pledged Collateral (Doc. XII).   (Doc. 282 at 58).   Accordingly, there are eight claims remaining against Defendants: (1) declaratory judgment under § 8-3-13 of the *Alabama Code* (Count I); (2) declaratory judgment regarding exoneration (Count II); (3) breach of contract (Count III); (4) money paid (Count V); (5) conversion (Count VIII); (6) conspiracy (Count IX); (7) unjust enrichment (Count X); and (8) promissory estoppel and fraud (Count XIII).  Defendants seek defensive summary judgment as to all of these claims.  (Doc. 238).  Plaintiffs seek offensive summary judgment as to their Counts I, II, and III.  (Docs. 247, 252).[28]

Defendants also asserted counterclaims against Plaintiffs.  The operative counterclaim complaint[29] asserted five claims: (1) fraudulent misrepresentation (Count I); (2) breach of contract (Count II); (3) breach of guaranties (Count III);

---

[28] Plaintiffs have three pending motions for summary judgment.  The first seeks offensive summary judgment on Plaintiffs' Count III.  (Doc. 247).  Also pending is Plaintiffs' motion for defensive summary judgment; the primary focus of this motion is Defendants' fraud counterclaim, but it touches on all pending counterclaims.  (Doc. 249).  Finally, Plaintiffs have filed an offensive/defensive hybrid motion.  (Doc. 252).  Defensively, it focuses on the counterclaim for breach of guaranty, but it also touches on the breach of contract counterclaim; offensively, it seeks judgment in Wiggins' favor on his Counts I and II—seeking declaratory relief from liability on the Guaranties.  (*Id.*).

[29] Defendants asserted fraudulent misrepresentation by way of a counterclaim-in-reply, after the court dismissed their previous counterclaims for fraudulent suppression and misrepresentation. (Doc. 187; *see* Docs. 158, 181).

(4) unjust enrichment (Count IV); and (5) breach of warranty deed (Count V). (Docs. 112; 187; *see* Doc. 214).   Except for Count IV, these claims survived motions to dismiss.  (Doc. 181; *see* Doc. 158).  Plaintiffs seek defensive summary judgment as to all of the remaining counterclaims.  (Docs. 249, 252).  Defendants seek offensive summary judgment as to their counterclaims for breach of contract (Count II), breach of guaranties (Count III), and breach of warranty deed (Count V); they do not seek offensive summary judgment as to the counterclaim for fraudulent misrepresentation (Count I).  (Doc. 240).

## IV.   MOTIONS TO STRIKE

Contemporaneously with the summary judgment briefing, Plaintiffs and Defendants filed motions to strike.  (Docs. 260, 274, 302, 303).  The court termed those motions, construing them as objections to admissibility under Rule 56(c)(2). (Doc. 310).   However, the court has not yet addressed the substance of the motions, which are fully briefed and ripe—or overripe—for review.  (Docs. 261, 301, 305-07; *see* Doc. 318).  Defendants filed three of the four motions to strike; the first of these motions contends Plaintiffs' summary judgment briefing exceeds the applicable page limitations.  (Doc. 260).  Defendants' remaining motions, as well as Plaintiffs' motion, present substantive challenges to the admissibility of certain statements offered in their opponents' respective declarations.  (Docs. 274, 302-03).  The motions are addressed in turn.

On the parties' joint motion, the court set a 60-page limit for initial briefs. (Doc. 223).  Plaintiffs' initial briefs in support of their three pending motions for summary judgment are 28 pages (Doc. 248), 59 pages (Doc. 256), and 40 pages (Doc. 253) respectively, inclusive of signature pages.  Additionally, Plaintiffs took the unusual—although not explicitly forbidden—step of filing a separate, stand-alone, 20-page statement of facts applicable to all three of their principal briefs. (Doc. 257).  Accordingly, not one of Plaintiffs' briefs, standing alone, exceeds the court's page limitations.  Defendants acknowledge this technical compliance; their motion is premised on Plaintiffs' briefs' incorporation of portions of their other briefs.  (Doc. 260 at 3-7).

The briefing in this case is less than ideal; however, Defendants have had the opportunity to respond to all of the arguments presented by Plaintiffs.  This includes extensive paper briefing and oral argument.  To the extent the court has considered arguments Plaintiffs have incorporated by reference, it has also considered the associated defenses asserted by Defendants.  The circular nature of the arguments is probably unavoidable to some extent, reflecting the confounding and convoluted facts of this case.  To the extent Defendants object to Plaintiffs' incorporation of a stand-alone statement of facts, they likewise have not shown prejudice.  Indeed, Defendants responded with their own, stand-alone, 43-page

response.  (Doc. 276).  Accordingly, the objections posed in Defendants' first motion to strike are **OVERRULED**.  (Doc. 260).[30]

The substantive objections appear in: (1) Plaintiffs' motion (Doc. 274) to strike portions of Ellis's Declaration (Doc. 244-18); (2) Defendants' motion (Doc. 303) to strike portions of Wiggins's Second Supplemental Declaration (Doc. 281-1); and (3) Defendants' motion (Doc. 302) to strike portions of Wiggins's Third Supplemental Declaration (Doc. 297-1).  Together, the parties' objections concern 33 paragraphs of the respective declarations.  Many of the objections relate to facts that are unnecessary to the court's adjudication of the pending motions for summary judgment, *infra*.  Regarding any relevant, challenged statements in the declarations, the court's foregoing statement of facts has omitted the parties' legal conclusions and, where necessary, deferred to specific testimony and documentary evidence.  Accordingly, the parties' objections are **OVERRULED** as **MOOT**, obviating the need for the court to address the arguments presented in the combined 137 pages of briefing on the substantive motions to strike.  (Docs. 274, 301-03, 305-07).

---

[30] To the extent Defendants' objections are aimed at Peacock's principal brief, it is **OVERRULED** *nunc pro tunc* on the same basis.  (Doc. 260 at 6-7).  Furthermore, the separate memorandum opinion addressing the motions pertaining to Peacock do not rely on arguments presented by Plaintiffs.

## V.    MOTIONS FOR SUMMARY JUDGMENT

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id*. at 249.

## A.   <u>Defendants' Counterclaim Count I: Fraud</u>

Defendants' amended counterclaim complaint against Plaintiffs included fraud counterclaims based on both suppression and misrepresentation.  (Doc. 112 at 91-0).  The claim for fraudulent suppression was dismissed, and Defendants' counterclaim for fraudulent misrepresentation is the subject of Plaintiffs' defensive motion for summary judgment.  (Doc. 249; *see* Doc. 256).[31]  Defendants do not seek offensive summary judgment on this counterclaim in their motion.  (Doc. 240; *see* Doc. 241).

A party alleging misrepresentation must show: "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the [party] (4) who suffered damage as a proximate consequence of the misrepresentation."  *Exxon Mobil Corp. v. Ala. Dep't of Cons. and Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (quotation and emphasis omitted).  As explained below, Defendants cannot show Plaintiffs made a misrepresentation.  Additionally, even setting aside the failure to show a misrepresentation, Defendants cannot show reasonable reliance.

---

[31] While the title page and introductory paragraph of the brief in support of this motion states it is filed on behalf of Wolf Pup only (Doc. 256), the motion itself and the body of the brief make clear it is filed on behalf of both plaintiffs.  (Doc. 249; *see also* Doc. 292 at 1, n.1).

Accordingly, Plaintiffs' defensive motion for summary judgment is due to be granted as to the counterclaim for fraudulent misrepresentation.  (Doc. 249).

### 1.    Defendants Cannot Show a Misrepresentation

The counterclaim for fraud concerns Defendants' allegations that Plaintiffs falsely stated Wolf Bay Landing was a condominium development.  (Doc. 278 at 7-10).  Defendants' briefing and oral argument clarify that the misrepresentations on which this claim relies consist of various written representations in documents surrounding and effectuating the 2007 Transaction—signed between October 5, 2007, and  November 13, 2007.  (Doc. 278 at 7-10).  Specifically, Defendants rely on the following writings containing the words "condominium" and/or "unit": (1) the November 13, 2007 Warranty Deed conveying Unit A301 from Wiggins to Ellis (Doc. 246-11); (2) the October 26, 2007 Assumption Warranty Deed conveying sixty units from Wolf Pup to CCLLC (Doc. 246-6); (3) the October 5, 2007 Specific Performance Agreement, referring to sale of "condominium units" (Doc. 246-3); (4) the October 5, 2007 Repayment Agreement (Doc. 246-5); (5) the October 5, 2007 Pledge Agreement (Doc. 246-2); and (6) the October 5, 2007 Release Schedule (Doc. 244-19).  (Doc. 278 at 7-8).

As Defendants would have it, each of these written references to "condominiums" and/or "units" constitute Plaintiffs' representations that Wolf Bay Landing was a legally created condominium development, consisting of separable

condominium units ready for individual sale.  (Doc. 278 at 7-10).  This contradicts the ultimate finding in the *Bowles* Litigation, that the Condo Declaration filed in Baldwin County Probate Court on April 17, 2007, failed to create a valid condominium project.  Defendants do not point to any explicit representation—either written, verbal, or otherwise—by Plaintiffs that Wolf Bay Landing consisted of legally created, ready-to-sell condominium units or that the Condo Declaration was valid.

"Misrepresentation may take many forms, a verbal misrepresentation being just one form." *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345, 1351 (Ala. 1991).  A fraudulent misrepresentation claim may be based on conduct or misrepresentations contained within a written document. *See id.* ("The statements and conduct of the parties must be viewed in their entirety to adequately resolve the question of whether a misrepresentation has occurred.").  However, "an alleged written misrepresentation in a contract, without more, cannot be actionable as fraud in Alabama." *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1275 (M.D. Ala. 2007).  Furthermore, "[u]nder Alabama law, the plaintiffs must aver that there were either oral or written misrepresentations made before the signing of the contract or during the performance of the contract." *Id.* at 1276.

For example, in *Goggans v. Realty Sales & Mortg.,* 675 So. 2d 441, 443 (Ala. Civ. App. 1996), a case cited in Defendants' opposition (Doc. 278 at 15-16),

the court addressed a real estate contract for a home.  Under the deal, the buyers assumed the sellers' mortgage.  Documents exchanged during closing indicated the note was a twenty-five-year mortgage.  During closing, a buyer asked a seller and the sellers' agent if the mortgage matured in twenty-five years; both answered affirmatively.  In reality, the mortgage matured in twenty-nine years.  The trial court granted summary judgment on the buyers' fraudulent misrepresentation claim because they had already signed the contracts at the time of the defendants' representation, and thus did not rely on them.  In reversing, the Court of Civil Appeals held the incorrect maturity date on the loan assumption documents, when combined with the  defendants' verbal statements regarding the incorrect maturity date, constituted a false representation.[32]  *Id.* at 443-44.

Here, while Defendants point to a number of documents referring to Wolf Bay Landing as a "condominium" consisting of "units," they do not present evidence of: (1) any explicit representation that the Condo Declaration was valid under Alabama law; or (2) any additional misrepresentation by Plaintiffs (like the

---

[32] To support their argument that the inclusion in documents of the words condominium and unit constituted misrepresentations, Defendants also rely on *Fern Street Inv., LLC v. K&F Rest. Partners, LLC,* No. 13-1935-MHH, 2015 WL 1013167, at *4 (N.D. Ala. Mar. 9, 2015).  (Doc. 278 at 16, n.10).  There, on a motion to dismiss, a court sitting in this district held statements in a franchise disclosure agreement were sufficient to state a claim for fraudulent misrepresentation. Aside from the different procedural posture—the decision in *Fern Street* was issued at the motion to dismiss stage—the statements in that franchise disclosure agreement appear to have been more specific and explicit than the use of the words "condo" or "unit" here.  *Id.* ("the franchise disclosure document misrepresented the actual state of the franchise business model," and the defendants affirmatively understated: (1) the amount of the initial investment by 20%; and (2) the amount of working capital needed for the first six months).

verbal misrepresentation in *Goggans*).   It is true that not all of the writings on which Defendants rely are contracts.  However, each of these documents is a piece in the mosaic of agreements which effectuated the 2007 Transaction.  None of the documents make any representations regarding the validity of the Condo Declaration.

Additionally—to the extent use of the words condo or unit in transactional documents could be interpreted as stating Wolf Bay Landing consisted of validly created, ready-to-sell condominium units—any statements regarding the validity of the Condo Declaration would be no more than an opinion, at least prior to the 2010 ruling in the *Bowles* Litigation.  As Plaintiffs' note, opinions or predictions are not misrepresentations upon which Defendants can reasonably rely.  *See McCutchen Co. v. Media Gen., Inc.,* 988 So. 2d 998, 1002 (Ala. 2008) ("A mere statement of opinion or prediction as to events to occur in the future is not a statement of a 'material fact' upon which individuals have the right to rely and, therefore, it will not support a fraud claim.") (quoting *Crowne Invs., Inc. v. Bryant,* 638 So. 2d 873, 877 (Ala. 1994)).  (*See* Doc. 256 at 3).

Next, simple chronology undermines Defendants' fraud counterclaim.   As suggested by the briefing—and as explicitly stated during the November 17, 2020 hearing—Defendants' theory is that, having referred to condos and units in the documents surrounding the 2007 Transaction, Plaintiffs' had a duty to correct

those misrepresentations when they learned of problems with the Condo Declaration. (*See, e.g.,* Doc. 278 at 9, 17).[33] To succeed under this reasoning, Defendants must show Plaintiffs knew of the deficiencies in the Condo Declaration at some point before the consummation of the 2007 Transaction.

Unsurprisingly, the parties disagree regarding the date on which the 2007 Transaction closed. It occurred in either October or November 2007. The relevant dates are: (1) October 5, 2007, when Wolf Pup, Ellis, CCLLC, and others executed the Specific Performance Agreement (Doc. 246-3), Repayment Agreement (Doc. 246-5), and Pledge Agreement (Doc. 246-2); (2) October 27, 2007, when the Release Schedule was executed (Doc. 244-19); (3) October 26, 2007, when Wolf Pup conveyed the sixty Wolf Bay Landing units to CCLLC via the Assumption Warranty Deed (Doc. 246-6); (4) November 13, 2007, when Wiggins conveyed Unit A301 to Ellis via Warranty Deed (Doc. 246-11); and (5) November 27, 2007, when Superior—the final signatory—executed the Modification Agreement[34] (Doc. 246-1 at 12). Plaintiffs contend the 2007 Transaction closed on October 26, 2007, when the Assumption Warranty Deed conveyed the units to CCLLC. (*E.g.* Doc. 257 at 5). Meanwhile, Defendants argue the 2007 transaction did not close until Superior signed off on the Loan Assumption Agreement on November 27,

---

[33] During the hearing, Defendants specifically disavowed any reliance on a theory of fraudulent suppression, consistent with the court's dismissal of suppression counterclaims years ago.

[34] Ellis signed the Modification Agreement on October 20, 2007. (Doc. 246-1 at 14).

2007.  (*E.g.* Doc. 276 at 9).  Based on the following discussion, Defendants' fraud counterclaim fails regardless of the date on which the 2007 Transaction closed.

Defendants rely on five documents to show Plaintiffs' knowledge of defects in the Condo Declaration.  (Doc. 278 at 9).  Several of these documents are temporally irrelevant, even under the Rule 56 standard: (1) a February 14, 2007 letter[35] to Peacock from counsel for a purchaser in the *Bowles* Litigation (Doc. 244-4); (2) a September 1, 2019 affidavit Wiggins submitted in the Malpractice Litigation (Doc. 244-7 at 6-7);[36] and (3) the April 16, 2009 complaint in the Malpractice Litigation (Doc. 246-19).[37]  Defendants also rely on a July 27, 2007 tolling agreement (Doc. 244-17) between Wiggins, Wolf Pup, Peacock, and others, regarding any claims arising out of Wolf Bay Landing, including problems with the Condo Declaration.  However, this release does not impute any specific knowledge of particular problems with the Condo Declaration, much less that it failed to create condominiums under Alabama law; neither does it lead to an inference of knowledge.

---

[35] This letter predates the April 17, 2007 Condo Declaration and thus is not probative of Plaintiffs' knowledge of any defects in the to-be-filed document.  (Doc. 244-10).  Likewise, the letter does not point to any problems leading to the summary judgment in the *Bowles* Litigation.

[36] This affidavit was executed and filed nearly two years after the 2007 Transaction was complete.  (Doc. 244-7 at 6-7).  While the affidavit includes Wiggins's averment that the Condo Declaration was invalid, it does not state when he reached this conclusion, much less that he knew it at any point in 2007.

[37] This complaint, filed more than a year after the 2007 Loan Assumption, does not shed light on when Wiggins learned of problems with the Condo Declaration.

Defendants' strongest evidence suggesting Plaintiffs knew of defects in the Condo Declaration is an affidavit from Gregory Leatherbury, an attorney for the original purchaser of Unit A301.   (Doc. 244-23).   The affidavit describes the October 24, 2007 telephone conversation with Peacock during which Leatherbury told her the Condo Declaration was defective and did not create a valid condominium.   (*Id.* at 4).   Attached to the affidavit is a November 2, 2007 letter Leatherbury sent Peacock.   (*Id.* at 18-20).   The letter primarily addresses concerns with the deeded boat slips.   However, it also states "the condominium documents are not valid as filed" and memorializes Leatherbury's understanding that Peacock was taking "curative efforts."   (*Id.* at 20).

The October 24, 2007 telephone conversation described by Leatherbury occurred after the parties here had already executed the Repayment Agreement, Specific Performance Agreement, Pledge Agreement, Release Schedule, and Loan Modification.   Thus, at the time Leatherbury told Peacock about problems with the Condo Declaration, the timeline for the events remaining to complete the 2007 Transaction were: (1) two days later—October 26, 2007—Wolf Pup conveyed sixty units to CCLLC via the Assumption Warranty Deed (Doc. 246-6); (2) twenty days later—November 13, 2007—Wiggins conveyed Unit A301 to Ellis via Warranty Deed (Doc. 246-11); and (3) thirty-four days later—November 27,

2007—Superior signed off on the Modification Agreement, which the other parties had already executed.  (Doc. 246-1).

While Peacock's conversation with Leatherbury occurred prior to the completion of the 2007 Transaction, this conversation does not show Plaintiffs' knowledge of defects that would lead the Baldwin County Circuit Court to declare the Condo Declaration invalid more than three years later, on December 9, 2010. (Doc. 127-2).   An opinion expressed by opposing counsel in an adversarial proceeding is simply insufficient to impute knowledge of the Condo Declaration's invalidity here.  *Cf. McCutchen,* 988 So. 2d at 1002.

For the foregoing reasons, Defendants cannot show a misrepresentation to sustain the counterclaim for fraudulent misrepresentation.

## 2.   Defendants Cannot Show Reasonable Reliance

As noted by the Alabama Supreme Court, "a party's failure to exercise some measure of precaution to safeguard his own interest precludes an action for fraud." *Potomac Leasing Co. v. Bulger*, 531 So. 2d 307, 312 (Ala. 1988).  "The right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances." *Sandoz, Inc. v. State*, 100 So. 3d 514, 527 (Ala. 2012) (alteration incorporated) (quotation marks omitted).   A party claiming fraud

"cannot be said to have *reasonably* relied on alleged misrepresentations when they have been presented with information that would either *alert* them to any alleged fraud or would *provoke inquiry* that would uncover such alleged fraud." *Id.*

Here, the question of reliance is tied to the *Bowles* Litigation, which concluded in December 2010, when the Circuit Court of Baldwin County held the Condo Declaration failed to create separable, transferrable condominium units. Wolf Pup initiated the *Bowles* Litigation in February 2007, seeking specific performance of previously executed, pre-construction sales contracts with buyers. On May 7, 2007, the purchaser-defendants in *Bowles* filed counterclaims against Wolf Pup, asserting breach of contract, suppression, fraud, and deceit. The counterclaims focused on Wolf Pup's failure to properly construct and permit deeded boat slips. (Doc. 127-1). The purchaser-defendants also asserted affirmative defenses, including unclean hands due to violations of numerous portions of the Alabama Condominium Act, including two statutory provisions the court ultimately relied upon.

Here, Plaintiffs contend Defendants cannot show reasonable reliance because they were aware of the *Bowles* Litigation but did not investigate the nature of the lawsuit or the status of the Condo Declaration. (Doc. 256 at 20-23). Indeed, the *Bowles* Litigation was referenced in the Real Estate Purchase Agreement, the Specific Performance Agreement, and the title insurance binder CCLLC procured.

(*See id.*; Doc. 259-1 SEALED at 4, 7; Doc. 246-3; *see also* Doc. 257 at 13, 15).[38]

The Specific Performance Agreement explicitly contemplated that Wolf Pup might prevail in the *Bowles* Litigation, implicitly acknowledging Wolf Pup might not prevail.  (Doc. 24-6 at 3 at 2) (providing rights "in the event Wolf Pup succeeds in its litigation seeking specific performance").   Additionally, both the *Bowles* Litigation and the Condo Declaration were matters of public record to which Defendants had access.

Defendants contend they were not required to investigate public records to ascertain the validity of the Condo Declaration.   (Doc. 278 at 19-20) (quoting *Dickinson v. Moore*, 468 So. 2d 136, 138 (Ala. 1985), for the proposition that "one acquiring real property is under no affirmative duty to examine the public records in order to ascertain the true state of the title.").   In *Dickinson*, the  purchaser of

---

[38] While the parties disagree about the legal impact of the Real Estate Purchase Agreement—they ultimately executed and proceeded under the Modification Agreement—this dispute is not material to resolution of the instant motions.   It is undisputed that the parties negotiated and signed the Real Estate Purchase Agreement on August 7, 2007.   The Real Estate Purchase Agreement specifically referenced the *Bowles* Litigation twice, including in the final paragraph, immediately above Ellis's signature. (Doc. 259-1 SEALED at 7).   That paragraph states:

> Seller shall indemnify Purchaser against any and all court ordered damages actually incurred by Purchaser in connection with any claim arising out of the litigation currently pending in Baldwin County, Alabama, styled as <u>Wolf Pup, LLC v. Linton D. Bowles, et al.</u>, CV-20070900084, and or any future claims which cover any actions of the Seller prior to Closing.

(*Id.*).   Additionally, Ellis was aware the title insurer initially wanted to except coverage from issues arising from the *Bowles* Litigation.   (*See* Doc. 257 at 13, 15). Ellis also testified he discussed the *Bowles* Litigation with Raley; Raley reassured him it was nothing to worry about. (*See* Doc. 278 at 22).

real property repeatedly inquired—during both negotiations and closing—about the state of his title in the property.  Each time, the seller responded he owned the property "lock, stock, and barrel" and would convey full title.  *Id.* at 137.  After purchasing the property, the buyer discovered the seller's son had retained an interest in it.  The jury found in favor of the plaintiff/purchaser on his claim for fraudulent misrepresentation.  On appeal, the Alabama Supreme Court affirmed, finding the seller's repeated reassurances that he was conveying fee simple title rendered the purchaser's reliance reasonable.  *Dickinson*, 468 So. 2d at 138 ("we [] cannot allow a seller of land to induce the purchase by misrepresenting facts he knew to be false").  In affirming, the court quoted an earlier decision in which it held:

> A party asserting facts cannot complain that the other took him at his word.  "Positive representation of a fact cannot be counteracted by the implication that the party might have ascertained to the contrary; under such circumstances he need not institute an independent investigation."

*Id.* (quoting *Shahan v. Brown,* 52 So. 737, 738 (Ala. 1910)).

The facts of this case do not line up with those presented in *Dickinson*.  There, the plaintiff repeatedly and specifically asked whether he was purchasing the property in fee simple.  Each time, the defendant explicitly answered affirmatively.  Here, Defendants never inquired about the status of the Condo Declaration.  Indeed, the only representations Ellis relied upon were inclusions of

the words "condominium" and "unit" in the various documents he executed to complete the 2007 Transaction.   From the use of these words, Ellis assumed the Condo Declaration created separable, ready-to-sell condominiums; he never asked about the Condo Declaration, and no one ever told him it complied with Alabama law.

Additionally, at least one other case suggests purchasers of real estate do have a duty to investigate publicly available information.  In *Morris v. Strickling*, 579 So. 2d 609 (Ala. 1991), the plaintiffs were purchasers of a subdivision lot developed by the defendants.  The plaintiffs constructed a home on the lot without: (1) inquiring about the lot's suitability for construction; or (2) conducting any sub-surface soil testing.   After the house was constructed, the plaintiffs noticed excessive foundation cracking and discovered all manner of garbage near the base of the house; they later discovered the lot previously had been used as a trash dump.   The plaintiffs sued, asserting breach of implied warranty, fraudulent suppression, fraudulent misrepresentation, and other claims.   The trial court granted summary judgment on all claims in favor of the defendants, applying the doctrine of *caveat emptor*.  *Id.* at 610.  The Alabama Supreme Court affirmed.  *Id.* at 611.  With regard to the fraud-based claims, the Alabama Supreme Court held they failed due to: (1) the plaintiffs' failure to inquire regarding the suitability of the lot; and (2) the publicly available subdivision plans, which revealed the lot's

past use as a dump.  *Id.*  While the court's discussion of the fraud claims was not couched in terms of reasonable reliance, it clearly implicates the principle.

Here, following the rationale of *Morris*, Defendants' counterclaims for fraudulent misrepresentation fail.  Just as the plaintiffs in *Morris* did not inquire regarding the suitability of the lot, Defendants here did not inquire about the status of the Condo Declaration.  Likewise, just as the subdivision plans were public records available to the plaintiffs in *Morris*, here, both the *Bowles* Litigation—including the purchasers' eventually-successful affirmative defenses—and the Condo Declaration were matters of public record which were available to Defendants.  Ellis was a sophisticated party with formidable experience in real estate transactions and condominium projects.  For a reasonable person with Ellis's experience conducting a multi-million-dollar transaction, discovery of the *Bowles* Litigation—concerning buyers backing out of sales contracts—"should have provoked inquiry or a simple investigation of the facts."  *Sandoz, Inc.*, 100 So. 3d at 527-28 (quoting *AmerUs Life Ins. Co. v. Smith,* 5 So. 3d 1200, 1216 (Ala. 2008)).[39]  Ellis is "charged with knowledge of all the information that the inquiry would have produced."  *Id.* at 528.

_____

[39] Faced with similar scenarios in the context of fraudulent suppression, Alabama courts have held that information available in public records foreclosed the claims. *Gewin v. TCF Asset Mgmt. Corp.*, 668 So. 2d 523, 529 (Ala. 1995) ("The existence of the litigation was a matter of public record. . . . Thus, experienced real estate investors, like [plaintiffs], could have discovered it by the exercise of due diligence.") (citation omitted); *Auburn's Gameday Ctr. at Magnolia Corner Owners Assoc. Inc. v. Murray*, 138 So. 3d 317, 331 (Ala. Civ. App. 2013) (affirming

Defendants cannot establish the reasonable reliance required to sustain the counterclaim for fraudulent misrepresentation.   For this reason—and for the independently-sufficient reason that Defendants cannot show a misrepresentation—there are no genuine issues of material fact, and Plaintiffs are entitled to judgment as a matter of law as to Defendants' counterclaim for fraudulent misrepresentation.

### B.   Claims and Counterclaims Concerning the Guaranties and Loan

The parties each have two claims arising under the Loan and Guaranties: (1) Plaintiffs' Count I (statutory exoneration under § 8-3-13); (2) Plaintiffs' Count II (release of guaranty); (3) Defendants' Counterclaim II (breach of contract for default on the Loan); and (4) Defendants' Counterclaim III (breach of guaranty). Plaintiffs' Count I and Count II are subject to Defendants' defensive motion for summary judgment (Doc. 238) and Plaintiffs' offensive motion for summary judgment (Doc. 252).   Defendants' Counterclaims II and III are subject to Defendants' offensive motion for summary judgment (Doc. 240) and Plaintiffs' defensive motions for summary judgment (Docs. 249, 252).

---

judgment in favor of condominium complex owners, noting the buyers "were placed on notice of the existence of the publicly recorded declaration and amendment" and were "familiar with and had experience in the workings of condominiums").   Here, in addition to Ellis's testimony regarding his extensive background in real estate and condominium projects, he further stated he did not ask any questions about the validity of the Condo Declaration and that he was aware of the lawsuit—which was public record—but did not investigate.

Among the arguments presented in Plaintiffs' briefing of the pending motions regarding their Count II is that the Pledge Agreement estops Defendants from enforcing the Guaranties.  (*See, e.g.* Doc. 253 at 28-30; Doc. 256 at 51-52; Doc. 283 at 31-32).  Specifically, Plaintiffs rely on paragraph 12 of the Pledge Agreement—between Ellis and Raley (as the "Pledgors") and Wolf Pup—which provides:

> All indebtedness to Superior Bank shall be refinanced, or otherwise paid in full, on or before one (1) year from the date hereof, and the current guarantors thereof released, or the Borrowers shall be considered in default, and in default of the Loan Documents.

(Doc. 246-2 at 6).

The court concludes the rationale expressed by the Fifth Circuit in *In re Pirani*, 824 F.3d 483 (5th Cir. 2016), although not briefed by the parties, supports Plaintiffs' argument regarding the Pledge Agreement's impact on the Guaranties. It is undisputed that, at the time the parties executed the Pledge Agreement, they all intended Ellis would pay off or refinance the Loan within one year, releasing the guarantors—including Wiggins.  (*See* Doc. 255-1 at 24, 82).  For the same reasons explained in the accompanying memorandum opinion and order on reconsideration of Defendants' and Peacock's cross-motions for summary judgment, Ellis cannot enforce the Guaranties in light of the Pledge Agreement.

Rather than unnecessarily lengthen the instant tome, the court incorporates the accompanying memorandum opinion's discussion of the Pledge Agreement

and its impact on the Guaranties.   Any arguments Defendants assert against Plaintiffs' reliance on the Pledge Agreement that are not addressed in the accompanying memorandum opinion concerning Peacock's and Defendants' cross-motions are addressed in the instant opinion.   However, because Defendants' arguments concerning the Pledge Agreement overlap with similar arguments regarding the Repayment Agreement, they are discussed in the following section, concerning Plaintiffs' Count III.   Before turning to this discussion, Plaintiffs' request for attorney's fees under the Pledge Agreement will be addressed.

### 1.   Plaintiffs' Request for Attorneys' Fees

Plaintiffs also seek attorneys' fees and expenses under the Pledge Agreement.  (Doc. 248 at 15, n.13).  The Pledge Agreement provides:

> In the event that it becomes necessary for Pledgee [i.e., Wolf Pup] to initiate litigation for the purpose of enforcing any of its rights hereunder or for the purpose of seeking damages for any violation hereof, then, in addition to all other judicial remedies that may be granted, Pledgee shall be entitled to recover reasonable attorneys' fees and all other cost that may be sustained by it in connection with such litigation.

(Doc. 246-2 at 5).  Defendants contend Plaintiffs are not entitled to relief under this provision because they have not presented any evidence regarding the amount of fees or costs incurred.  (Doc. 277 at 18).  In reply, Plaintiffs contend they seek leave to prove their attorney's fees at trial.  (Doc. 299 at 23-24).

In support of their contention that Plaintiffs have missed their opportunity to prove attorney's fees, Defendants cite three cases: *Bus. Loan Ctr., LLC v. M/V CAPE FLORIDA*, No. 17-0555, 2018 WL 1881262, at *4 (S.D. Ala. Apr. 19, 2018); *RBC Bank (USA) v. Glass*, 773 F. Supp. 2d 1245, 1247 (N.D. Ala. 2011); and *Koninklijke Ahold, N.V. v. Millbrook Commons, LLC*, No. 10-1060, 2013 WL 4045072, at *3 (M.D. Ala. Aug. 8, 2013). (Doc. 277 at 18). However, these opinions issued when there was nothing left for the respective courts to decide. In *Glass*, the movant had prevailed on summary judgment, and no claims remained for trial. 773 F. Supp. 2d at 1247 (denying post-judgment motion for attorney's fees). Similarly, in *Koninklijke* the court conducted a bench trial, after which the prevailing party moved for attorney's fees via post-judgment motion. 2013 WL 4045072, at *3 (denying post-judgment motion for fees because the movant had not presented any evidence at trial). The third case Defendants cite is also inapposite; there the court entered default judgment, but excluded attorney's fees from the award because the movant had not presented any evidence regarding fees incurred—despite the court's invitation to remedy the shortcoming. *M/V Cape Florida*, 2018 WL 1881262 at *4. In each of these cases, the proceedings had concluded and there was nothing left to prove.

There remains a matter for trial in the instant case: the amount of damages Plaintiffs suffered from Superior's seizure of—and Defendants' refusal to repay—

funds Plaintiffs deposited into the Interest Reserve Account.  Rule 54 provides a "claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved *at trial* as an element of damages."  FED. R. CIV. P. 54(d)(2)(A) (emphasis added).  Here, damages are an integral part of Plaintiffs' breach of contract claim to be proven at trial.  *See Koninklijke*, 2013 WL 4045072, at *2 ("the claim for attorneys' fees may be waived if not properly presented at trial"); *Glass*, 773 F. Supp. 2d at 1247 (If, in the instant case, the court had denied RBC's motion for summary judgment, and the case had been tried to the jury demanded by the Glasses, and if the Glasses had not agreed to bifurcate or postpone the attorney's fee question for adjudication by the court, RBC would have been required to prove its attorney's fees as part of its case-in-chief.").  For the foregoing reasons, Plaintiffs can prove their attorneys' fees and expenses at trial.

### 2.      Conclusion Regarding Claims Under Guaranties and Loan

In light of the foregoing discussion—including its incorporation of the rationale from the accompanying memorandum opinion concerning Peacock's and Defendants' cross-motions—there are no genuine issues of material fact with regard to Plaintiffs' Count II; Plaintiffs are entitled to judgment as a matter of

law.[40]  Accordingly, Plaintiffs' offensive motion for summary judgment (Doc. 252) will be granted; Defendants' defensive motion for summary judgment necessarily will be denied as to these claims  (Doc. 238).  Defendants' offensive motion for summary judgment with regard to their Counterclaims II (breach of the Loan) and III (breach of Guaranties) will be denied for the same reasons.  (Doc. 240).

### C.   Plaintiffs' Claims Under the Repayment Agreement[41]

Four of Plaintiffs' other claims seek relief under—or related to—the Repayment Agreement: (1) Count III, asserting breach of contract; (2) Count V, asserting a claim for money paid; and (3) Count VIII, asserting conversion as to Wiggins's Pledged Collateral; and (4) Count X, asserting a claim for unjust enrichment with regard to Wiggins's Pledged Collateral, in the alternative to breach of contract.  (*See* Doc. 282 at 56-57).  Defendants' defensive motion for summary judgment is aimed at each of these claims.  (Doc. 238).  Plaintiffs seek offensive summary judgment on their claim for breach of contract in Count III. (Doc. 247).

Defendants—collectively defined as the "Borrower"—executed the Repayment Agreement in favor of Wolf Pup, its members, and its members'

---

[40] This decision pretermits discussion of Plaintiffs' Count I, which seeks the same relief—release of the Guaranties—under an entirely different rationale.  In light of the relief granted here, Count I will be dismissed as duplicative.

[41] As mentioned above, Defendants' defenses to Plaintiffs' claims under the Pledge Agreement—which overlap with their defenses to Plaintiffs' claims under the Repayment Agreement—are also discussed in this section.

owners.   (Doc. 246-5).   As a reminder, the Repayment Agreement required Defendants to repay any portion of the Pledged Collateral seized by Superior; it also provided Defendants would not sell Wolf Bay Landing in its entirety absent payment in full of the Loan and repayment of any Pledged Collateral Superior seized.   (*Id.* at 2).   Meanwhile, the Pledge Agreement—executed on the same day—included the already-discussed provision requiring Ellis to repay or refinance the Loan within one year, releasing the guarantors.  (Doc. 246-2 at 6).

### 1.    Defendants' Defensive Motion for Summary Judgment

Defendants' fraud allegations—premised on the invalidity of the Condo Declaration—are not merely grounds for their fraudulent misrepresentation counterclaim; Defendants also employ these allegations as their principal defense to Plaintiffs' claims under the Pledge Agreement and Repayment Agreement. (Doc. 239 at 42-48).  For the same reasons Defendants' allegations concerning the defective Condo Declaration cannot sustain their counterclaim for fraud, they also are insufficient to show fraud as a defense to Plaintiffs' claims under the Repayment and/or Pledge Agreements.

Defendants assert several additional defenses to Plaintiffs' claims under the Repayment and/or Pledge Agreements.  First, Defendants contend Wiggins cannot assert claims under these agreements because he was not a party to them.  (*E.g.* Doc. 239 at 29, 37, n.18; Doc. 293 at 9-11).   The remainder of Defendants'

defenses arise from the deficiencies in the Condo Declaration: (1) failure of consideration; (2) Plaintiffs' own breach; (3) failure of a condition precedent; (4) impossibility and frustration of purpose; and (5) unclean hands. (Doc. 239 at 37-50). The court will first address Wiggins's third-party beneficiary status before turning to the defenses premised on the invalidity of the Condo Declaration.

### a.   Wiggins's Third-Party Beneficiary Status

The parties to the Pledge Agreement were Ellis, Raley, and Wolf Pup. (Doc. 246-2). While Wiggins signed the Pledge Agreement, he did so as Wolf Pup's authorized representative, not in his personal capacity. (*Id.* at 6). Similarly, Wiggins signed the Repayment Agreement as Wolf Pup's authorized representative. (Doc. 246-5 at 3). The other signatory was Ellis, who signed both individually and as CCLLC's managing member. (*Id.*). Accordingly, Wiggins was not a party to these agreements in his personal capacity. On these facts, Defendants contend Wiggins cannot assert claims under these agreements because he did not plead third-party beneficiary status. (Doc. 279 at 13, 22, 25, 27). In support, Defendants quote *Fuller v. Winn-Dixie Montgomery, LLC,* No. 16-363, 2017 WL 3098104 (S.D. Ala. July 19, 2017). (Doc. 279 at 13, n.8) ("For the third-party beneficiary claim . . . , Fuller cannot raise new claims on summary judgment and is limited to the allegations of the operative complaint, which did not include this claim.") (footnote omitted).

"A party claiming to be a third-party beneficiary, 'must establish that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon the third party.'" *Walker v. Allstate Prop. & Cas. Ins. Co.*, No. 19-0701-RDP, 2020 WL 1235626, at \*7 (N.D. Ala. Mar. 10, 2020) (quoting *Airlines Rep. Corp. v. Higginbotham*, 643 So. 2d 952, 954 (Ala. 1994)).   A plaintiff asserting a breach of contract claim as a third-party beneficiary "must allege 'facts in the complaint suggesting that either party to the contract intended it to directly benefit him at the time they executed the contract.'" *Id.* (alterations incorporated) (quoting *Thomas v. Am.'s Serv. Co.*, No. 15-0019-AKK, 2015 WL 4729792, at \*2 (N.D. Ala. Aug. 10, 2015)).

Here, Wiggins personally stood to benefit under both the Pledge Agreement and the Repayment Agreement.  The Repayment Agreement provided, in the event any of the Pledged Collateral was seized, Defendants would "immediately repay to Wiggins any portion of the $1,500,000 collateral and interest accrued thereon posted by Wiggins." (Doc. 246-5 at 2).  Likewise, Wolf Bay Landing could not be sold without payment of the Loan in full.  (*Id.*).  Similarly, the Pledge Agreement provided Ellis would repay or refinance the Loan within one year, releasing the guarantors—including Wiggins.  (Doc. 246-2 at 6).  Clearly, the signatories to these agreements intended Wiggins to benefit directly at the time of their

execution.  Moreover, Plaintiffs alleged these facts prominently in the Second Amended Complaint.  (Doc. 94 at 2-6).  *See Walker*, 2020 WL 1235626, at *7.

To the extent Defendants challenge Plaintiffs' allegations concerning Wiggins's capacity to sue as a third-party beneficiary, a party is not required to allege their authority or capacity to sue under Rule 9(a) of the *Federal Rules of Civil Procedure*.  Instead, Rule 9(a)(2) places the burden to prove lack of capacity on the party challenging it.  *See James v. City of Huntsville*, No. 14-2267-AKK (N.D. Ala. Mar. 4, 2015), Doc. 10, *R&R adopted* May 26, 2015.[42]  Defendants do not dispute Wiggins is in fact a third-party beneficiary; instead they merely challenge the allegations of this status in the Second Amended Complaint.  As shown above, Wiggins's status as a third-party beneficiary is obvious from the face of the operative complaint.  Additionally, the only case cited by Defendants in support of this argument—*Fuller*—also addressed the failure to plead the underlying claim, not merely to failure to plead capacity.  (*See* Doc. 279 at 13, n.8,

---

[42] Presented with a motion to dismiss for failure to specifically plead personal representative capacity with regard to a wrongful death claim under §1983, this court held:

> Rule 9(a)(1)(B) of the *Federal Rules of Civil Procedure* provides that a pleading need not allege a party's authority to sue in a representative capacity unless required to show the court has jurisdiction.  *See* Fed. R. Civ. P. 9(a)(1)(B); *see also* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1292 (3d ed.).  "The rationale behind this rule is that the nature of the plaintiff's cause of action can be determined from the body of the complaint."  *Colorado Springs Cablevision, Inc. v. Lively*, 579 F. Supp. 252, 255 (D. Colo. 1984).  A defendant must challenge a plaintiff's authority to sue in a representative capacity by a specific denial.  Fed. R. Civ. P. 9(a)(2).

*James*, No. 14-2267, Doc. 10 at 4-5.

22).  Accordingly, Defendants are not entitled to summary judgment on the basis of their arguments regarding Wiggins's third-party beneficiary status.

> b.    Defenses Based on Invalid Condo Declaration

Defendants' remaining defenses to Plaintiffs' claims under the Repayment and Pledge Agreements all rely on deficiencies in the Condo Declaration.  Each of these arguments implicitly rests on the theory that the validity of the Condo Declaration—creating ready-to-sell condominium units—was the cornerstone of the entire 2007 Transaction.  However, none of the documents effectuating the 2007 Transaction is explicitly premised on the validity of the Condo Declaration.  Indeed, the evidence shows a valid Condo Declaration was not material to the 2007 Transaction, Ellis's *post hoc* testimony notwithstanding.

The Gulf Coast condo market had declined by the time the parties completed the 2007 Transaction.  These adverse conditions in the condo market persisted and did not recover until sometime after 2010.  (*See* Doc. 255-1 at 87).  Ellis testified CCLLC never received an acceptable offer for a unit at Wolf Bay Landing before selling the development to Trinity Retreat in 2014.  (*Id.*).  During that time, the offers which did come in were for approximately forty percent of the values reflected in the Release Schedule.  (*Id.*).  Accordingly, Ellis testified that, even if the Condo Declaration had been valid, CCLLC would not have sold any units through 2010.  (*Id.*).

Other evidence supports Ellis's testimony in this regard. In a December 11, 2009 email to Wiggins, Ellis noted his ultimate goal was to "sell out of the project once the market returns." (Doc. 281-127). In a March 23, 2010 email exchange, Wiggins expressed his interest in "expedit[ing] sales as soon as possible." (Doc. 297-19 at 3). In response, Ellis stated sales were not his "most immediate goal, until the market returns to cover the full release fee due to Superior Bank, plus make a profit on the sale. Also, I do not want to have to recapture the stepped up deprec[i]ation that has been taken via the Go Zone credit for these units." (*Id.*). To the extent Defendants contend the failure of the Condo Declaration affected the sales contracts existing at the time of the 2007 Transaction, the *Bowles* litigation was already under way at that time and was referenced in agreements Defendants signed. Indeed, as previously mentioned, the Specific Performance Agreement implicitly recognized the purchaser-defendants might prevail in the *Bowles* Litigation. (Doc. 246-3).

Further belying the materiality of the status of the Condo Declaration is that Ellis's attorney cured the defect simply by filing a new declaration of condominium on June 25, 2014, the day after the foreclosure sale. (*See* Doc. 255-1 at 45; Doc. 299 at 10). Ellis testified he could have cured the defects in the Condo Declaration earlier but chose not to because he was "flat broke" and having a valid declaration was not a priority in 2010 and 2011. (Doc. 255-1 at 45, 87). Neither

54

did Ellis ever make a claim on the title insurance policy.  (*Id.* at 45).  Similarly, the Real Estate Purchase Agreement, which the parties negotiated and signed after the Condo Declaration was filed, described Wolf Bay Landing on a metes and bounds basis.  (Doc. 259-1 SEALED at 14).  Accordingly, the facts presented here do not support Defendants' contention that the validity of the Condo Declaration was a material factor during the 2007 Transaction.

Regardless, "a plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions."  *Lyles v. Pioneer Hous. Sys., Inc.,* 858 So. 2d 226, 229 (Ala. 2003) (quoting *S. Energy Homes, Inc. v. Ard,* 772 So. 2d 1131, 1134 (Ala. 2000) (alteration incorporated; quotation marks omitted).  There is a factual dispute regarding precisely when Defendants knew of the problems with the Condo Declaration.  Ellis testified he learned of the defects a "short" time after the December 2010 ruling in the *Bowles* litigation.  (Doc. 255-1 at 33).  Whether Ellis learned of the defective Condo Declaration shortly after the *Bowles* Litigation concluded—or as strongly suggested by the evidence, sometime during the preceding year[43]—does not affect the legal consequences of Defendants' subsequent actions.

---

[43] Other evidence suggests Ellis was aware of problems with the Condo Declaration at least as early as 2009.  (Doc. 297-10) (November 18, 2009 email from Superior Bank's Bill McKinnon to Ellis, attaching Wiggins's state court complaint against Peacock—which alleged problems with the Condo Declaration).  There were also communications in 2010—prior to the judgment in *Bowles*—suggesting Ellis was aware of problems with the Condo Declaration.  (*See* Doc. 281-147 (April 1, 2010 email from Balch & Bingham's Randolph Lanier to Ellis, Wiggins, and

Rather than taking action upon learning of the defective Condo Declaration, Defendants continued to benefit from ownership of Wolf Bay Landing, including exercising exclusive dominion over the property, collecting rents, and retaining the benefit of accelerated GO Zone depreciation. Defendants also retained the benefit of Wiggins's Pledged Collateral, which Superior seized and applied against the principal of the Loan. In June 2014, Defendants exercised the ultimate benefit of ownership when they sold Wolf Bay Landing to Trinity Retreat, extinguishing Ellis's personal debt for a fraction of the amount he owed. Having reaped these benefits of ownership, even after learning of the Condo Declaration's defects— shortly after December 2010, at the very latest—Defendants cannot seek to avoid the burdens of their agreements with Plaintiffs. *Lyles,* 858 So. 3d at 229.

Defendants' contract defenses, which fail for independently sufficient reasons, are addressed in turn.

---

others, attaching As-Built drawings and stating: "Wolf Pup and Character Counts need to get a good condo lawyer to file an appropriate amendment to the Declaration of condominium to get this fixed."); Doc. 281-151 (April 5, 2010 email from Lanier to Ellis, recommending lawyers in Baldwin County "for condominium work"); Doc. 281-141 at 3 (August 7, 2010 memo from Frank Ellis accompanying the documents from the 2007 Transaction, stating: "I know that I have a couple of 'Achilles heel' documents, at the same time, my performance was limited due to the misrepresentation by Wolf Pup LLC that I was purchasing a fully approved condominium project that could be sold and financed by third party purchasers, which is even currently not the case, based on Wiggins' own suit against . . . Linda Peacock . . . . I should have for you tomorrow the law suit number against the local realtor and then the counter claim by him and other contract purchasers stating this flaw in the condo formation . . . . The plot thickens.")). This chronology, especially when combined with his March 31, 2011 purchase of Unit A110, suggests the status of the Condo Declaration was immaterial to Ellis.

i.  *Failure of Consideration*

"Consideration must be present when the contract is made." *Fant v. Champion Aviation, Inc.,* 689 So. 2d 32, 37 (Ala. 1997).  "The requirement of consideration means that a gratuitous promise is not enforceable."  *Id.*  "Under Alabama law, failure of consideration is an affirmative defense to enforcement of a contract."  *Hardy v. Jim Walter Homes, Inc.,* No. 06-0687, 2008 WL 906455, at *6 (S.D. Ala. April 1, 2008).  As the Alabama Supreme Court has held:

> The failure of consideration is "'the neglect, refusal and failure of one of the contracting parties to do, perform, or furnish, after making and entering into the contract, the consideration in substance and in fact agreed on.'"  *Lemaster v. Dutton,* 694 So. 2d 1360, 1366 (Ala. Civ. App. 1996) (quoting 17 C.J.S. *Contracts* § 129 (1963)). Additionally, a failure of consideration is "'predicated on the happening of events which materially change the rights of the parties, which events were not within their contemplation at the time of the execution of the contract.'" *Lemaster,* 694 So. 2d at 1366.

*Self v. Slaughter*, 16 So. 3d 781, 787 (Ala. 2008).  As a court sitting in the Southern District of Alabama has explained, failure of consideration and lack of consideration are two distinct theories.  *Hardy*, 2008 WL 906455, at *7.  In *Hardy*, a case cited by Defendants, the court discussed:

> the distinct doctrines of lack of consideration (a contract formation issue which goes to the existence of a contract in the first instance) and failure of consideration (a contract performance issue under which an otherwise valid contract may be voided by one party after the fact for the other party's failure to perform). *Compare Lemaster v. Dutton,* 694 So. 2d 1360, 1366 (Ala. Civ. App. 1996) ("Typically, a total failure of consideration is used as an excuse for nonperformance

57

of a contract.") *with Marcrum v. Embry,* 282 So. 2d 49, 51 (Ala. 1973) (valid contract requires "valuable consideration moving from one side to the other" or "binding promises on the part of each party to the other"); *see generally Belew v. Rector,* 202 S.W. 3d 849, 854 n. 4 (Tex. App.-Eastland 2006) (explaining that "lack of consideration" and "failure of consideration" represent different defenses, and that "lack of consideration exists, if at all, immediately after the execution of a contract while failure of consideration arises because of subsequent events").

*Id.*; (*see* Doc. 239 at 37; Doc. 293 at 11).

Here, Defendants contend the flaws in the Condo Declaration constitute a failure of consideration, excusing them from performing under the Pledge Agreement and the Repayment Agreement. (*E.g.* Doc. 239 at 37-38; *E.g.* Doc. 279 at 25, 27).[44]   However, the chronology of events in this case does not support a failure of consideration defense.   Even if the defective Condo Declaration constituted a breach, it was present at the time the parties consummated the deal. While the failure of Condo Declaration was not definitively announced until the conclusion of the *Bowles* Litigation in 2010, the underlying defects were present prior to, during, and after the execution of the 2007 Wolf Bay Landing transaction; no "subsequent event" affected the validity of the Condo Declaration.   *Hardy*,

---

[44] Defendants also contend there was no consideration as to Ellis under either the Pledge or Repayment Agreements.  (Doc. 239 at 39).

2008 WL 906455, at *7.  Accordingly, failure of consideration does not apply to the facts of this case.  *See id*.[45]

Neither does a total lack of consideration apply to the extent asserted on behalf of Ellis.  The failure of the Condo Declaration notwithstanding, the parties exchanged a number of rights in exchange for Defendants' assumption of the Loan, including transfer of the entire property to Defendants' exclusive possession in 2007.  Additionally, Defendants benefitted from continued use of the Plaintiffs' Pledged Collateral to secure the Loan and from Wiggins's agreement to consent to the Modification Agreement as a guarantor.  The foregoing benefits to Defendants, including Ellis, were the valuable consideration exchanged for Defendants' execution of the Pledge and Repayment Agreements.  These two agreements were among the documents that effectuated the 2007 Transaction; they operated to induce Plaintiffs to enter into the deal and accept the risks embodied in the other agreements.  (Doc. 246-2 at 2) (Pledge Agreement intended "to induce [Wolf Pup] to enter into and accept the Loan Documents" and was made "in consideration of

---

[45] Defendants citation of *Kelso v. Int'l Wood Prods, Inc.*, 588 So. 2d 877, 878 (Ala. 1991), hints at this deficiency.  (*See* Doc. 239 at 39).  *Kelso* concerned the plaintiff's attempt to enforce a gratuitous promise—a promise for which no consideration was ever exchanged—which created "no legally enforceable contract right."  *Id.*  Also inapposite is *Local 798 Realty Corp. v. 152 W. Condo.*, 37 A.D. 3d 239, 240 (2007), another case cited by Defendants. (*See* Doc. 239 at 38, n.19).  There the court, applying New York law, dismissed a lawsuit seeking specific performance of a contract purporting to convey three non-existent condominium units; the court held the purchasers had the right to *cancel* the contract under its express terms.  *Local 798*, 37 A.D. 3d at 240.  Tellingly, the plaintiffs in *Kelso* sought recission, seeking to undo the void contract.  Defendants here have explicitly and repeatedly foresworn recission.  (Doc. 278 at 12; Doc. 293 at 13).

the premises and mutual covenants contained in the Loan Agreements"); (Doc. 246-5 at 2) (Repayment Agreement signed "in consideration of the contemporaneously executed documents"). Clearly, the parties exchanged consideration with respect to the 2007 Transaction.

For the foregoing reasons, Defendants are not entitled to defensive summary judgment for failure of consideration.

### ii.   *Plaintiffs' Breach*

Next, Defendants contend the defective Condo Declaration constituted Plaintiffs' breach of the parties' contracts, preventing Plaintiffs from suing Defendants for subsequent breaches.  (Doc. 239 at 39-40).  In addition to the problems discussed above, occasioned by Defendants' acceptance of the benefits of owning—and eventually selling—Wolf Bay Landing, this argument fails because Defendants have not established the defective Condo Declaration constitutes a breach of any of the parties' agreements, including the Pledge Agreement or the Repayment Agreement.

The Repayment Agreement refers to "Wolf Bay Landing Condominiums" three times: (1) in the opening paragraph, noting the purchase price; (2) in paragraph 6a, providing Defendants would not sell the "Wolf Bay Landing Condominium project" in its entirety absent payment in full of the Loan and return of the Pledged Collateral; and (3) in paragraph 6b, providing that certain proceeds

from the sale of any unit would be placed in escrow until the Pledged Collateral was returned to Wiggins. (Doc. 246-5 at 2-3). Similarly, paragraphs six and seven of the Pledge Agreement provide for the sale of units and the allocation of sales proceeds. (Doc. 246-2 at 3-4). While it is clear that no individual condominium units could be sold absent a valid condominium declaration, the Repayment Agreement and Pledge Agreement are entirely silent regarding the existence— much less the validity—of the Condo Declaration or the party responsible for creating and filing it. The same is true regarding the other agreements surrounding the 2007 Transaction. Accordingly, the defective Condo Declaration did not constitute a breach of any contract by Plaintiffs.

Finally, once the 2007 Transaction was complete, Defendants had exclusive ownership and control of Wolf Bay Landing. Ellis testified he could have cured the defects in the Condo Declaration earlier but chose not to do so. (Doc. 255-1 at 45, 87). As noted in one of the cases quoted by Defendants, the law does not allow a contracting party "to take advantage of an obstacle to performance which . . . lies within his power to remove." (Doc. 239 at 40) (quoting *Gulf, Mobile & Ohio R.R. Co. v. Ill. Cent. R.R. Co.*, 128 F. Supp. 311, 324 (N.D. Ala. 1954)).

For the foregoing reasons, Defendants are not entitled to defensive summary judgment due to any breach by Plaintiffs.

### iii.   Condition Precedent

Defendants also contend the validity of the Condo Declaration was a condition precedent.  (Doc. 239 at 40-41).  A condition precedent is an act or event which must occur before a contractual duty to perform arises.  *CAM Invs., LLC v. Totty,* 128 So. 3d 749, 753 (Ala. Civ. App. 2013).  Defendants posit the "entire purpose of the transactions at issue in this case surround a conveyance of Wolf Bay Landing as condominium units to CCLLC."  (Doc. 239 at 41). In support of this contention, Defendants rely on the same arguments advanced with regard to their counterclaim for fraud: the appearance of the words "condominium" and "unit" in the various documents effectuating the 2007 Transaction.  (*Id.* at 41).  For the same reasons explained in the foregoing pages, this argument fails.

For the foregoing reasons, Defendants are not entitled to defensive summary judgment for failure of a condition precedent.

### iv.   Impossibility and Frustration of Purpose

Next, Defendants assert the failure of the Condo Declaration rendered their performance impossible or frustrated the purpose of the 2007 Transaction.  (Doc. 239 at 48-49).  The rationale explained in the foregoing subsection applies equally to these theories.  Additionally, as discussed in more detail, *supra*, with regard to Defendants' counterclaim for fraud, Defendants were on notice of the *Bowles* Litigation.  Therefore, they could have foreseen the problems with the Condo

Declaration, foreclosing their impossibility defense.  *See Mayo v. Andress*, 373 So. 2d 620, 624 (Ala. 1979).

For the foregoing reasons, Defendants are not entitled to defensive summary judgment under the doctrines of impossibility and/or frustration of purpose.

v.   *Unclean Hands*

Finally, Defendants argue the invalid Condo Declaration precludes Plaintiffs' claims under the Repayment Agreement and the Pledge Agreement on the theory of unclean hands.  (Doc. 239 at 49-50).  A party asserting an unclean hands defense must show "specific acts of willful misconduct which is morally reprehensible as to known facts."  *Retail Devs. of Ala., LLC v. E. Gadsden Golf Club, Inc.*, 985 So. 2d 924, 932 (Ala. 2007) (citing *Sterling Oil of Okla., Inc. v. Pack,* 287 So. 2d 847, 864 (Ala. 1973)).  "Unclean hands is an equitable defense that is akin to fraud; its purpose is to discourage unlawful activity."  *Branch Banking & Tr. Co. v. S & S Dev., Inc.*, 620 F. App'x 698, 701 (11th Cir. 2015) (alteration incorporated); *see Pace v. Wainwright*, 10 So. 2d 755, 756 (Ala. 1942) (unclean hands barred relief to party who participated in fraud scheme).

The cases on which Defendants rely with regard to their unclean hands defense all involve illegal or fraudulent conduct.  *See J & M Bail Bonding Co. v. Hayes*, 748 So. 2d 198, 199 (Ala. 1999) (bail bonding company conspired with corrections officer to block calls to inmates from competitor bondsmen); *In re*

*Kingsley*, 518 F.3d 874, 878 (11th Cir. 2008) (fraudulent transfer by debtor in bankruptcy); *HealthSouth Corp. v. Jefferson Cty. Tax Assessor*, 978 So. 2d 737,745 (Ala. Civ. App. 2006) (HealthSouth precluded from recovering taxes paid on fictitious property created in scheme to overstate fixed assets). Here, the court has already found Defendants' fraud counterclaim based on the Condo Declaration fails as a matter of law. Neither do the undisputed facts surrounding the Condo Declaration show Plaintiffs' actions were "morally reprehensible." *See Retail Devs. of Ala.*, 985 So. 2d at 932.

For the foregoing reasons, Defendants are not entitled to defensive summary judgment as to Plaintiffs' claims under a theory of unclean hands. Moreover, as discussed in the foregoing sections, Defendants are not entitled to summary judgment on any theories they advance with regard to Plaintiffs' claims under the Repayment Agreement and the Pledge Agreement.

### 2.    Plaintiffs' Offensive Motion on Count III

Of their claims under the Repayment Agreement, Plaintiffs move for offensive summary judgment only on Count III (Breach of Contract). (Doc. 247). A party asserting breach of contract must show: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *McCutchen*, 988 So. 2d. 998, 1004 (Ala. 2008).

Plaintiffs contend Defendants have breached the Repayment Agreement by failing to repay the Pledged Collateral seized by Superior in 2010.  (Doc. 248 at 7-13).  Plaintiffs also contend Defendants breached the Repayment Agreement and the Pledge Agreement by failing to mark the Loan as paid in full.  (*Id.* at 13-16). Finally, Plaintiffs contend Defendants breached the Real Estate Purchase Agreement and Repayment Agreement by failing to pay the agreed price for Wolf Bay Landing.  (*Id.* at 16-18).

In response to Plaintiffs' motion, Defendants present several arguments already rejected above with respect to their defensive motion for summary judgment, as well as Plaintiffs' defensive motion for summary judgment regarding Defendants' counterclaim for fraud: (1) Wiggins does not have an individual claim and is not a third-party beneficiary; (2) the Repayment Agreement is not supported by consideration; (3) Plaintiffs' failure to disclose the failure of the Condo Declaration constituted fraud; and (4) the contract defenses based on the failure of the Condo Declaration.  (Doc. 277 at 7-9, 19-21).  The court need not address these arguments again, as the undisputed facts, even when viewed in the light most favorable to Defendants, show: (1) Wiggins has asserted viable claims as a third-party beneficiary; (2) the Repayment Agreement was supported by consideration; (3) the non-disclosure of the status of the Condo Declaration did not constitute fraud; and (4) the failure of the Condo Declaration does not support the contract

defenses asserted by Defendants.  These conclusions also establish Plaintiffs have satisfied the first two elements of their breach of contract claim: Plaintiffs' performance of  a binding contract with Defendants.  *See McCutchen Co.,* 988 So. 2d. at 1004.

This opinion has not yet addressed the following arguments Defendants' assert in response to Plaintiffs' offensive motion for summary judgment: (1) as to the claims concerning the Interest Reserve Account, Plaintiffs have failed to prove damages; (2) Defendants have not breached any promise to pay off the Loan or release the guarantors; (3) Plaintiffs have failed to show damages regarding any failure to release the Guaranties or satisfy the Loan; and (4) Plaintiffs cannot recover under the Real Estate Purchase Agreement.  (Doc. 277 at 9-18).  These arguments primarily are aimed at the third and fourth requirements for breach of contract: Defendants' breach and Plaintiffs' damages.  *McCutchen Co.,* 988 So. 2d. at 1004.  Defendants' remaining arguments are addressed in turn, although not as delineated.

a.    <u>Promise to Pay or Release and Damages</u>

Paragraph six of the Repayment Agreement provides Defendants would not sell Wolf Bay Landing in its entirety unless the Loan was paid in full and the Pledged Collateral was returned to Plaintiffs with interest.  (Doc. 246-5 at 2). Defendants argue they are not liable under this provision of the Repayment

Agreement for both procedural and substantive reasons. Procedurally, Defendants contend the operative complaint does not allege violations of this provision of the Repayment Agreement. (Doc. 277 at 11-12). On the merits, Defendants assert: (1) the June 2014 foreclosure on Wolf Bay Landing was not a "sale" for purposes of the Repayment Agreement; and (2) Plaintiffs have not shown any damages from the supposed breach. (*Id.* at 12-14). Each argument is addressed in turn.

Procedurally, the operative complaint includes allegations to support a claim for breach of contract under paragraph six of the Repayment Agreement due to the sale of Wolf Bay Landing absent payment in full of the Loan. (Doc. 94 at 3-6). Count III alleges Defendants breached their obligation to repay the Loan. (*Id.* at 37). While Count III quotes the release language from the Pledge Agreement, it also incorporates the one-and-a-half-page Repayment Agreement. (*Id.*; *see* Doc. 98-2). Accordingly, a fair reading of the complaint reveals Count III includes a claim under the "payment in full" provision of paragraph six of the Repayment Agreement.

On the merits, Defendants contend the June 2014 foreclosure on Wolf Bay Landing was not a "sale" for purposes of the Repayment Agreement and thus did not constitute a breach. (Doc. 277 at 12-14). Rather, Ellis contends the foreclosure on a metes and bounds basis was necessary to cure the defective Condo Declaration and was in accord with his rights as the lender. (Doc. 277 at 12; Doc.

279 at 14, 23).  Trinity Retreat (solely owned at the time by his wife—Ellis later became a member too) was the successful bidder, paying Ellis $5,750,000.  Ellis paid the proceeds to Cadence, which applied it to fully satisfy Ellis's personal loans with Superior.  (Doc. 277 at 12; Doc. 279 at 14).  On these facts, Defendants contend "Ellis foreclosed upon, but did not 'sell' Wolf Bay Landing."  (Doc. 277 at 13; Doc. 279 at 14).  Perhaps unsurprisingly, Defendants do not cite any law to support this theory.

Plaintiffs point to numerous documents referring to the foreclosure as a sale: (1) the mortgage foreclosure deed refers to a "foreclosure sale," and states Ellis offered Wolf Bay Landing for "sale and did sell" it and that it was "sold" to Trinity Retreat.   (Doc. 255-5); (2) the Second Settlement Agreement with Cadence provides Wolf Bay Landing shall be "sold to a third party" and $5.75 million must be paid to Cadence (Doc. 255-21 at 10); and (3) a previous R&R noting the property was sold to Trinity Retreat (Doc. 138 at 12).  (Doc. 298 at 14-17).  To be fair, Plaintiffs also do not cite much law on this point, nor do they need to.  The record shows Trinity Retreat paid $5,750,000 in exchange for title to Wolf Bay Landing.  To call this anything other than a sale is silly.  Accordingly, Defendants'

June 2014 foreclosure sale breached paragraph 6 of the Repayment Agreement in that the Loan was not paid in full contemporaneously with the sale.[46]

Finally, Defendants contend—even if they breached the payment in full promise—Plaintiffs have not shown the measure of damages flowing from this breach.  (Doc. 277 at 14).  "As a general rule, damages in a breach-of-contract action are that sum which would place the injured party in the same condition he would have occupied if the contract had not been breached."  *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422, 427 (Ala. 2006) (quotation marks omitted).  Accordingly, the damages here are measured by the value of Defendants' marking the Loan as paid in full when they sold Wolf Bay Landing.  This is also the relief Plaintiffs request.  (*See* Doc. 299 at 19-21).[47]  In the context of Plaintiffs' Counts I and II, it is clear they seek damages in the form of a release.  That this relief has

---

[46] Defendants assert the foregoing conclusion runs afoul of prior rulings in this case.  (Doc. 277 at 14).  Specifically, Defendants point to portions of the December 20, 2016 R&R concerning Plaintiffs' and Peacock's motions to dismiss Defendants' counterclaims and third-party claims for breach of guaranty.  (*Id.* (*citing* Doc. 158 at 17-20)).  The R&R, which analyzed the claims under the Rule 12(b) standard at the motion to dismiss stage, concluded Wiggins and Peacock had not shown Defendants "cannot recover under the Guaranties as a matter of law."  (Doc. 158 at 20, *R&R adopted by* Doc. 181).  Contrary to Defendants' assertion, the instant conclusion regarding Defendants' breach does not conflict with the undersigned's prior report, which addressed a different claim under a different legal standard.  *See also* the accompanying memorandum opinion and order on reconsideration of Peacock's and Defendants' motions.

[47] Defendants have placed a dollar value on Plaintiffs' supposed default on the Loan: the amount due under the Loan, plus interest.  Conveniently, this is the amount they seek—$ 16,319,271.23—via counterclaim Count II, alleging breach of contract for default on the Loan.  (Doc. 241 at 17-18).

already been granted, *supra*, does not render Defendants' breach of the Repayment Agreement any less of a breach.

b.      Damages Regarding Interest Reserve Account

Defendants argue Plaintiffs' motion is deficient with regard to their breach of contract claim concerning the Interest Reserve Account because the motion does not specify or offer evidence regarding the amount Superior seized from the Interest Reserve Account.  (Doc. 277 at 9).  However, Plaintiffs explain they seek partial summary judgment as to the Interest Reserve Account, with leave to prove damages at trial.  (*See* Doc. 299 at 23).  This is permissible under Rule 56.

Next, Defendants contend Plaintiffs did not contribute any funds to the Interest Reserve Account.   (Doc. 277 at 10).   The Loan Assumption and Modification Agreement required Wolf Pup to establish the Interest Reserve Account at Superior in the minimum amount of $560,000.  (Doc. 246-1 at 7). Once established, CCLLC was responsible for maintaining the minimum balance in the account.  (*Id.*).  However, Tim Hamner, a banker with Cadence who handled the account, testified the account never held the minimum balance.  (Doc. 250-11 at 42; *see* Doc. 246-13; Doc. 243-29 at 117-62).  Hamner further testified the initial deposit into the account in September 2007 was $269,875; by November the account held $461,620.95.  (Doc. 250-11 at 42; *see* Doc. 246-13).  Defendants have produced evidence suggesting Plaintiffs' sale of Unit A301 was the source of

the proceeds Plaintiffs initially deposited in the Interest Reserve Account.  (Doc.

243-5 at 148; 243-8 at 106, 133-34).[48]

In response, Plaintiffs contend Ellis bought Unit A301 and paid Wolf Pup,

not Superior.  (Doc. 299 at 24).  This portion of Plaintiffs' reply repeatedly cites to

a declaration by Wiggins which is not subject to a motion to strike.  (Doc. 266-8).

However, this document does not state how much Plaintiffs deposited into the

Interest Reserve Account.  (*Id*.).  The declaration cites to stipulations included in

the November 21, 2008 Fourth Amendment to Loan Documents, reflecting that the

$560,000 Interest Reserve Account was established.  (Doc. 255-35 at 3).  Ellis,

Superior, and CCLLC signed that stipulation.  (*Id.* at 7-14).

Plaintiffs have presented evidence that they funded at least part of the

required minimum balance in the Interest Reserve Account.   To the extent

Defendants contend the Interest Reserve Account was funded with proceeds from

the sale of Unit A301 to Ellis, this does not show that Plaintiffs paid no money into

the account.  Even if Defendants are correct as to the genesis of at least some of the

---

[48] Defendants also note that, although the October 2, 2007 Purchase Agreement for Unit A301 was between Wolf Pup and Ellis, Wiggins owned the unit when he conveyed it to Ellis on November 13, 2007.  (*See* Doc. 246-11; Doc. 277 at 10-11 (*citing* Doc. 243-22 at 49-52)). Rather, Wolf Pup conveyed the unit to Wiggins for ten dollars on October 26, 2007. (Doc. 255-7).  Accordingly, Defendants contend the funds initially deposited into the Interest Reserve Account did not belong to Wolf Pup.  (Doc. 277 at 11).  Although the thrust of this argument is not entirely clear, it appears to be resolved by the conclusion that Wiggins has claims under the Repayment Agreement as a third-party beneficiary.  Defendants also contend that, because Unit A301 was not actually a legally created condominium unit—due to the defective Condo Declaration—they cannot be held liable for repayment of the Interest Reserve Account.  (Doc. 277 at 11).  This argument fails for the same reasons already discussed with regard to Defendants' contract defenses premised on deficiencies in the Condo Declaration.

amount deposited into the Interest Reserve Account, it still represents sale proceeds rightfully belonging to Plaintiffs.  It is uncontested that Defendants did not repay Plaintiffs any funds seized from the Interest Reserve Account. Accordingly, Plaintiffs have established damages for purposes of their motion for partial summary judgment as to their breach of contract claim concerning the failure to repay the Interest Reserve Account.   The precise measure of those damages can be determined at trial.  *See* 10B WRIGHT, MILLER & KANE, FED. PRAC. & PROC. CIV. § 2737 (4th ed.) ("When Rule 56 was extensively rewritten in 2010, the material on partial summary adjudication was moved to other portions of the rule. Thus, amended Rule 56(a), which contains the general standard for obtaining summary judgment, now also includes express authority for judgment on less than the entire case, denominating such judgments in its title as a 'Partial Summary Judgment.'").

### c.  Recovery Under Real Estate Purchase Agreement

Defendants also challenge Plaintiffs' claims to the extent they are based on the Real Estate Purchase Agreement.  (Doc. 277 at 15-17).  While the legal impact of the Real Estate Purchase Agreement is unclear, it is not necessary to explore the question; the Second Amended Complaint does not even mention the Real Estate Purchases Agreement.  (Doc. 94).  Accordingly, Plaintiffs cannot recover for its breach.  The remainder of the briefing on this issue focuses on whether Plaintiffs

can show breach of contract via Defendants' failure to pay for Wolf Bay Landing. (*See* Doc. 277 at 16-17).  Given the foregoing conclusions regarding release of the Guaranties and the failure of Defendants' counterclaim for breach of the Loan, it is not necessary to address these arguments.

### 3.     Conclusion re Repayment Agreement: Plaintiffs' Count III

Based on the foregoing discussion, the undisputed facts show the Repayment Agreement was a binding, valid contract which Plaintiffs performed and Defendants breached, damaging Plaintiffs.[49]   Accordingly, Defendants are not entitled to judgment as a matter of law on Plaintiffs' Count III, asserting breach of contract; Defendants' defensive motion for summary judgment on this claim will be denied.  (Doc. 238).

For the same reasons, Plaintiffs are entitled to judgment as a matter of law with regard to portions of Count III, and their offensive motion for summary judgment is due to be granted in part and denied in part.  (Doc. 247).  Specifically, Plaintiffs are entitled to summary judgment on their claims regarding the failure of Defendants to repay the Wiggins C.D. and accrued interest seized by Superior on December 23, 2010.   The  undisputed  facts  show  Superior  seized  a  total  of

---

[49] The same is true with regard to the Pledge Agreement.

$1,742,126.70,[50] representing the value of the Wiggins C.D. and accrued interest; Defendants are liable to Plaintiffs in this amount under the Repayment Agreement. (Doc. 259-2 SEALED at 3).   Likewise, Plaintiffs are entitled to judgment as a matter of law under the Repayment Agreement with regard to Defendants' June 2014 sale of Wolf Bay Landing without paying the Loan in full.  The relief for that breach has already been granted in the form a release from the Guaranties.

With respect to the Interest Reserve Account, there is a genuine issue of material fact regarding the amount of damages.  While Plaintiffs have proved their claim for breach of contract with regard to the Interest Reserve Account, including that they were damaged, the exact amount of their damages is uncertain; Plaintiffs may prove their damages at trial.  Finally, Plaintiffs' motion will be denied as to any contract claim asserted under the Real Estate Purchase Agreement.

### D.   Consequences of Determination Regarding Plaintiffs' Count III

As explained below, the foregoing conclusion requires the dismissal two of Plaintiffs' claims: Count V (money paid) and Count X (unjust enrichment). Likewise, it offers an independent basis on which to dismiss whatever remains of Defendants' Count II (breach of contract regarding the Loan).

---

[50] The evidence shows Superior seized $1,742,126.70 from the Wiggins C.D.  (Doc. 259-2 SEALED at 3).  Immediately after correctly noting the amount seized from the Wiggins C.D. (Doc. 248 at 10, n.8), Plaintiffs' brief inexplicably requests judgment in the amount of $1,734,244.76 (*Id.* at 11).  The court assumes this is a typo and will defer to the undisputed evidence regarding the amount seized form the Wiggins C.D.

### 1.   Plaintiffs' Count X: Unjust Enrichment

Plaintiffs' unjust enrichment claim concerns Defendants' failure to repay the Pledged Collateral seized by Superior.  (*See* Doc. 282 at 56-57).   In response to Defendants' defensive motion for summary judgment, Plaintiffs' explain they pled unjust enrichment as an alternative to their claims under the Repayment Agreement.  (*Id.*).  Plaintiffs assert this was particularly appropriate here, where Defendants challenged the validity of the contracts between the parties.  (*Id.*). Having determined Plaintiffs are entitled to relief under the Repayment Agreement, the alternative remedy of unjust enrichment is inappropriate. *Vardaman v. Florence City Bd. of Educ.*, 544 So. 2d 962, 965 (Ala. 1989) ("the existence of an express contract generally excludes an implied agreement relative to the same subject matter"); *Univalor Trust, SA v. Colum. Petroleum, LLC,* 315 F.R.D. 374, 382 (S.D. Ala. 2016) ("existence of an express contract extinguishes an unjust enrichment claim altogether because unjust enrichment is an equitable remedy which issues only when there is no adequate remedy at law").

For the foregoing reasons, there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law on Plaintiffs' claim for unjust enrichment.  Defendants' defensive motion for summary judgment will be granted as to this claim.  (Doc. 238).

### 2.     Plaintiffs' Count V: Money Paid

This claim is also based on the Defendants' failure to repay the Pledged Collateral seized by Superior.  For the same reasons discussed in the preceding section regarding unjust enrichment, Plaintiffs' recovery under Count III for breach of contract bars this duplicative claim.  "A claim of money paid by mistake essentially restates a claim for unjust enrichment."   *Simple Helix, LLC v. Relus Techs., LLC*, No. 20-453-HNJ, 2020 WL 5984024, at *17 (N.D. Ala. Oct. 8, 2020).

For the foregoing reasons, there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law on Plaintiffs' claim for money paid.  Defendants' defensive motion for summary judgment will be granted as to this claim.  (Doc. 238).

### 3.     Defendants' Count II: Breach of Contract re the Loan

To the extent anything remains of Defendants' Count II for breach of the Loan, it is doomed by the conclusion, *supra*, that the Repayment Agreement is enforceable.  (*See* Doc. 253 at 13-16).  Under the Repayment Agreement, Wolf Bay Landing could not be sold in its entirety unless: (1) the Pledged Collateral was returned to Wiggins; and (2) the Loan was paid in full.  (Doc. 246-5 at 2).  By the time Defendants sold Wolf Bay Landing to Trinity Retreat via foreclosure in 2014, Ellis held the note and was the only person or entity capable of fulfilling this promise.

In response to Plaintiffs' arguments regarding the "payment in full" provision, Defendants assert several arguments already rejected above: (1) Wiggins was not a party to the Repayment Agreement and did not have standing as a third-party beneficiary; (2) failure of consideration due to the deficient Condo Declaration; and (3) the 2014 foreclosure did not represent a sale of Wolf Bay Landing. (Doc. 279 at 13-15). As previously discussed, these arguments are devoid of colorable merit.[51]

The remaining argument relevant to the import of the Repayment Agreement is that "Ellis denies individual liability on any of the side agreements to the Loan Assumption." (Doc. 279 at 13-14). In support of this argument, Defendants cite portions of Ellis's deposition in which he testified that he signed certain side agreements on behalf of CCLLC only, not in his individual capacity. (*See* Doc. 255-1 at 21-22). Specifically, Ellis testified whether he signed in his individual capacity was a "legal interpretation" which he would "leave to the courts." (*Id.* at 22). The parties to the Repayment Agreement were Ellis, CCLLC, and Wolf Pup.

---

[51] Defendants' arguments in this regard only explicitly refer to the Pledge Agreement. However, it is clear that Defendants' arguments are also aimed at the Repayment Agreement, because they repeat arguments regarding the sale of Wolf Bay Landing. (*See* Doc. 279 at 13-14). The obligation to pay off or refinance the Loan under the Pledge Agreement was triggered by the passage of time, not the sale of Wolf Bay Landing. (Doc. 246-2 at 6). The Repayment Agreement was the only contract creating a "payment in full" obligation in the event Wolf Bay Landing was sold. (Doc. 246-5 at 2). Additionally, Defendants' opposition incorporates portions of their brief in support of their defensive motion for summary judgment asserting these arguments as to both the Pledge and Repayment Agreements. (Doc. 279 at 14) (*citing* Doc. 239 at 34-36). It appears Defendants' citation refers to the page numbers assigned by their word processing software. (*Id.*). Using the CM/ECF-assigned page numbers, the arguments the Defendants assert via incorporation appear at pages 37-39. (Doc. 239 at 37-39).

(Doc. 246-5 at 2).   At the end of the Repayment Agreement, there were two signature blocks: (1) one for CCLLC, which Ellis signed as its managing member; and (2) one for "Frank P. Ellis, IV" which Ellis also signed.[52]  (*Id.* at 3).  The only plausible "legal interpretation" of the foregoing facts is that Ellis is personally bound by the Repayment Agreement.[53]

In light of the failure of all of Defendants' arguments in response to Plaintiffs' defensive motion for summary judgment, there are no genuine issues of material fact with regard to Defendants' Counterclaim II (breach of the Loan), and Plaintiffs are entitled to judgment as a matter of law as to this counterclaim; their motion will be granted in this regard.   (Doc. 238).   For the same reasons, Defendants' offensive motion as to Counterclaim II will necessarily be denied. (Doc. 240).   Because the debt on the Loan was extinguished under the terms of the Repayment Agreement, Defendants' Count III (breach of guaranty) fails for alternative reasons that are independently sufficient to those explained in section V.B., *supra*.  This same conclusion dictates that Plaintiffs are entitled to judgment as a matter of law as to their Count I on this independent basis.

---

[52] The Repayment Agreement did not have a pre-printed signature block for Wolf Pup; Wiggins wrote that portion by hand and signed as Wolf Pup's representative.  (Doc. 246-5 at 3).

[53] To the extent Ellis contends he is not personally bound by the Pledge Agreement, the same conclusion applies.  The parties to the Pledge Agreement were Wolf Pup, Raley, and Ellis.  (Doc. 246-2 at 2).  Ellis signed the Pledge Agreement without reference to CCLLC.  (*Id.* at 6).

### E.   <u>Plaintiffs' Count XIII: Promissory Estoppel/Fraud</u>

Defendants' defensive motion for summary judgment presents three arguments regarding Plaintiffs' claim for Promissory Estoppel/Fraud: (1) inadequate pleading under Rule 9(b); (2) any such claim is time-barred; and (3) the claim is an attempt to attach fraud liability to a breach of contract.  (Doc. 239 at 58-61).  Defendants rightly note the allegations asserted in Count XIII of the Second Amended Complaint are all aimed at promises Defendants made with respect to the 2007 Transaction and their failure to fulfill those promises within a year.  (*Id.*; *see* Doc. 94 at 56-58).  Count XIII further alleges Defendants knew the "representations and promises were false when made and that they did not intend to perform . . . ."  (Doc. 94 at 58).  Count XIII seeks a declaratory judgment that Defendants are precluded—on promissory estoppel grounds—from  pursuing Plaintiffs under the Loan and from failing to repay the Pledged Collateral.  (*Id.*). This claim for relief is moot in light of the relief already granted under the parties' contracts.

What remains of Count XIII is Plaintiffs' claim for fraudulent misrepresentation.  Among Defendants' arguments with regard to Count XIII is its untimeliness under Alabama's applicable two-year statute of limitations.  (Doc. 239 at 59-60).  This argument rests on the fact that all of the misrepresentations alleged in Count XIII occurred during the negotiation of the 2007 Transaction.

(*Id.*).   In response, Plaintiffs contend their fraud claim is also supported by the allegations concerning Defendants' conduct from 2010-2014—during the alleged conspiracies with Superior to seize the Pledged Collateral and with Cadence to orchestrate the foreclosure sale.  (Doc. 282 at 41-42, 46-54).  Plaintiffs' response leads to the inescapable conclusion that their claim for fraudulent misrepresentation is time-barred.

First, the conduct alleged in Count XIII all occurred in 2007.  In response to Defendants' arguments, Plaintiffs do not contend the discovery rule saves these otherwise time-barred misrepresentations.   Plaintiffs also do not contend their fraud claim, asserted for the first time in February 2016, relates back to any previous iteration of the complaint.  (*See* Doc. 282 at 41-42).  Accordingly, Count XIII is time-barred to the extent it is based on Defendants' 2007 conduct.

Turning to Plaintiffs' arguments in response—that the fraud claim is also based on Defendants' conduct from 2010-2014—any such claim would also be time-barred, even considering these unpled allegations.[54]   After the 2007 misrepresentations, the remaining conduct upon which Plaintiffs rely concerns

---

[54] Although not argued by any party, it appears Count XIII is better understood as asserting promissory fraud.  "A claim of promissory fraud is 'one based upon a promise to act or not to act in the future.'" *Ex parte Michelin N. Am., Inc.,* 795 So. 2d 674, 678 (Ala. 2001) (quoting *Padgett v. Hughes,* 535 So. 2d 140, 142 (Ala.1988)).  In addition to the four elements required to show fraudulent misrepresentation, a plaintiff alleging promissory fraud must prove: "at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and [] that the defendant had an intent to deceive.'"  *Id.* at 678-79 (quoting *Padgett,* 535 So. 2d at 142); *see Southland Bank v. A & A Drywall Supply Co.*, 21 So. 3d 1196, 1209-12 (Ala. 2008).

Defendants' contractual duties.  As far as the undersigned can tell, Plaintiffs' fraud claim—as articulated in their response—rests on Defendants' failure to tell Plaintiffs from 2010 through 2014 that they were going to breach the contracts. This is insufficient to state a claim for fraudulent misrepresentation.  *See Southland Bank*, 21 So. 3d at 1209-12 (in promissory fraud case, plaintiff cannot meet burden of showing intent to deceive "merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud").  The only misrepresentations actually alleged in Count XIII were made in 2007.  Thus, Plaintiffs' claim for fraudulent misrepresentation is time-barred; Defendants are entitled to judgement as a matter of law as to this claim.

### F.     **Plaintiffs' Count VIII: Conversion**

To succeed on a conversion claim, a plaintiff must show "proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property."  *SouthTrust Bank v. Donely*, 925 So. 2d 934, 939 (Ala. 2005) (emphasis omitted).  A plaintiff asserting conversion must show a defendant "exerted control" over the converted property.  *Watson v. Thomas*, 646 So. 2d 84, 86 (Ala. Civ. App. 1994); *see McGee v. McGee*, 91 So. 3d 659, 667 (Ala. 2012) ("The elements of conversion include a wrongful taking of specific property and an assumption of

ownership or dominion over the separate and identifiable property of another.")
(quotation marks omitted).

Here, the primary focus of Plaintiffs' arguments regarding their conversion
claim is Superior's seizure of the Pledged Collateral and its efforts, acting in
concert with Defendants.  (Doc. 282 at 54-56).  Plaintiffs' briefing largely relies on
the same allegations underlying their conspiracy claim.  (*Id.*).  However, the
undisputed facts show Superior maintained exclusive control over the Pledged
Collateral accounts from deposit to seizure.  Accordingly, to the extent Plaintiffs
rely on the Pledged Collateral to show conversion, their claim fails.

Plaintiffs also contend the facts show an effort to "take, misuse, and interfere
with Plaintiffs' . . . contractual  rights (the automatic proxy to vote and control
CCLLC and right to sell WBL units)."  (Doc. 282 at 54).[55]  In support of this
argument, Plaintiffs cite a number of exhibits and portions of Ellis's deposition.
(*Id.* at 54-55).  Most of this evidence consists of Superior's internal emails and
documents from late 2009 through 2010, discussing the problems with the Loan
and possible solutions.  (*See* Doc. 259 SEALED).  Ellis was a party to other
emails, but none of these show he interfered with or exerted control over Plaintiffs'
membership and voting rights under the Pledge Agreement.  (*E.g.* Docs. 266-1,
266-2, 266-3).  Neither do the cited portions of Ellis's deposition.  (Doc. 250-7 at

---

[55] The court has already concluded the Pledge Agreement did not create a security interest in the
Wolf Bay Landing property in favor of the Plaintiffs.  (Doc. 138 at 21-24).

48-49, 57-58).  Finally, Plaintiffs cite to portions of Wiggins's declaration and supplemental declaration.  The most relevant portion of the supplemental declaration includes Wiggins's averment that "Cadence interfered with such contractual rights and remedies."  (Doc. 267-1 at 4).  While the original Wiggins declaration includes a number of averments regarding Superior's actions, they all relate to the seizure of the Pledged Collateral.  (Doc. 266-8).  As already noted, Defendants did not exert control over the Pledged Collateral Superior seized. Likewise, none of the cited evidence shows Defendants took, assumed, used, detained, or interfered with Plaintiffs' membership or voting rights under the Pledge Agreement.

For the foregoing reasons, Plaintiffs cannot sustain Count VIII (conversion), and Defendants are entitled to judgment as a matter of law as to this claim. Accordingly, Defendants' motion for summary judgment will be granted as to this claim.

### G.   Plaintiffs' Count IX: Conspiracy

The foregoing conclusions mean, as Defendants contend, there is no underlying wrong to sustain Plaintiffs' conspiracy claim.  (Doc. 239 at 53-54). While Plaintiffs have proven their breach of contract claim, a breach of contract is insufficient to sustain a conspiracy claim.  *See Barber v. Stephenson*, 69 So. 2d 251, 255 (1953) ("an action for conspiring with another to induce the latter to

break his contract cannot be maintained, the remedy being to sue on it"). Accordingly, Defendants' defensive motion for summary judgment will be granted as to Plaintiff's Count IX.

### H.   Defendants' Counterclaim Count V: Breach of Warranty Deed

Defendants' Counterclaim V is the subject of Defendants' offensive motion for summary judgment (Doc. 240) and Plaintiffs' defensive motion for summary judgment (Doc. 249).   This claim is based on Wolf Pup's execution of the Assumption Warranty Deed purporting to convey sixty Wolf Bay Landing units to CCLLC on October 26, 2007.   (Doc. 241 at 18; *see* Doc. 246-6).   Defendants contend, however, the deed breached the warranty of good and marketable title because the Condo Declaration was invalid.   (Doc. 241 at 19).[56]   Defendants seek $36,218,284.85 on this claim, consisting of: (1) $19,675,000.00 in damages, measured by the difference of Wolf Bay Landing's value as a condominium as opposed to an apartment building; (2) $13,131,055.00 in accrued interest; and (3) $3,412,229.85 in interest payments.   (*Id.*; Doc. 240 at 3).

The Assumption Warranty Deed Wolf Pup executed provides Wolf Pup "does hereby grant, bargain, sell, and convey" to CCLLC "in fee simple," the sixty units at Wolf Bay Landing, described by their unit numbers and by incorporation

---

[56] Defendants also assert the transfer was premature because Superior had not yet executed the Loan Assumption Agreement.  (Doc. 241 at 19).

of the Condo Declaration.  (Doc. 246-2 at 2).  The Assumption Warranty Deed also includes the following express covenants of title:

> AND GRANTOR [Wolf Pup] DOES FOR ITSELF, and for its successors and assigns covenant with the said grantee [CCLLC], and with grantee's successors and assigns, that grantor is lawfully seized in fee simple of the said premises; that they are free from all encumbrances, except as otherwise noted above; that it has a good right to sell and convey the same as aforesaid; and that it will and its successors and assigns shall warrant and defend the same unto the said grantee, and unto grantee's successors and assigns, forever, against the lawful claims of all persons.

(*Id.* at 3).  The Assumption Warranty Deed does not include any other express covenants.

Plaintiffs contend the inclusion of the words "grant, bargain, sell, and convey" renders the Assumption Warranty Deed a statutory warranty deed under § 35-4-271 of the *Alabama Code*.  (Doc. 283 at 37).  Where a deed includes no express covenants, Alabama law imposes the following "more limited," implied covenants on statutory warranty deeds: (1) a covenant of seizin; (2) a covenant against encumbrances; and (3) a covenant of quiet enjoyment.  ALA. CODE § 35-4-271; *see St. Paul Title Ins. Corp. v. Owen*, 452 So. 2d 482, 484-85 (Ala. 1984).  Because the Assumption Warranty Deed here does include express covenants, it is not a statutory warranty deed.  *Cousins v. McNeel*, 96 So. 3d 846, 858 (Ala. Civ. App. 2012)  ("a statutory warranty deed does not contain express warranties").  In addition to the covenants implied under § 35-4-271—covenants of seizin, quiet

enjoyment, and against encumbrances—the Assumption Warranty Deed included express covenants that Wolf Pup: (1) had the right to convey the property described; and (2) would defend the title against the claims of other persons. (Doc. 199-2 at 2); *see Cousins*, 96 So. at 857-58 (interpreting similar language in a deed as providing these additional covenants). The inclusion of these five covenants renders the Assumption Warranty Deed a "general warranty deed" under Alabama law. *See Colonial Cap. Corp. v. Smith*, 367 So. 2d 490, 491 (Ala. Civ. App. 1979); *In re Health Sci. Prod., Inc.*, 183 B.R. 903, 931 (Bankr. N.D. Ala. 1995).

Here, Defendants contend Plaintiffs breached their covenants of seizin and the right to convey by way of the defective Condo Declaration. (*E.g.* Doc. 278 at 40). These two covenants are "basically the same and mean that the grantor owns the estate which he proposes to convey." *Smith*, 367 So. 2d at 491. "These covenants are broken at the time of conveyance if the grantor does not have good title." *Smith*, 367 So. 2d at 491. It is undisputed that Wolf Pup owned Wolf Bay Landing in fee simple. It is further undisputed that Wolf Pup conveyed all of its interest in Wolf Bay Landing during the 2007 Transaction. Accordingly, as a matter of Alabama law, Wolf Pup did not breach the covenants of seizin or the right to convey. *Smith*, 367 So. 2d at 491 (covenants of seizin and right to convey were not implicated where grantor owned the property in fee simple and conveyed all of his interests to the grantee). For these reasons, as to Defendants'

Counterclaim V: (1) Defendants' offensive motion for summary judgment will be denied (Doc. 240); and (2) Plaintiffs' defensive motion for summary judgment will be granted (Doc. 249).

## VI.  CONCLUSION

Defendants' offensive motion for summary judgment regarding their counterclaims is **DENIED** in its entirety. (Doc. 240) (Count V breach of warranty deed).  Plaintiffs' defensive motions for summary judgment regarding Defendants' counterclaims are **GRANTED** in their entirety.  (Docs. 249, 252).  As a result, Defendants have no surviving counterclaims.

The remaining motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**.  (Docs. 238, 247, 252).  Plaintiffs are entitled to judgment as a matter of law with regard to their Count II (release of the Guaranties) and portions of Count III (breach of contract).  Plaintiffs may prove their attorneys' fees at trial.  As to Count III, Plaintiffs have shown: (1) Defendants breached the Repayment Agreement with regard to the Wiggins C.D., and Plaintiffs are entitled to damages in the amount of $1,742,126.70; (2) Defendants breached the Repayment Agreement with regard to the Interest Reserve Account, with damages to be proven at trial.  Defendants are entitled to judgment as a matter of law on all of Plaintiffs' other claims.

The parties are **ORDERED** to mediate this matter with the Honorable John E. Ott by no later than March 19, 2021.  The parties are instructed to provide mutually agreeable mediation dates by February 17, 2021, via an email to bridget_tyree@alnd.uscourts.gov.

**DONE** this 12th day of February, 2021.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE